Arthur S. Beeman (State Bar No. 237996)
asbeeman@jonesday.com
Pamela K. Fulmer (State Bar No. 154736)
pkfulmer@jonesday.com
Brett A. Lovejoy (State Bar No. 212942)
blovejoy@jonesday.com
Noel Rodriguez (State Bar No. 228784)
nrodriguez@jonesday.com
Matthew J. Silveira (State Bar No. 264250)
msilveira@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Brent D. Sokol (State Bar No. 167537)
bdsokol@jonesday.com
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Attorneys for Plaintiffs NEUROGRAFIX; IMAGE-BASED SURGICENTER CORPORATION; AARON G. FILLER, M.D., Ph.D. A PROFESSIONAL CORPORATION; CENTER FOR ADVANCED SPINAL NEUROSURGERY MEDICAL GROUP INC.; and NEUROGRAPHY INSTITUTE MEDICAL ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| NEUROGRAFIX, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SIEMENS MEDICAL SOLUTIONS USA, INC., et al.,<br><br>Defendants. | Case No. CV 10-1990 MRP(RZx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDERS DISMISSING PLAINTIFFS IBSC AND NIMA**<br><br>Hearing date: August 30, 2010<br>Time: 11:00 a.m.<br>Location: Courtroom 12<br>Judge: Hon. Pfaelzer |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................1
II. PROCEDURAL HISTORY .................................................................................1
III. ARGUMENT .......................................................................................................4
    A. Standard for Reconsideration................................................................5
    B. IBSC's and NIMA's Non-Overlapping Fields of Use Are Grounded in the '360 Patent's Teachings............................................5
IV. CONCLUSION ..................................................................................................11

# TABLE OF AUTHORITIES

Page

**CASES**

*Amarel v. Cornell*,
    102 F.3d 1494 (9th Cir. 1996)...................................................................................5

*Amgen, Inc. v. Chugai Pharm. Co.*,
    808 F. Supp. 894 (D. Mass. 1992)..........................................................................2, 3

*International Gamco Inc. v. Multimedia Games, Inc.*,
    504 F.3d 1273 (Fed. Cir. 2007)................................................................................3

*Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*,
    331 F.3d 1041 (9th Cir. 2003).................................................................................5

*Special Investments Inc. v. Aero Air Inc.*,
    360 F.3d 989 (9th Cir. 2004)...................................................................................5

**RULES**

Central District of California Local Rule 7-18........................................................................5

Central District of California Local Rule 7-18(c) ...................................................................5

## I. INTRODUCTION

The Plaintiffs[1] submit this motion for reconsideration of the Court's July 6, 2010 and July 13, 2010 orders (the "Orders"). Specifically, the Plaintiffs ask the court to reconsider its dismissal of NIMA and IBSC with prejudice, and to enter an order establishing those entities' constitutional standing to sue for patent infringement. Although this Court has yet to hear any argument on claim construction, the Orders rely on a fundamental misconception of United States Patent No. 5,560,360 (the "'360 Patent")—that the patent claims "a 'method of utilizing magnetic resonance' to create an image and a 'magnetic resonance apparatus' for creating an image," but does not teach any differentiation between the types of images created.[2]  Orders at 11:15-17.  In fact, the '360 Patent teaches the creation of distinct image types based on how the image will be used.  When this is taken into consideration, under the Court's legal reasoning and the facts in evidence, NIMA's grant of exclusive rights in the field of collection, preparation, and interpretation of diagnostic imaging under the '360 Patent does not overlap with IBSC's grant of exclusive rights in the field of utilizing images prepared under the '360 Patent for purposes of the guidance of interventional or surgical procedures.

