# EXHIBIT D

# United States Court of Appeals for the Federal Circuit

———————————

**ARLINGTON INDUSTRIES, INC.,**
*Plaintiff-Appellant,*

**v.**

**BRIDGEPORT FITTINGS, INC.,**
*Defendant-Appellee.*

———————————

2010-1025

———————————

Appeal from the United States District Court for the Middle District of Pennsylvania in Case No. 06-CV-1105, Judge A. Richard Caputo.

———————————

Decided: January 20, 2011

———————————

KATHRYN L. CLUNE, Crowell & Moring, LLP, of Washington, DC, argued for plaintiff-appellant. With her on the brief was LUCY GRACE D. NOYOLA. Of counsel on the brief were CARTER G. PHILLIPS and ERIC A. SHUMSKY, of Sidley Austin LLP, of Washington, DC.

DEANNE E. MAYNARD, Morrison & Foerster LLP, of Washington, DC, argued for defendant-appellee. With her on the brief were MARK E. UNGERMAN, SETH M. GALANTER and MARC A. HEARRON. Of counsel on the brief

was ALAN M. ANDERSON, Briggs and Morgan, P.A., of
Minneapolis, Minnesota.

_____

Before RADER, *Chief Judge*, LOURIE and MOORE, *Circuit
Judges*.

Opinion for the court filed by *Chief Judge*, RADER.  Opin-
ion concurring in part and dissenting in part filed by
*Circuit Judge*, LOURIE.

RADER, *Chief Judge*.

Two concomitant litigations between Arlington Indus-
tries, Inc. ("Arlington") and Bridgeport Fittings, Inc.
("Bridgeport"), both from the United States District Court
for the Middle District of Pennsylvania, produced differ-
ent constructions of the same claim term from Arlington's
U.S. Patent No. 5,266,050 ("the '050 patent").   In the
earlier filed case, the court construed the term "spring
metal adaptor" to mean "an adaptor made of spring
metal."  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
No. 01-CV-0485, 2008 WL 542966, at *6 (M.D. Pa. Feb.
25, 2008) ("*Arlington I* construction").  In the later filed
case, here on appeal, the district court construed the same
term to require a "split," such that the diameter of the
adaptor can easily expand or contract.  *Arlington Indus.,
Inc. v. Bridgeport Fittings, Inc.*, No. 06-CV-1105, 2007 WL
4276565, at *15 (M.D. Pa. Dec. 4, 2007) ("*Arlington II*
construction").  The *Arlington II* court similarly construed
the term "spring steel adapter" from U.S. Patent No.
6,521,831 ("the '831 patent") as requiring a split.[1]  *Id.* at
*16.  On motions for summary judgment, the *Arlington II*

_____

    [1]   Adapter," used in the '831 patent, is an alternate
spelling of "adaptor."  Except for quotations from the '831
patent, the latter spelling will be used in this opinion to
reflect the convention generally used by the parties.

court ruled that certain Bridgeport products did not infringe the asserted claims of the '050 and '831 patents. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 615 F. Supp. 2d 337, 344-46 (M.D. Pa. 2009) ("*Arlington II*"). Because the *Arlington II* court misconstrued the "spring metal adaptor" and "spring steel adapter" terms by importing a "split" limitation from the specifications into the claims, this court vacates the grants of summary judgment and remands.

## I.

### A.

Before the '050 patent, the most common form of electrical connector (used to connect cable to a junction box) featured a threaded lock nut, which had to be screwed into the junction box with both hands. '050 patent col.1 ll.17-36. Matching the threaded lock nut to the connector could be difficult, especially if the junction box was difficult to reach. *Id*. col.1 ll.30-34.

Arlington's '050 patent discloses an improved electrical connector that snaps into electrical junction boxes with one hand instead of two. *Id*. col.1 ll.10-13. A "spring metal adaptor" or "spring steel adaptor" surrounds the leading end of the electrical connector and attaches the connector to the junction box. *Id*. col.10 ll.28-38.

ARLINGTON INDUSTRIES v. BRIDGEPORT                                    4



*FIG. 5*

'050 patent fig.5.

