# Exhibit 7

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5    NEUROGRAFIX, a California           )

6    corporation; WASHINGTON RESEARCH    )

7    FOUNDATION, a not-for-profit        )

8    Washington corporation,             )

9                        PLAINTIFFS, )   CASE NO.

10           VS.                         )   CV 10-1990 (MRP)(RZX)

11   SIEMENS MEDICAL SOLUTIONS USA,      )

12   INC., a Delaware corporation and    )

13   SIEMENS AKTIENGESELLESCHAFT, a      )

14   German corporation,                 )

15                        DEFENDANTS. )

16   _____ )

17   AND RELATED CROSS ACTION            )

18   _____ )

19

20        VIDEOTAPED DEPOSITION OF AARON G. FILLER, M.D.

21               LOS ANGELES, CALIFORNIA

22                  FEBRUARY 22, 2011

23

24   REPORTED BY: CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR

25   JOB NO.: 36551

Page 2

1

2

3

4

5

6

7                                    February 22, 2011

8                                    9:03 a.m.

9

10

11

12

13    Deposition of Aaron G. Filler, M.D., taken on

14    behalf of Defendants, held at the offices of

15    Russ, August & Kabat, 12424 Wilshire Boulevard,

16    Suite 1200, Los Angeles, California, before

17    Christy A. Cannariato, CSR #7954, RPR, CRR.

18

19

20

21

22

23

24

25

1                    A P P E A R A N C E S

2

3

4    REPRESENTING THE PLAINTIFF AND THE WITNESS:

5        RUSS, AUGUST & KABAT

6        BY:  MARC FENSTER, ESQ.

7        12424 WILSHIRE BOULEVARD

8        LOS ANGELES, CALIFORNIA 90025

9

10

11

12

13   REPRESENTING THE DEFENDANTS:

14       KIRKLAND & ELLIS

15       BY:  GREGG LoCASCIO, ESQ.

16       BY:  SEAN M. McELDOWNEY, ESQ.

17       655 FIFTEENTH STREET, N.W.

18       WASHINGTON, D.C. 20005

19

20

21

22

23   ALSO PRESENT:

24   MICHAEL MOSELEY, Ph.D.

25   DARREN SIRKIN, THE VIDEOGRAPHER

1                           I N D E X

2

3    EXAMINATION BY                                      PAGE

4    MR. LoCASCIO.........................................8

5

6    -----------------------------------------------------

7                           EXHIBITS

8    EXHIBIT DESCRIPTION                                 PAGE

9

10   Exhibit 11

11   United States Patent 5,560,360........................34

12

13   Exhibit 12

14   Expert Report Related to Construction of

15   Dr. Aaron Filler, M.D...............................175

16

17   Exhibit 13

18   Rebuttal Expert Report of Dr. Aaron Filler, M.D. To

19   the Expert Report of Michael E. Miseley Concerning--

20   Patent No. 5,560,360................................36

21

22   Exhibit 14

23   Single page with Equation of Conspicuity.............96

24

25

Page 5

1                               EXHIBITS

2       EXHIBIT DESCRIPTION                                      PAGE

3

4       Exhibit 15

5       Expert Report of Michael E. Moseley Concerning

6       U.S. Patent No. 5,560,360............................99

7

8       Exhibit 16

9       Plaintiff Neurografix's Disclosure of Asserted Claims

10      and Infringement Contentions..........................124

11

12      Exhibit 17

13      Plaintiffs Neurografix and Washington Research

14      Foundation's Preliminary Claim Constructions..........135

15

16      Exhibit 18

17      Amendment and Request for Reconsideration.............178

18

19      Exhibit 19

20      MR Imaging of Anisotropically Restricted Diffusion of

21      Water in the Nervous System:  Technical Anatomic, and

22      Pathologic Considerations, by Joseph V. Hajnal, et al.,

23      Journal of computer Assisted Tomography 15:(1)1-18,

24      January/February 1991.................................178

25

1   -----------------------------------------------------------

2                  QUESTIONS INSTRUCTED NOT TO ANSWER

3

4                          Page 124, Line 24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1          Los Angeles, California; Tuesday, February 22, 2011

2                               9:03 a.m.