## II. PROCEDURAL HISTORY

The Plaintiffs filed this action on March 18, 2010, and attached a copy of the '360 Patent to the complaint.  As a courtesy, the Plaintiffs agreed to provide

---

[1] The plaintiffs named in the initial complaint are NeuroGrafix; Image-Based Surgicenter Corporation ("IBSC"); Aaron G. Filler, M.D., Ph.D., a Professional Corporation (d/b/a Institute for Nerve Medicine Medical Associates Inc.) ("INM"); Center for Advanced Spinal Neurosurgery Medical Group Inc. ("CASN"); and Neurography Institute Medical Associates, Inc. ("NIMA") (collectively, the "Plaintiffs").  IBSC, INM, CASN, and NIMA are referred to herein as the "Field-of-Use Plaintiffs."

[2] This misconception was aided by defendant Siemens Medical Solutions USA, Inc.'s ("Siemens") presentation of its argument.  Siemens offered new arguments in its reply brief and, at the motion hearing, submitted a 52-page PowerPoint presentation, without advance notice to the Plaintiffs, containing arguments that it had never briefed.

1  Siemens with a copy of the '360 Patent's licensing history, and granted Siemens
2  multiple extensions to answer the complaint.
3      On May 7, 2010, Siemens filed a motion to dismiss the complaint for lack of
4  standing and failure to state a claim. Among its many grounds for dismissal,[3]
5  Siemens argued, in three-and-a-half pages, that the Field-of-Use Plaintiffs lacked
6  constitutional standing because their rights to the '360 Patent overlapped. In the
7  space available for their opposition to the "overlapping fields" argument, the
8  Plaintiffs argued that the fields of use were separable based on the use of images
9  prepared under the '360 Patent.
10     In its reply, Siemens expanded its argument regarding the Field-of-Use
11 Plaintiffs' standing to five pages, and, for the first time, asserted that the Field-of-
12 Use Plaintiffs' fields were improper because they were based solely on contract
13 rights. Siemens also provided new authority for this argument, *Amgen, Inc. v.*
14 *Chugai Pharm. Co.*, 808 F. Supp. 894 (D. Mass. 1992). Finally, Siemens offered a
15 rudimentary construction of the '360 Patent, contending that the '360 Patent claims
16 methods and apparatus for the creation of generic images, which can be used for
17 any purpose after their creation.
18     At the Court's direction, Plaintiffs filed a three-page sur-reply addressing the
19 "overlapping fields" argument, focusing on Siemens' new argument that the fields
20 of use were separated solely by contract. The Plaintiffs cautioned that Siemens'
21 argument fundamentally implicated claim construction. Nonetheless, the Plaintiffs
22 demonstrated that the fields of use were defined not only by contract, as Siemens
23 contended in its reply brief, but by various state and federal regulations.
24     At the June 23, 2010 hearing on the motion to dismiss, Siemens relied on a
25 52-page PowerPoint presentation. Siemens declined to provide the Plaintiffs with
26 any advance notice of the existence, let alone the content, of that presentation. The

---

[3] Siemens primarily argued that NeuroGrafix lacked both constitutional and prudential standing. It also argued that the Plaintiffs failed to adequately plead their indirect infringement claims.