Figure 5 shows a typical electrical junction box (34)
and a zinc die-cast connector (26).  *Id*. col.3 ll.53-55.  The
spring steel adaptor (20) is shown detached from the
connector but centered around the axis on which it will be
guided into the connector.   *Id*. col.3 ll.55-62.   In this
embodiment, the spring steel adaptor (20) fits on the
smooth central section (32) of the electrical connector
between a raised shoulder (30) and a flange (28).  *Id*.
After insertion into the electrical junction box (34), the
outward-bent locking tangs (22) lock the connector into

place.  The outward-bent tensioner tangs (23) exert force on the exterior wall of the electrical junction box, keeping the connector under tension and firmly in place against the wall.  *Id*. col.6 ll.5-17.

Claim 8 of the '050 patent states as follows:

8.  A quick connect fitting for an electrical junction box comprising:

a hollow electrical connector through which an electrical conductor may be inserted having a leading end thereof for insertion in a hole in an electrical junction box;

a circular *spring metal adaptor* surrounding said leading end of said electrical connector which has a leading end, a trailing end, and an intermediate body;

at least two outwardly sprung members carried by said metal adaptor near said trailing end of said adaptor which engage the side walls of the hole in the junction box into which said adaptor is inserted;

at least two spring locking members carried by said metal adaptor that spring inward to a retracted position to permit said adaptor and locking members to be inserted in a hole in an electrical junction box and spring outward to lock said electrical connector from being withdrawn through the hole; and

an arrangement on said connector for limiting the distance said connector can be inserted into the hole in the junction box.

*Id*. col.10 ll.28-53 (emphasis added).

ARLINGTON INDUSTRIES v. BRIDGEPORT                                    6

Arlington's '831 patent discloses a duplex electrical connector having two openings to allow the insertion of two electrical cables through the connector into a single hole in the junction box. '831 patent col.1 ll.13-16. Figure 1 shows a blown apart view of one embodiment of the duplex connector. *Id.* col.2 ll.57-61. The spring steel adaptor (28) includes a slot (29) to permit expansion prior to being fitted over diameter (17) and a plurality of tangs (31) to prevent removal of the connector following insertion into the aperture of an electrical junction box. *Id.* col.4 ll.59-63.



FIG. 1

'831 patent fig.1.

Claim 1 of the '831 patent states as follows:

1.  A duplex electrical connector comprising:

a) a housing having a cylindrical outbound end, a generally oval inbound end, and an interior channel linking said inbound and said outbound end;

b) a pair of parallel openings in said inbound end;

c) a tubular spring steel cable retainer secured in each of said openings in said inbound end for accepting separate cables, said retainers including a set of inwardly extending tangs to receive and engage said separate cables inserted from said inbound end and guide said separate cables toward said cylindrical outbound end in a manner that said separate cables are advanced to said outbound end, said inwardly extending tangs restricting removal of said separate cables by force applied on said separate cables from said inbound end; and

d) a tubular *spring steel adapter* secured to said cylindrical outbound end of said housing, said adapter having outwardly extending tangs.

*Id*. col.6 l.64–col.7. l.14 (emphasis added).

The '831 patent incorporates by reference U.S. Patent No. 6,080,933, col.4 ll.64-67, which in turn incorporates by reference U.S. Patent No. 5,373,106 ("the '106 patent"), col 4 ll.6-10. The '106 patent and '050 patent descend from the same parent, U.S. Patent No. 5,171,164 ("the '164 patent").

B.

In *Arlington I*, filed approximately six months before *Arlington II*, Arlington alleged that certain Bridgeport Whipper-Snap products infringed claim 8 of the '050 patent. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 497 (M.D. Pa. 2010) ("*Arlington I*"). The *Arlington I* court declined to read a "split ring" limitation into the claims, finding that the meaning of the term, "an adaptor made of spring metal," was clear in view of the language of the claims, the specification, and

ARLINGTON INDUSTRIES v. BRIDGEPORT                              8

the prosecution history.  2008 WL 542966, at *6.  Follow-
ing a ten-day trial, a jury thereafter returned a verdict in
favor of Arlington against Bridgeport, finding infringe-
ment of claim 8 of the '050 patent with respect to thirty
Whipper-Snap models.  692 F. Supp. 2d at 523-24.  By
joint motion of the parties, this court stayed the *Arlington
I* appeal pending disposition of the current appeal.