3

4

5          THE VIDEOGRAPHER:  Good morning.

6          This is the start of tape labeled No. 1 of the

7   videotaped deposition of Aaron Filler in the matter

8   Neurografix versus Siemens in the US District Court,

9   Central District of California, Case No. CV 10-19990

10  (MRP)(RZX).

11         This deposition is being held at 12424

12  Wilshire Boulevard, Santa Monica, California, on Tuesday,

13  February 22nd, 2011 at approximately 9:03 a.m.

14         My name is Darren Sirkin from TSG Reporting.

15  The court reporter is Christy Cannariato also in

16  association with TSG.

17         Counsel, would you please introduce

18  yourselves.

19         MR. LoCASCIO:  Gregg LoCascio and Sean

20  McEldowney from Kirkland & Ellis, LLP on behalf of the

21  Defendants.  In attendance is Dr. Michael Moseley.

22         MR. FENSTER:  Marc Fenster with Russ, August &

23  Kabat on behalf of Neurografix and the witness.

24         THE VIDEOGRAPHER:  Thank you.  Will the court

25  reporter please swear in the witness.

1              AARON G. FILLER, M.D.,

2         having first been duly sworn, was

3         examined and testified as follows:

4

5                   EXAMINATION

6    BY MR. LoCASCIO:

7         Q.    Good morning, Dr. Filler.

8         A.    Good morning.

9         Q.    Have you been deposed before?

10        A.    Yes.

11        Q.    And roughly tell me how many times.

12        A.    About 250, 300 times.

13        Q.    What context generally were those depositions

14   in?

15        A.    They were mostly medical sort of personal

16   injury, med-mal.  Some of them are expert, mostly relating

17   to medical imaging in some ways.

18        Q.    In any of them were you a named party?

19        A.    Yes, I've been a named party a few times.

20        Q.    Were you ever the plaintiff or were you always

21   the defendant in those cases?

22        A.    Both.

23        Q.    Can you just tell me briefly in what context

24   you've been a plaintiff, sir, other than this case?

25              MR. FENSTER:  You mean him personally?

1    talks about various types of sequences, T2, CHESS.

2    Whether that's something he invented or the art is germane

3    to what those terms mean under the spec, Marc.

4            MR. FENSTER:  Okay.

5            MR. LoCASCIO:  This isn't an exercise in, you

6    know, someone else invented it.  The questions for

7    validity, I agree, Marc are for another day.

8        Q.    BY MR. LoCASCIO:  Dr. Filler, is there someone

9    who is the inventor/pioneer/originator, whatever term you

10   want to put to it, of the T2 weighted sequence?

11       A.    Well, you know, I have that article about the

12   history of computational imaging, and I go through the

13   history of MMR.  I don't know if you've had a chance to

14   read it, but that goes back into the MMR period back into

15   the 1950s.  And it may be in my paper I say in that paper

16   I say specifically who first used T2 weighted sequences.

17            But that was very early on as they understood

18   the T1 and T2 decay and then how to run different MMR

19   experiments that, you know, preferentially showed off the

20   decay from -- the T1 effects versus the decay from the T2

21   effects.

22       Q.    In short, sir, you agree with me that you

23   didn't come up with fat suppression sequences?

24       A.    No.

25       Q.    Did you come up with fat suppression

1    sequences?  My question was in the negative, and you

2    answered no, so that's why I've reasked it.  Withdrawn.

3              Did you invent using a fat suppression

4    sequence in an MRI machine?

5              MR. FENSTER:  Objection.  Vague.

6       A.    I did not invent -- you asked me did I invent

7    using fat suppression in MRI machines, and the answer is

8    no.

9       Q.    Okay.  Did you invent using diffusion

10   weighting sequences?