1   presentation included arguments that Siemens had not previously briefed,
2   including, at page 31, an argument that *International Gamco Inc. v. Multimedia*
3   *Games, Inc.*, 504 F.3d 1273 (Fed. Cir. 2007), foreclosed the use of government
4   regulation to define fields of use.  Based on that case, Siemens argued, for the first
5   time, that fields defined by any "downstream ability" are insufficient to provide a
6   licensee with exclusive patent rights.  Reporter's Transcript of Proceedings on June
7   23, 2010 ("Tr.") 23:1-23.  Siemens emphasized that the Court needed to "look at
8   what's actually claimed in this patent."  Tr. 23:24-25.  It contended that the
9   "patented invention" must be "the subject of the sublicenses," and that the '360
10  Patent merely claims "the right to perform the scan using the machine, not then go
11  take that scan and perform surgery."  Tr. 27:17-18, 28:21-23.  As in its reply brief,
12  Siemens relied heavily on *Amgen*.  *See* Tr. 27:19-29:21, 30:10-15.
13       In rebuttal, Plaintiffs took issue with Siemens' reliance on *Amgen*,
14  emphasizing that the court in that case considered the licensee's right to practice the
15  patent only after the parties had engaged in claim construction.  Tr. 43:13-25.  The
16  Court recognized the significance of that case's procedural posture, stating, "I doubt
17  you'd have a patent case in which the claims had not been construed."  Tr. 44:1-2.
18  Plaintiffs further explained that the distinction between diagnostic and surgical
19  imaging was far more complicated than Siemens presented, as the claims were not
20  limited to the simple creation of a generic image.  Tr. 44:4-45:23.
21       On June 30, 2010 and July 13, 2010, the Court issued the Orders.  The Court
22  rejected Siemens' argument that NeuroGrafix lacked constitutional standing to sue.
23  However, the Court concluded that NeuroGrafix lacked prudential standing to sue
24  on its own, and that the Field-of-Use Plaintiffs were nonexclusive licensees of the
25  '360 Patent, without constitutional standing to sue.
26       The Court reasoned that both IBSC and NIMA had rights "to use the
27  patented apparatus and methods to make images" and "to collect and prepare the
28  images," respectively.  Orders 13:15-16, 13:23.  The Court concluded, however,

that IBSC's and NIMA's rights to the patent overlapped, and that the Plaintiffs' distinction between the creation of images in the "diagnostic field" and "non-diagnostic field" was "absurd because it relies on the ability of the technical services provider to control the use of the image once it is created."  Orders 13:23-25, 13:28-14:3.  As for INM and CASN, the Court held that those entities "only supervise the creation of the images and interpret the resulting image" and therefore those entities were "granted contractual rights, not patent rights under the '360 patent, and cannot have constitutional standing to sue for patent infringement."  Orders 14:22-15:2.

Therefore, the Court granted the motion to dismiss the Field-of-Use Plaintiffs with prejudice, dismissed NeuroGrafix without prejudice, and granted NeuroGrafix leave to file an amended complaint "no later than thirty (30) days after" the dates of the Orders.  Orders 16:8-9.

**III.   ARGUMENT**

In its Orders, the Court recognized that both IBSC and NIMA practice the '360 Patent, but concluded that those entities' rights to the patent overlap because their distinct fields of use—diagnosis and surgery—are "beyond the scope of the patent."  Orders 14:8.  This holding disregards the teachings of the '360 Patent, which was presented to the Court prior to the hearing on Siemens' motion to dismiss.  The '360 Patent teaches that the images created for diagnostic purposes will be fundamentally different from the images created for the guidance of interventional or surgical procedures.[4]

---

[4] Although the Plaintiffs respectfully disagree with the Court's conclusion that INM and CASN do not practice the claims of the '360 Patent and thus were not granted any rights in the patent, the Plaintiffs are precluded from challenging the Court's legal reasoning under Local Rule 7-18.  Therefore, abiding by the Court's legal rulings in this case, the Plaintiffs presently limit their challenge of the Orders to the Court's conclusion that IBSC's and NIMA's rights to practice the patent overlap.  Plaintiffs reserve the right to challenge the Court's decision to dismiss INM and CASN on appeal or at a later stage of this litigation.

**A.     Standard for Reconsideration.**

Interlocutory orders and rulings made by a district judge, such as the Orders here, "are subject to modification by the district judge at any time prior to final judgment." *Amarel v. Cornell*, 102 F.3d 1494, 1515 (9th Cir. 1996) (citation and internal quotation marks omitted); *accord Special Investments Inc. v. Aero Air Inc.*, 360 F.3d 989, 993 (9th Cir. 2004) (order dismissing one party is not a final, appealable order absent Rule 54(b) certification).  Motions for reconsideration in this District are governed by Local Rule 7-18:

> A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision."

C.D. Cal. L.R. 7-18.  Whether to grant a motion for reconsideration is a matter within the court's discretion. *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).