In the later-filed case, Arlington alleged that two
other models of Bridgeport's Whipper-Snap connectors,
both duplex connectors, infringed the '831 patent.  *Id.* at
496.  Arlington later amended its complaint to allege that
these models also infringed the '050 patent.  *Id.*  Although
infringement of the '050 patent was now an issue in both
*Arlington I* and *Arlington II*, neither party moved to
consolidate the cases, and the matters proceeded on
parallel tracks.  *Id.*

The *Arlington II* court construed "spring metal adap-
tor" to mean a *split* spring metal adaptor.  2007 WL
4276565, at *8.  The court found that the split allows the
adaptor to narrow upon insertion into the electrical
junction box.  *Id.* at *7 ("[A] necessary feature of the
"spring" metal adaptor is that it is 'split.'  Without the
split, it would not spring.").  The *Arlington II* court con-
strued "spring steel adapter" from the '831 patent as also
requiring a split, stating that this term was subject to the
same analysis.  *Id.* at *15.

Bridgeport thereafter moved for summary judgment
of non-infringement of the '050 and '831 patents.  *Arling-
ton II*, 615 F. Supp. 2d at 337.  In September 2008, the
district court granted summary judgment of non-
infringement, non-willfulness, and no damages as to the
'050 patent in favor of Bridgeport.  *Id.* at 338.  In May
2009, the district court granted summary judgment of
non-infringement, non-willfulness, and no damages as to

the '831 patent.  *Id.*  After denying Arlington's request for reconsideration, the district court entered final judgment on September 1, 2009.

Arlington thereafter appealed the *Arlington II* court's claim construction and entries of summary judgment. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.

### A.

Claim construction is a question of law, which this court reviews without deference.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).  This court also reviews a district court's grant of summary judgment of non-infringement without deference.  *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006).  On appeal, Arlington argues that the *Arlington II* court erred by importing a "split" limitation into its constructions of "spring metal adaptor" and "spring steel adapter."  This court agrees.

### B.

Claim 8 of the '050 patent recites a "spring metal adaptor."  Consistent with the ordinary and customary meaning of these words, this term imposes the limitation that the adaptor must be made of spring metal.  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The specification, which acts as "the primary basis for construing the claims," *id.* at 1315, supports this construction.  Specifically, the '050 patent states that the spring metal adaptor "is typically . . . *formed from spring steel* such as SAE

1095 tempered spring steel or its equivalent."  Col.3 ll.7-10 (emphasis added).

Notably, Bridgeport conceded before the district court that the adaptor is made from spring metal.  In particular, in its claim construction brief before the district court, Bridgeport stated that "[c]laim 8 of the '050 Patent expressly recites that the *entire* adapter is made of 'spring metal.'"  J.A. 1751 (citing the spring metal adaptor term at col.10 l.35).  Similarly, in its claim construction rebuttal brief, Bridgeport acknowledged that "the entire adaptor is 'resilient' by virtue of being formed from 'spring metal.'"  J.A. 2785 n.15.

The *Arlington I* court also determined that a person skilled in the field, having read the claim in the context of the entire patent, would construe the "spring metal adaptor" as "an adaptor made of spring metal."  2008 WL 542966, at *6.  "In the interest of uniformity and correctness, this court consults the claim analysis of different district courts on the identical terms in the context of the same patent."  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008).  Thus, the customary and ordinary meaning of the claim term, the specification, the *Arlington I* construction, and Bridgeport's admissions all support the construction "an adaptor made of spring metal."

Bridgeport nevertheless contends that the term "spring metal adaptor" imposes a "split" limitation, proposing alternative theories.  On the one hand, Bridgeport argues that the claim language supports reading "spring" as modifying the phrase "metal adaptor" rather than denoting an adaptor made of spring metal.  According to Bridgeport, the term "spring" is more naturally read to mean a metal adaptor that performs a springing function.  Bridgeport notes that after the initial reference in claim 8

to the "circular spring metal adaptor," the claim subsequently refers to the adaptor as "said metal adaptor" rather than "said spring metal adaptor." However, this argument conflicts with the unambiguous disclosure in the specification that the spring metal adaptor is "formed from tempered spring steel or its equivalent." '050 patent col.3 ll.7-10. Bridgeport's argument also conflicts with its admissions before the district court that "the *entire* adapter is made of 'spring metal.'" J.A. 1751; J.A. 2785 n.15. Additionally, while Bridgeport argues that the term "spring" means a springing action, "spring metal adaptor" lacks the directional language used elsewhere in claim 8 to connote a springing action, such as locking members that "spring inward" and "spring outward." *Id.* col.10 ll.44-49. Thus, this court declines to read "spring" as modifying the phrase "metal adaptor," rather than denoting an adaptor made of spring metal as construed by the *Arlington I* court. 2008 WL 542966, at *6.