11             MR. FENSTER:  Objection.  Vague.

12      A.    I did not invent using diffusion weighting in

13   an MRI machine.  No.

14      Q.    Did you invent using something called long T2

15   processing in an MRI machine?

16      A.    No.

17      Q.    Do you believe you were the first to combine

18   any of those techniques?

19             MR. FENSTER:  Objection.  Vague.

20      A.    I was the first to combine them in the way the

21   patent discloses in order to increase the conspicuity of

22   nerve.  Or our group.  When I say I, I can say

23   collectively our inventors.

24      Q.    And what is, in your view, the way the patent

25   disclose combining those techniques to increase the

Page 56

1    conspicuity?

2         A.      Well, we provide several methods.

3                 MR. FENSTER:  Objection.  Vague.

4                 Go ahead.

5         Q.      What are they?

6         A.      Well, for fat suppression we use I think you

7    mentioned Dixon, a variety of inversion recovery type

8    sequences, as well as chemical shift selection sequences

9    for fat suppression.

10        Q.      That's CHESS?

11        A.      Yeah, chemical shift selection is the

12   classical version of the chemical shift method.

13        Q.      And the acronym for that is CHESS?

14        A.      Yes.

15        Q.      You didn't come up with any of those; correct?

16        A.      No.

17        Q.      Same thing happened again.

18                Did you come up with any of those?

19        A.      I didn't invent those pulse sequences.  No.

20        Q.      And do you believe, sir, that you were the

21   first to use those to image a nerve?

22                MR. FENSTER:  Objection.

23        A.      No, I didn't say that.  I said that what we

24   did was to assemble them in such a way as to make the

25   nerve meet the conspicuity requirement.  That's one of the

Page 168

1    supporting cells are glia versus Schwann cells.  There's

2    normally no fat at all inside the arachnoid.  So fat

3    suppression is just not relevant.  I mean, myelin is a

4    lipid, and you have myelin and some gli --

5    oligodendroglial cells as well as myelin in the Schwann

6    cells.  But the fact that we talked about in fat

7    suppression is something that is an issue outside the

8    Obersteiner-Redlich transition zone.

9        Q.    Sir, do you have the patent still in front of

10   you which I think is Exhibit 11?  You can just look at the

11   copy of the patent you have sitting right there, sir.  I

12   want to ask you just a couple quick questions.

13          The first one is if you can turn to Claim 1

14   for me, which is Column 37.

15          Are you there?  There are various steps in

16   Claim 1.  Agreed?

17       A.    Yes.

18       Q.    And some of those steps describe performing

19   some function; correct?

20       A.    Yes.

21       Q.    And with respect to the first three, (a), (b),

22   and (c), at a high level whenever you use an MRI machine,

23   do you expose on a living subject an in vivo region to a

24   magnetic polarizing field?

25       A.    Well, you could do it on a nonliving subject.

1    Q.    But, sir, do you always expose a region of the

2    subject to a magnetic polarizing field when you use an MRI

3    machine?

4    A.    Yes.

5    Q.    Do you always expose the region to an

6    electromagnetic excitation field when you use an MRI

7    machine?

8    A.    Yes.

9    Q.    Do you also sense the resonant response of the

10   in vivo image to the polarizing and excitation fields when

11   you use an MRI machine?

12   A.    Yes.

13   Q.    And then, I take it, the whole point of the

14   use of an MRI machine would be to produce some output

15   indicative of that resonant response.   Agreed?

16   A.    Yes.

17   Q.    Okay.  And so those steps, those three or four

18   steps I just walked through, that's basically using an MRI

19   machine.  Fair?

20   A.    Well, from a certain point of view.  I mean, I

21   think the steps play a certain technical role in the

22   construction of the claim which we may come back to with

23   your subsequent questions, but those reflect three

24   fundamental aspects of the operation of an MRI scanner.