**B.     IBSC's and NIMA's Non-Overlapping Fields of Use Are Grounded in the '360 Patent's Teachings.**

The Plaintiffs submit this motion under Local Rule 7-18(c).  At oral argument, Siemens urged the Court to "look at what's actually claimed in this patent," because the "patented invention" must be "the subject of the sublicense," and the '360 Patent merely claims "the right to perform the scan using the machine, not then go take that scan and perform surgery."  Tr. 23:24-25, 27:17-18.  The Plaintiffs responded that Siemens' argument prematurely addressed claim construction, but explained that the '360 Patent, which was submitted with the complaint, supported the separation between IBSC's and NIMA's fields of use— diagnosis and surgery.  Nonetheless, the Court concluded that the Plaintiffs'

distinction between those fields of use was not based on the patent. The Plaintiffs respectfully submit that the Court failed to consider the '360 Patent in its entirety before reaching its decision.

Images created for diagnostic purposes (hereinafter, "diagnostic images") are not only used in fundamentally different ways than images created for the guidance of interventional or surgical procedures (hereinafter, "surgical images"), but they are also generated in different ways.[5] Diagnostic images are used to diagnose neural anomalies, make diagnoses, and assess the need for surgery, among other things. '360 Patent 30:7-14, 31:59-32:53. No frame of reference, relative to the subject of the image, is needed in diagnostic images. In other words, diagnostic images can be reviewed by a practitioner after the subject has disengaged from the scanner. The practitioner does not have to "map" the diagnostic image back onto the body of the subject in order to perform the diagnosis. A practitioner can analyze the diagnostic image regardless of what the frame of reference is between the subject and the diagnostic image, and regardless of whether this frame of reference is even known.

In contrast to diagnostic images, the '360 Patent discloses that surgical images are used to influence any of a variety of surgical operations as well as to avoid neural paths during surgery. '360 Patent 33:2-5. For such purposes, it is essential that the frame of reference between the surgical image and the subject remain known throughout the surgical procedure. In other words, a diagnostic image is in an coordinate system that is not fixed relative to the coordinate system of the subject, whereas a surgical image is in a coordinate system that, at all times during the surgical procedure, is fixed relative to the coordinate system of the

---

[5] As explained in further detail *infra*, unless otherwise noted, Plaintiffs use the term "image" herein to mean the same thing that the term means in the Field-of-Use provisions of the IBSC and NIMA sublicenses, *i.e.*, interchangeably (i) the data sets produced by any of the claims of the '360 Patent and (ii) any viewable graphic representations derived from such data sets in accordance with the teachings of the '360 Patent.

subject.

This fundamental difference in both the use and inherent requirements of diagnostic and surgical images is reflected in both the NIMA and IBSC sublicense Field-of-Use provisions and in the '360 Patent. Addressing the Field-of-Use provisions first, the NIMA sublicense Field-of-Use provision specifies, in relevant part, the "collection, preparation and interpretation of *diagnostic* imaging." Orders 13:9-10 (quoting NIMA License Agreement § 1.9) (emphasis added). The IBSC sublicense Field-of-Use provision specifies, in relevant part, "utilizing images prepared under the Patent Rights *for the guidance of interventional or surgical purposes*." Orders 12:15-16 (quoting IBSC License Agreement § 1.9) (emphasis added).

Turning to the '360 Patent, it is made abundantly clear in the '360 Patent specification that surgical images are in a coordinate system that is fixed relative to the subject whereas diagnostic images are not. In other words, while the surgical images must either be in the reference frame of the subject, or directly mappable onto the reference frame of the subject, the diagnostic images do not.

Addressing the disclosure of surgical images in the '360 Patent first, Section "d" of the "Detailed Description of the Preferred Embodiment" is directed to disclosing surgical systems and methods in accordance with the claimed invention. '360 Patent 33:1-35:35. Section "d" repeatedly notes the need for a coordinate system in a surgical image that provides the needed registration between the surgical image and the subject so that interventional or surgical procedures may be performed. For instance, section "d" discloses that, "in the preferred arrangement, processor **178** is programmed to guide surgical operations performed in a coordinate system that is referenced to the image coordinate system." '360 Patent 33:35-38. One way this can be accomplished, the '360 Patent teaches, is by placing the portion of the subject to be operated on into a splint that is secured to a platform "to provide a fixed relationship between the coordinate systems used in the image

and by the system." '360 Patent 33:40-41. In this manner, the coordinate systems are then linked using a computer model of three-dimensional space and, optionally, correct positioning is verified using x-rays. '360 Patent 33:41-45.