Bridgeport alternatively argues that the entire term "spring metal adaptor" should be defined by implication to require a split. This court has, on occasion, supplied a definition by implication, if the specification manifests a clear intent to limit the term by using it in a manner consistent with only a single meaning. *See, e.g., Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("[T]he written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.").

In this case, however, this court finds several reasons to avoid importing a split limitation into claim 8. Only one of the four embodiments described in the '050 patent is expressly described as having an "opening" that

changes diameter to permit a spring action.  Col.3 ll.20-
27.  While the drawings of the adaptor consistently depict
an incomplete circle, drawings in a patent need not illus-
trate the full scope of the invention.  *MBO Labs., Inc. v.
Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir.
2007) ("[P]atent coverage is not necessarily limited to
inventions that look like the ones in the figures.  To hold
otherwise would be to import limitations onto the claim
from the specification, which is fraught with danger.").
Moreover, "even where a patent describes only a single
embodiment, claims will not be read restrictively unless
the patentee has demonstrated a clear intention to limit
the claim scope using words of expressions of manifest
exclusion or restriction."  *Martek Biosciences Corp. v.
Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009);
*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906
(Fed. Cir. 2004).  The '050 patent does not show a clear
intent to limit the claims to "split" embodiments.

Importantly, importing a split limitation improperly
discounts substantive differences between the claims.
Such differences can be a "useful guide in understanding
the meaning of particular claim terms."  *Phillips*, 415
F.3d at 1314; *see Curtiss-Wright Flow Control Corp. v.
Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("[C]laim
differentiation takes on relevance in the context of a claim
construction that would render additional, or different,
language in another independent claim superflu-
ous . . . .").  Claim 1 recites a "spring metal adaptor being
less than a complete circle," while claim 8 omits the less
than a complete circle modifier.  '050 patent col.9 ll.26-27,
col.10 ll.28-53.  This difference indicates that, unlike the
adaptor of claim 1, the spring metal adaptor of claim 8
can be either a complete circle or an incomplete circle.
Similarly, independent claim 12 of the parent '164 patent
recites "a split circular spring metal adaptor," while claim

8 of the '050 patent omits the "split" modifier. '164 patent col.10 l.20; '050 patent col.10 ll.28-53. Thus, unlike the adaptor of claim 12 of the '164 patent, the spring metal adaptor of claim 8 can either be split or unsplit. Reading a split limitation or an incomplete circle limitation into the term "spring metal adaptor" would render these additional modifiers superfluous, which weighs against doing so.

The prosecution history also does not support a split limitation. During the prosecution of the parent '164 patent, the examiner rejected originally filed claims 1 and 13 under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 1,725,883 ("Recker"). In the same office action, the examiner objected to, but did not reject, originally filed claim 2. Claim 2 depended from claim 1 but contained an additional limitation. J.A. 984. The examiner stated that claim 2 would be allowable if written in independent form.

In response, the applicant amended claims 1 and 13 to add a "less than a complete circle" limitation to the "spring metal adaptor" term. J.A. 1010. This action preceded the allowance of the claims, suggesting that both the inventors and the PTO understood the unmodified term to encompass unsplit adaptors. *See Phillips*, 415 F.3d at 1318 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention."). Notably, when Arlington submitted the continuation application leading to the '050 patent, Arlington added new claim 22 which corresponded to the combination of *original* claims 1 and 2—before those claims were amended to incorporate the "less than complete circle" limitation. New claim 22, lacking this limitation, issued as claim 8 of the '050 patent.

Bridgeport contends that Arlington made clear during prosecution that its originally filed claims already included the limitation of a split. Bridgeport focuses on the following statement: "The shell member 16 [in Recker] is a tube that forms a complete undivided circle so there can be no springing apart of the periphery of the tube as provided for in Applicants' broad claims 1 and 13." J.A. 1010. According to Bridgeport, "broad claims 1 and 13" refers to unamended claims 1 and 13, which did not include the "less than a complete circle" limitation. However, when viewed in context, Arlington's reference to "broad claims 1 and 13" clearly refers to these independent claims *after* amendment. Indeed, the paragraph containing this sentence begins by unambiguously stating that "[b]oth claims 1 and 13 have been amended in a manner to distinguish them from Recker." *Id.*

Relying on expert testimony, Bridgeport also argues that the only way a circular metal adaptor could physically fit over the raised shoulder of the connector is if the adaptor contains an opening in its circumference. But the connector of claim 8 has no "shoulder" limitation, unlike that of independent claim 7. '050 patent col.10 ll.14, 28-53. Bridgeport therefore premises its argument that a split limitation should be implicitly read into the "spring metal adaptor" term by additionally importing a raised shoulder limitation into the construction of "electrical connector." Bridgeport's argument illustrates the manifest complications resulting from importing limitations from the specification into the claims.