25   Q.    Okay.  Step (d) on Claim 1 says "controlling

1    the performance of steps (a), (b), and (c).  (a) being

2    exposing the region to the magnetic polarizing field (b)

3    being exposing it to an electromagnetic excitation field

4    and (c) sensing the resonant response in producing an

5    output.

6            And it goes on to say, "to enhance any output

7    produced the selectivity of said nerve while the nerve is

8    living in the in vivo region of the subject."  Did I read

9    (d) correctly?

10       A.      You did.

11              MR. FENSTER:  Objection.  Misstates the claim.

12       Q.      Step (d), what function does step (d) perform?

13    Is it to enhance the selectivity of the nerve?  Is that

14    the function of step (d)?

15              MR. FENSTER:  Objection.  Vague.

16       Q.      You're controlling these first three to do

17    something, and that's kind of what I want to know from

18    you.  What are you doing with the control of steps (a),

19    (b), and (c)?  What's the act?

20       A.      Well, that would be the execution of a pulse

21    sequence.

22       Q.      That's the what (d) is?

23       A.      Yes.

24       Q.      And the pulse sequence, sir, performs the

25    function of enhancing any output that produced the

1   and the structures that relate to a means plus function

2   language.

3       Q.     All of which goes to terms that involve

4   something called the processing means; correct?

5              MR. FENSTER:  That's not true.  Misstates the

6   document.

7       Q.     Okay.  Dr. Filler, let me ask you another

8   question, sir, not with reference to the document.

9       A.     Okay.

10      Q.     Your patent discloses use of a computer to

11  perform various processing tasks; correct?

12      A.     Yes.

13      Q.     And that computer requires software

14  instructions to do those tasks; correct?

15      A.     Yes.

16      Q.     And those software instructions, sir, are not

17  provided in the specification; correct?

18      A.     No, I wouldn't say that.  I mean, I never said

19  that.

20      Q.     You believe for some of the processing means

21  language there are specific algorithms or instructions to

22  set forth the software instructions?

23      A.     I think that everything you need to know is

24  disclosed in the specification if you bring skill in the

25  art.  I think if an attorney tried to read the

1  specification and know what to do, he might have a hard

2  time.  If you took someone skilled in the art, as we

3  describe, and then there's sufficient information to do

4  everything we describe and to know what to do with the

5  computers that we describe.  Yeah, I think everything --

6  every single step, you know, was supported by algorithms.

7  The algorithms are sufficient.

8      Q.    Just give me one second.  Don't need to go

9  anywhere.

10         When we were looking at Claim 1 before, we

11  were looking at steps, (a), (b), (c), and (d).  There was

12  an (e) which refers to processing the image, processing

13  the output to generate a data set.  And then there's some

14  specifics that follow that.  Any MRI machine, the use of

15  it, sir, before you even filed your patent application,

16  necessarily processed the output to generate a data set.

17  Correct?

18      A.    Yes.

19      Q.    And all of those machines, I take it, had some

20  software to instruct them how to do that; right?

21      A.    Yes.

22         MR. LoCASCIO:  At this point, Marc, I have no

23  other questions for Dr. Filler with respect to his report

24  as it relates to claim construction.  Thank you very much.

25         THE VIDEOGRAPHER:  We're going to go off the

Page 178

1    record at 2:43 p.m.   Thank you.

2              (Proceedings concluded.)

3              (Exhibit 18 marked for identification.)

4              (Exhibit 19 marked for identification.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 182

1   STATE OF CALIFORNIA    )

2                          ) SS

3   COUNTY OF LOS ANGELES )

4

5

6

7

8

9

10

11

12

13            I, the undersigned, declare under penalty of

14   perjury that I have read the foregoing transcript, and I

15   have made any corrections, additions or deletions that I

16   was desirous of making; that the foregoing is a true and

17   correct transcript of my testimony contained therein.

18            Executed this _____ day of _____, 20__, at

19   _____, _____.

20     (City)      (State)

21

22

23

24           _____

25           AARON G. FILLER, M.D.