The '360 Patent further teaches that the splint is not always necessary to ensure that the coordinate system of the surgical image is fixed relative to the coordinate system of the subject. For instance, where the region to be interrogated is not susceptible to motion artifact, the '360 Patent teaches that a splint is not required. '360 Patent 34:38-41. Instead, fiducial markers can be used in order to provide registration between the coordinate systems of the subject and the surgical image. '360 Patent 34:41-46.[6] In one vivid example of the need for a coordinate system in surgical images that is fixed relative to the subject, column 34, lines 54-57, specifies how, "[f]or spine work, the original image can be collected with a strip of fiducial markers taped to the patient's back and independently marked in a manner that can be sensed by the system **28** to allow location of the stylus **182** during surgery."[7]

Moreover, Section "d" of the '360 Patent further teaches that, in some instances, fiducial markers are not needed to ensure that that the coordinate system of the surgical image is fixed relative to the coordinate system of the subject. See, for example, column 33, line 66, through column 34, line 15, of the '360 Patent, which discloses the use of high-speed MRI data collection in order to rapidly update images so that the surgeon may observe the progression of an appropriately labeled, non-magnetic probe into the body in real time. Here, fiducials are not needed to register the surgical image onto the subject because the surgical image has been taken in real time and thus the practitioner's probe (*e.g.*, stylus 184), progressing into the subject, serves as a proxy to the fiducials. This assures that the

---

[6] See column 33, lines 27-32, of the '360 Patent for further description of the use of fiducial markers to provide registration between coordinate systems.

[7] A stylus is, for example, a surgical apparatus, such as a focused laser beam or a drill. '360 Patent 33:46-48.

1  coordinate system of the surgical image is fixed relative to the coordinate system of
2  the subject.
3       Turning to diagnostic images, Section "b" of the "Detailed Description of the
4  Preferred Embodiment" is directed to disclosing diagnostic systems and methods in
5  accordance with the claimed invention. '360 Patent 30:6-32:53. Although a great
6  number of ways to use the claimed methods and apparatus to affect a diagnosis are
7  disclosed in Section "b," not once is there any reference to the need for a splint or
8  other fiducial source in order to generate a diagnostic image. Indeed, this is
9  because there is no need for registration between the coordinate system of the
10 diagnostic image and the coordinate system of the subject. The practitioner can,
11 and typically does, review the diagnostic image after the subject is no longer under
12 observation by the scanner. Thus, in essence, the coordinate system of the
13 diagnostic image is arbitrary, so long as it is known.
14      At this stage of the litigation, a detailed analysis of the scope of the claim
15 terms is premature. However, further description of the term "image" may help the
16 Court to further appreciate the distinction between the real coordinate systems of
17 the surgical images and the arbitrary coordinate systems of the diagnostic images,
18 disclosed in the '360 Patent and generated by practice of the claims of the '360
19 Patent, and how this distinction guarantees that NIMA and IBSC are granted
20 nonoverlapping rights to the '360 Patent under the Field-of-Use provisions in their
21 respective sublicenses.
22      Here, the term "images," be it surgical images or diagnostic images, refers
23 interchangeably to (i) the data sets produced by any of the claims of the '360 Patent
24 or (ii) viewable graphic representations derived from such data sets. Data sets can
25 be two-dimensional, as in the case of, for example, data sets produced by the
26 method of claim 1 of the '360 Patent, or three-dimensional, as in the case of, for
27 example, data sets produced by the method of claim 39. Such data sets, in non-
28 limiting examples, describe the shape and position of a nerve in a subject as