This court has often acknowledged the fine line between reading a claim in light of the specification and importing a limitation from the specification into the claim. *See, e.g., Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1307-08 (Fed. Cir. 2008); *Phillips*, 415 F.3d at 1323-24. Review of the intrinsic

evidence reveals no intent to limit the term "spring metal adaptor" by using it in a manner that excludes unsplit adaptors.[2]  This court therefore concludes that the district court erred in construing "spring metal adaptor" to require a split.  Instead, the contested term means "an adaptor made of spring metal."  Because the trial court misconstrued the claim, this court vacates the grant of summary judgment of non-infringement of the '050 patent and remands for further proceedings.

C.

Arlington argues that the district court erroneously imported a "split" limitation into the "spring steel adapter" term from claim 1 of the '831 patent.  Bridgeport argues that the district court correctly construed this term in light of the intrinsic and extrinsic evidence.

This court again agrees with Arlington.  Claim 1 does not state that the adaptor is split, the specification does not define the spring steel adaptor as split, and nothing in the specification implicitly requires a split adaptor.  Bridgeport emphasizes that the '831 patent specification teaches that the "spring steel adapter 28 includes a slot

---

[2]  The concurrence-in-part and dissent-in-part characterizes the specification as the "heart of the patent" and, using "colloquial terms," states that "you should get what you disclose."  This devalues the importance of claim language in delimiting the scope of legal protection.  "Claims define and circumscribe, the written description discloses and teaches."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) (en banc).  To use a colloquial term coined by Judge Rich, "*the name of the game is the claim.*"  Giles S. Rich, *The Extent of the Protection and Interpretation of Claims-American Perspectives,* 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499, 501 (1990).  Indeed, unclaimed disclosures are dedicated to the public.  *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1051 (Fed. Cir. 2002) (en banc).

29 to permit expansion prior to being fitted over [the] diameter" of the leading end of the connector.  However, this statement refers to a single embodiment.  Col.4 ll.32-33, ll.59-60.  Bridgeport also notes that Figs. 1 and 2, which depict two embodiments of the invention, both show a split adaptor.  But "[t]he written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc); *see also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims.").

The '831 patent incorporates Arlington's '106 patent by way of another patent.  The '106 patent states that the spring steel adaptor "is formed from spring steel" or its equivalent.  Col.4 ll.26-29.  The '106 patent also states that spring steel is the preferred material.  Col.12 ll.39-46.  This court therefore construes the term "spring steel adapter" as an adapter made from spring steel.  Accordingly, this court vacates the district court's summary judgment of non-infringement of the '831 patent and remands for further proceedings.

## III.

Bridgeport requests that this court review the construction of two additional terms from claim 8 of the '050 patent:  "circular" and "outwardly sprung members."  Although these terms will likely be relevant on remand and thus may be appropriate for appellate review, *see Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1375 n.2 (Fed. Cir. 2005), this court declines to address these issues on the record before us.  This should not be perceived as an endorsement of the district court's constructions of these

17                          ARLINGTON INDUSTRIES v. BRIDGEPORT

terms, nor, as argued by Arlington, as an acknowledgement that these terms were irrelevant to the *Arlington II* court's grant of summary judgment.  Instead, this court's decision not to address these terms results from the need for more extensive briefing and the relatively unusual procedural posture of having the identical claim terms at issue in the stayed *Arlington I* appeal.

IV.

For the foregoing reasons, this court vacates the district court's grants of summary judgment of non-infringement of the '050 and '831 patents and remands for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

————————————

**ARLINGTON INDUSTRIES, INC.,**
*Plaintiff-Appellant,*

**v.**

**BRIDGEPORT FITTINGS, INC.,**
*Defendant-Appellee.*

————————————

2010-1025

————————————

Appeal from the United States District Court for the Middle District of Pennsylvania in Case No. 06-CV-1105, Judge A. Richard Caputo.