1 specified by claims 1-35 of the '360 Patent and the shape and position of a selected
2 structure in a subject as specified by claims 36-50, 52-53, and 55-66 of the '360
3 Patent.[8] Data sets can be further processed to form images that display the shape
4 and position of a nerve as specified, for example, by claim 35 of the '360 Patent.[9]

Regardless of whether data sets, or images produced by processing datasets, are considered, regardless of whether such data sets or images are two-dimensional or three-dimensional, and regardless of whether such data sets or images are used by a practitioner or automatically by a computer without human intervention, one thing remains constant: the data set or image must either be directly mappable back onto the subject or not. The '360 Patent makes it clear that if the data set or image is for interventional or surgical purposes, mapping back to the subject is necessary. Moreover, the '360 Patent provides no teaching, suggestion or motivation for mapping the data set or image back to the subject for diagnostic purposes. Nor does the '360 Patent provide any teaching of any diagnostic methods in which such mapping would be useful.

Diagnostic and surgical images, by themselves, are not explicitly claimed by the '360 Patent. Nor does the '360 Patent claim specific methods of using such images to perform diagnostic or surgical procedures. However, practice of any of the claims in the '360 Patent with the specific intent of performing surgery, as mandated by the terms of the IBSC sublicense Field-of-Use provision, will produce

---

[8] In presenting this example, Plaintiffs in no manner wish to convey a position, at this early stage of the litigation, on (i) the relationship, if any, between the scope of the term "nerve" in claims 1-35 and the scope of the term "structure" in claims 36-50, 52-53, and 55-66 of the '360 Patent or (ii) whether any of the steps of any of the method claims of the '360 Patent require human intervention.

[9] It is noted that certain of the claims of the '360 Patent specify different types of data sets, with some claims successively processing one form of data set to produce another form of data set. For example, claim 39 of the '360 Patent specifies "combining said data set and said additional data sets to generate said further data set." In order to avoid unnecessary confusion or claim construction at this stage of the litigation, Plaintiffs do not attempt to detail each of these different types of data sets. Nevertheless, the point remains that each of these types of data sets, and any images rendered based on such data sets in accordance with the teachings of the '360 Patent, are differentiable based on whether the data sets or images were constructed for the surgical setting or the diagnostic setting.

1 images that are not the same as images that were made by practicing any of the
2 claims in the '360 Patent with the specific intent of performing a diagnosis, as
3 mandated by the terms of the NIMA sublicense Field-of-Use provision.

As specified at the outset, the '360 patent makes it clear that diagnostic and surgical images are different at their root core. Diagnostic images are in an arbitrary coordinate system that is not traceable to the subject. Surgical images are in a coordinate system that is fixed relative to the coordinate system of the subject. The coordinate system of a surgical image will be different from the coordinate system of a diagnostic image. Thus, the teachings of the '360 Patent, combined with the divergent specific intent provided by the Field-Of-Use provisions of the IBSC and NIMA sublicenses, ensures that there is no possible overlap between the rights to the '360 Patent conferred to IBSC and NIMA under the terms of their respective sublicenses.

## IV. CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court reconsider its Orders dismissing NIMA and IBSC with prejudice, and enter an order establishing those entities' constitutional standing to sue for patent infringement. In the alternative, Plaintiffs request that the Court enter an order dismissing those entities without prejudice to their joining the lawsuit after the Court has engaged in claim construction of the '360 Patent.

Dated: July 30, 2010

JONES DAY

By: /s/ Arthur S. Beeman
    Arthur S. Beeman

Attorneys for Plaintiffs
NEUROGRAFIX; IMAGE-BASED SURGICENTER CORPORATION; AARON G. FILLER, M.D., Ph.D. A PROFESSIONAL CORP.; CENTER FOR ADVANCED SPINAL NEUROSURGERY MEDICAL GROUP INC.; and NEUROGRAPHY INST. MEDICAL ASSOCS., INC.

SFI-646770v3

11

MPA ISO MOTION FOR RECONSIDERATION