————————————

LOURIE, *Circuit Judge*, concurring in part and dissenting in part.

I join the majority in reversing the district court's decision regarding the '831 patent. The specification for that patent does not consistently show an opening in the spring metal adaptor and need not have been so limited. The district court also did not make a specific claim construction for the '831 patent, but simply adopted its analysis from the '050 patent specification. Thus, the district court erred in failing to separately construe the '831 claims. However, I respectfully dissent from the majority's holding regarding the '050 patent.

One of the most difficult tasks in adjudicating patent cases is interpreting patent claims. We have propounded a variety of "rules" for doing so, such as that claims should not be limited to preferred embodiments, *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quotation omitted), claim terms are interpreted in light of the specification of which they are a part, *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985), and claims are interpreted according to their plain meaning, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).

But the basic mandate is for claims to be interpreted in light of the specification of which they are a part because the specification describes what the inventors invented. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The specification is the heart of the patent. In colloquial terms, "you should get what you disclose."

The fine distinctions we often make concerning what is disclosed in a specification arise of course from how the inventors describe aspects of their invention. They describe embodiments of the invention, preferred embodiments, specific examples, sometimes using language broader than expressed in the claims to describe embodiments, and finally, in frequent boilerplate, indicate that the invention isn't to be limited to what is expressly disclosed (as if they were unable to describe anything else they actually invented). Questions then arise as to whether an invention is limited to a preferred embodiment, or to the disclosed embodiments, or to what the specification in some language indicates is part of the invention.

But, at bottom, we are reading a patent specification to see what the inventors invented, what they disclosed,

and how they conveyed that information.  A patent is a teaching document.  In almost all cases, the inventors, and their patent solicitors, knew what was invented and generally disclosed their invention in competent language.

Unfortunately, the nature of our adversary system often causes those patents to be asserted against someone engaged in activity not contemplated by the inventors as part of their invention.  So the patent is used as a business weapon against such parties, and litigation counsel attempt to fit a square peg into a round hole, or, in other words, to fit into the claim language what the inventors never contemplated as part of their invention.

I believe the inventors in this case contemplated that their invention consisted only of spring metal adaptors with an opening that results from not forming a complete circle.  They said just that, in column 3, lines 20-22.  ("The circular metal spring adaptor 20 has an opening that results from not forming a complete circle.")  Claim 1 states that as well in its fifth paragraph.  '050 patent, col. 9 ll.26-32 ("said circular spring metal adaptor being less than a complete circle . . .").  The afore-mentioned disclosure does indeed state that the "preferred embodiment" has that feature, but the other three embodiments similarly have spring metal adaptors with an opening that results in them forming less than a complete circle.

Figures 2, 5, 9, 12, and 16 show an opening that precludes the adapters from being a complete circle.  No drawing or disclosure appears in the specification in which the adaptors consist of a complete circle.  Reading the specification therefore convinces me that that is the limitation the inventors had in mind when they and their patent drafters wrote their patent, including the claims.  It is true that independent claim 8, unlike claim 1, lacks

the "being less than a complete circle" language of claim 1, but claim differentiation should not enlarge claims beyond what the specification tells us the inventors contemplated as their invention.

The problem in claim interpretation is thus our focus on our muddy, conflicting, and overly formulaic rules, *see, e.g., KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (warning against the use of rigid rules), *and Bilski v. Kappos*, 130 S. Ct. 3218, 3226 (2010), when the real task of claim interpretation is to read the specification and determine what the inventors meant when they used the language they did.  Obviously the claims define the scope of protection accorded the owners of a patent.  *Phillips*, 415 F.3d at 1312.  But in construing the claims we should avail ourselves of the knowledge we glean from the patent specification to see what the inventors disclosed as their invention.  The bottom line of claim construction should be that the claims should not mean more than what the specification indicates, in one way or another, the inventors invented.

In this case, the inventors made clear in the specification of the '050 patent that the spring metal adapters in their invention have an opening that prevents the adaptors from forming a complete circle.  The result that the panel majority arrives at here, on remand, could be that Bridgeport might be held to be an infringer of a patent that clearly indicates that there is a split in the adaptor, by making or selling an adaptor lacking such a split. That is not a result that the patent law ought to protect.

For the foregoing reasons, I join in part but respectfully dissent concerning the panel's reading of the '050 patent.