# Exhibit OMR1

```
 1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION
 3
                            -  -  -
 4              HONORABLE MARIANA R. PFAELZER,
           UNITED STATES DISTRICT JUDGE PRESIDING
 5                          -  -  -

 6
   NEUROGRAFIX,                      )
 7                                   )   CERTIFIED COPY
                 PLAINTIFF,          )
 8                                   )
   VS.                               )   CV 10-01990 MRP
 9                                   )
   SIEMENS MEDICAL SOLUTIONS         )
10 USA INC., et al.,                 )
                                     )
11 DEFENDANTS.                       )
   _____)
12

13

14
                        MARKMAN HEARING
15             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    THURSDAY, MARCH 24, 2011
16                       A.M. SESSION
                    LOS ANGELES, CALIFORNIA
17

18

19

20

21              SHERI S. KLEEGER, CSR 10340
                FEDERAL OFFICIAL COURT REPORTER
22             312 NORTH SPRING STREET, ROOM 402
                LOS ANGELES, CALIFORNIA 90012
23                 PH:   (213)894-6604

24

25
```

```
 1

 2
          APPEARANCES OF COUNSEL:
 3
          ON BEHALF OF PLAINTIFF:
 4
                  RUSS AUGUST & KABAT
 5                BY:   MARC A. FENSTER, ESQUIRE
                        ANDREW D. WEISS, ESQUIRE
 6                      ALEXANDER GIZA, ESQUIRE
                  12424 WILSHIRE BOULEVARD
 7                12TH FLOOR
                  LOS ANGELES, CA 90025
 8
          JOSH SEAT, SPECIAL AGENT
 9

10        ON BEHALF OF DEFENDANT:
                  SIEMENS
11                BY:   ERIC C. LIEBELER, ESQUIRE
                        FRANK J. NUZZI, ESQUIRE
12
                  KIRKLAND ELLIS
13                BY:   GREGG LOCASIO, ESQUIRE
                        SEAN M. MCELDOWNEY, ESQUIRE
14                655 15TH STREET NW
                  SUITE 1200
15                WASHINGTON, D.C. 20005

16

17

18

19

20

21

22

23

24

25
```

1    a magnitude.

2              And all within the section of vector

3    processing, there's a reference to using tensor math,

4    which explains that it's not saying it's a tensor.  It's

5    just saying alternative forms of vector analysis can be

6    applied.

7              This is at Column 21.

8              And it says:  Similarly tensor analysis

9    employing tensors of various rank can be used to treat

10   or transform the coordinates of MR diffusional

11   anisotropy.

12             All it's saying is that you can use

13   different methods to create a vector to determine the

14   direction and magnitude.  And it's not just saying do

15   math.  It's saying determine the vector.  Resolve this

16   data into a vector which has a magnitude and a direction

17   and it's not limited to the particular equations

18   disclosed.

19             THE COURT:  Go on.

20             MR. FENSTER:  Your Honor, we're now done

21   with the non means-plus-function terms.

22             With the Court's permission, I'll turn it

23   over to my partner Alex Giza to argue those terms.

24             MR. GIZA:  Good afternoon, Your Honor.  Alex

25   Giza, Russ August & Kabat, representing the plaintiff

1    NeuroGrafix.

2              Your Honor, I'm going to address the

3    means-plus-function claim, that's Claims 54, 64, 55,

4    68 -- 58, 61.  I'll also be addressing the claims which

5    defendants argue are step-plus-function.  But first,

6    let's dive to the means-plus-function claim.

7              THE COURT:  Ones that we can all agree are

8    means-plus-function.

9              MR. GIZA:  Yes, Your Honor, there's those

10   five.  So the good news is there is some agreement on

11   the means-plus-function claim.  There are two general

12   issues.  First, on the areas of agreement.

13             We put up Slide 59.

14             The parties are generally agreed as to the

15   functions, the recited functions for the

16   means-plus-function limitations.  So there's no

17   substantive dispute there.

18             There's also some agreement as to the

19   corresponding structure, whether it is or includes this

20   particular corresponding structure.  The parties have

21   agreed that the corresponding structure for the

22   means-plus-function claim at least includes computer 72.

23   It's shown here in Figure 8.

24             Front-end circuit --

25             THE COURT:  Wait, wait.  Go on.

1          MR. GIZA:  The parties agree that the

2   corresponding structure to the means-plus-function

3   claims includes computer 72, front-end circuit 74.

4          Those are both shown here in some detail in

5   Figure 8.

6          THE COURT:  Yes.

7          MR. GIZA:  It also includes, according to

8   the parties' agreement, on Slide 60, host processing

9   system 32.  And right next to Figure 6, there is the

10  language in the specification that describes the host

11  processing system as structure in place of the separate

12  processing system.

13         So that's the where the parties agree.

14         In general, there's two issues that we need

15  to address today regarding claim construction 4, the

16  means-plus-function claim.

17         First, whether an algorithm is required in

18  addition to the agreed structure.  And second, if an

19  algorithm is required is the algorithm disclosed, and if

20  it is disclosed, what exactly are the contours of that

21  algorithm.

22         A little more precisely, the question is:

23  Would a person having ordinary skill in the art

24  understand the Filler patent to disclose an algorithm

25  that is clearly linked to the recited function?

1          THE COURT:  Yes, in general that's a correct

2    question.

3          MR. GIZA:  Okay.  One point I want to raise

4    right from the beginning is the parties' agreement as to

5    what one of ordinary skill in the art is.

6          Now, I'm not saying that we have full

7    agreement.  There is some dispute as to whether it is

8    required for one of ordinary skill in the art to have a

9    medical degree.

10          NeuroGrafix believes that it is required.

11   Defendants believe that it could be a qualification but

12   is not be necessary to be a qualification.

13          Putting that aside, there is no dispute

14   between the parties that one of ordinary skill in the

15   art in this case is a highly educated and experienced

16   individual.  Both sides propose a level of ordinary

17   skill in the art that includes at least six years of

18   postgraduate education.  In many cases, a bachelor's

19   degree in engineering or computer science is the level

20   of ordinary level skill.

21          Not here.  Here we're talking about an M.D.

22   plus a residency plus experience.  From the defendants'

23   side, they're talking about a Ph.D. level of ordinary

24   skill in the art.  This is a highly educated person, and

25   we must make this analysis through that lens.

1          THE COURT:  Go on.

2          MR. GIZA:  So let's address the first issue,

3    whether an algorithm is required.  There are two cases

4    that will focus the argument for us.  On the one hand,

5    we have the Dossel case.  On the other hand, we have

6    Aristocrat.  And I'm sure that you're familiar with

7    these cases.  They're both prominent patent cases.  They

8    have been briefed extensively here.

9          There are two ways to reconcile these cases.

10         THE COURT:  Why don't you do it.  I would

11   like to hear you do it.

12         MR. GIZA:  Good.  Either way, Your Honor, no

13   matter which way we reconcile it, these claims, the

14   claims in the Filler patent are not indefinite.  That

15   much is certain.

16         Let's talk about Dossel and Aristocrat.

17   First off regarding Dossel, the relevant facts are

18   these:  The issue is whether means-plus-function

19   language, claim language, was indefinite in Dossel

20   because Dossel did not recite a computer as structure,

21   did not have the word "computer" in the specification.

22   There was no algorithm, according to the Court.  All

23   there was a reference to a -- to known algorithm,

24   specifically the word known algorithm.

25         Aristocrat is on the other side.

1    Aristocrat, there is disclosure of a computer with

2    appropriate programming.  And appropriate programming is

3    exactly the language that's in the specification there.

4              In the Aristocrat patent there was no

5    algorithm or even a reference to known algorithm.

6              So the outcome in Dossel was that the claim

7    language was not indefinite.  The outcome in Aristocrat

8    was that the claim language was indefinite.

9              So how do we reconcile these two cases?

10             One way in Dossel, Dossel's application

11   disclosed that the algorithms were known.  Aristocrat

12   did not have this disclosure.  Referred only to a

13   computer with appropriate programming.  Did not indicate

14   that there was some known way of doing it, just that

15   potentially there could be.  And the Court called them

16   out on this and said, All you can argue in Aristocrat is

17   that devising an algorithm to perform the claim function

18   would be within the capability of one of skill in the

19   art.

20             So one way to reconcile these two cases is,

21   on the one hand, if you refer to known algorithm, that

22   could be sufficient.  But arguing that one of ordinary

23   skill in the art could device an appropriate algorithm

24   is not.  That's one way to look at it.

25             Another way to reconcile these two cases.

1    If we look at Dossel, although the Court says there was

2    no disclosure of an algorithm, if we interpret Dossel to

3    have actually disclosed some corresponding algorithm and

4    maybe there is some definitional issue regarding

5    algorithm, how the Dossel court understood or used the

6    term algorithm, there certainly was some disclosure in

7    the specification about how the computation, how the

8    processing was supposed to be done.

9        If we understand that to be some sort of

10   corresponding algorithm, then Dossel and Aristocrat can

11   be reconciled such that Dossel stands for the

12   proposition that disclosure of basic mathematical

13   technique that would not be known -- that would be

14   known, pardon me, to any person of skill in the

15   pertinent art is not required if you have corresponding

16   additional disclosure that rounds out the rest of the

17   algorithm that you need to implement the claim

18   means-plus-function processing function.

19       So we have two ways of potentially

20   reconciling Dossel and Aristocrat.  If we go with the

21   first way, Dossel and Aristocrat stand for the

22   proposition that allows reference to known algorithms

23   and thus does not require an algorithm as corresponding

24   structure, then for this case no further analysis is

25   needed.

1          We have disclosure of corresponding

2    structure in this case, agreed structure, computer

3    front-end circuit postprocessing system.  However, if

4    Dossel and Aristocrat do require an algorithm in

5    addition to a computer, then we must analyze each

6    disputed claim individually, and this is where we get

7    into the subtlety that you talked about.  There is some

8    detail involved in this case, and we will delve into

9    that level.

10          In any event, Dossel stands at least for the

11    proposition that a reference to known algorithms as part

12    of additional relevant disclosure is sufficient to meet

13    the requirements of means-plus-function claiming.

14          MR. LOCASCIO:  Your Honor, I certainly don't

15    want to interrupt, but this one may seem like we -- I

16    think they've concluded -- talking about the law, and

17    now we're going into each of them?

18          I would suggest -- and certainly, we'll sit

19    down if Your Honor would like.  But I think I can

20    respond on the broader legal issues that separate us

21    here, and then we can go down to the sections below.

22          But I just think that would be a logical way

23    to address this.  We talked a fair amount about the law.

24          THE COURT:  Is that all right?

25          MR. GIZA:  That's fine, Your Honor.

1          You would like that?

2          THE COURT:  Well, you can do it whichever

3    way you want.  I think I do know what the law is.

4          MR. GIZA:  Okay.

5          THE COURT:  And I do know which way it's

6    going and how the most recent cases have gone.  So we

7    can move along.

8          MR. GIZA:  Okay.  So with your leave, Your

9    Honor, can we delve into Claim 54, which is the first

10   means-plus-function claim, and I'll describe for you how

11   the algorithm is disclosed.

12         THE COURT:  Do that.

13         MR. GIZA:  Let's go to Slide 62.

14         The first disputed means-plus-function

15   limitation is Claim 54-C, and it is a process through

16   means coupled to citation and output arrangement means

17   for processing to outputs to generate data

18   representative of the diffusion and anisotropy of the

19   selected structure.

20         This is a good claim limitation to start

21   with because the difference between the parties is

22   rather small.

23         As I mentioned earlier, the parties agree as

24   to the function, the recited function, and that is

25   processing said outputs to generate data representative

1    of the diffusion anisotropy of the selected structure.

2              With regard to corresponding structure, both

3    NeuroGrafix and the defendants, as I mentioned earlier,

4    agree that computer 72, front-end circuit 74, and host

5    processing system 32 and their equivalents are all

6    corresponding structure.  Those are clearly linked to

7    the recited function.

8              In terms of the algorithm, NeuroGrafix

9    believes that the appropriate algorithm is blocks 112

10   through 148 of Figures 9 and 10, and appropriate

11   equivalent.  Defendants believe that the corresponding

12   structure is blocks 112 through 154 from Figures 9 and

13   10 and equivalent.

14             So the only difference, Your Honor, between

15   the two parties on this particular claim term is the

16   corresponding structure of blocks 150 through 154 in

17   Claim 10.

18             Let's go on to Slide 63.

19             Here are Figures 9 and 10.

20             The portions that are boxed in red, the

21   parties agree that's all corresponding structure to this

22   claim limitation.  It all is clearly linked with the

23   recited function.  And this is fairly clear, if you look

24   starting with box 122, the box has ROI in there.  That

25   stands for region of interest.  That relates to the

1   selected structure, which is the last prepositional

2   phase in this claim limitation.

3           The next box, 124, average intensity, that's

4   a computation of the average intensity.  That is part of

5   the processing required by this claim.

6           The next box, 126, says linear regression.

7   That is a linear regression processing.

8           And 128, compute D and T2.  Again, another

9   step regarding the processing in this claim.  It says

10  compute D, capital D.  D stands for diffusion

11  coefficient, and that's expressly stated at Column 15,

12  line 27.  It's also stated at Column 18, line 27.

13          So clearly, this structure, this

14  corresponding structure, at least this part is

15  corresponding structure to Claim 54C, and it's clearly

16  linked to that claim language, that function.

17          The dispute between the parties -- we'll

18  move on to Slide 64.  The dispute between the parties

19  focuses on blocks 150, 152 and 154.  We believe it's not

20  be necessary for this claim limitation.  Defendants

21  believe that it is.  Particularly in step 128, the

22  variable D, as I mentioned, is data representative of

23  diffusion anisotropy.  And I've mentioned those two

24  portions in the specification where it describes that.

25          And I'll put it up for you.

1              We're looking at Column 15 and line 27.  You

2    can see it says:  Finally, the value of the apparent T2

3    relaxation time for the apparent diffusion coefficient

4    D, if diffusional weighting is employed, is computed for

5    particular ROI at block 128.

6              So once we get to block 128, Your Honor, we

7    have data representative of diffusion anisotropy.  And

8    that's what Claim 54C is computing.

9              Blocks 150 through 154 are additional

10   processing, the additional processing for display, as is

11   clear from block 154, which expressly says display.

12             Claim 54C does not require display, just

13   processing the data representative of diffusion

14   anisotropy.

15             Accordingly, the appropriate corresponding

16   structure for Claim 54C, if an algorithm is necessary,

17   is blocks 112 through 148 of Figures 9 and 10 and their

18   equivalent.

19             Unless you have any questions, Your Honor, I

20   will --

21             THE COURT:  No, I don't.

22             Let's just be sure of something.  The blocks

23   that we are talking about were all known and described

24   in the art, yes?

25             MR. GIZA:  I'm not sure that's true, Your

1    Honor.

2              THE COURT:  Well, I'm asking you.  Does the

3    invention include portions of -- at least the novelty of

4    this invention include the novelty of these blocks, no?

5              MR. GIZA:  Your Honor, that goes a little

6    bit beyond the claim construction question here, and I'm

7    not -- I can't speak with certainty as to that point.

8              THE COURT:  All right.  But everybody would

9    know about it.

10             MR. GIZA:  These steps, most of these steps

11   are, you know, looking at compute D or -- and T2.

12             Right.  So one of ordinary skill in the art,

13   as the parties have agreed, would have an understanding

14   of what to do in that situation.

15             THE COURT:  Yes.  All right.

16             MR. LOCASCIO:  Your Honor, let me first

17   address the law.

18             Mr. Giza suggests two ways to -- his

19   words -- harmonize Dossel and Aristocrat.  The Federal

20   Circuit has done this for us, Your Honor.  We don't have

21   to try to guess.

22             THE COURT:  They did do it.

23             MR. LOCASCIO:  Aristocrat itself says it.

24   Aristocrat specifically discusses Dossel.  For the last

25   14 years people have been trying to rely on Dossel to

1    say, You don't need an algorithm.  And I think ten times

2    the Federal Circuit has issued a decision published that

3    says:  Dossel doesn't mean you don't need an algorithm,

4    period.  And they have made that abundantly clear.

5              THE COURT:  Well, they are certainly coming

6    down with more than one decision indicating that.

7              MR. LOCASCIO:  WMS Gaming.  Harris vs.

8    Erickson.  I've got a list on them, Slide 101.

9              A specific algorithm needs to be included

10   for construction.

11             Now, how the Dossel and Aristocrat

12   distinction, as the plaintiff suggests, came to pass is

13   interesting.  Dossel is not a District Court case, as it

14   was suggested, that comes up on claim construction.

15   Dossel is a PTO rejection that makes its way to the

16   Federal Circuit.

17             And so the question there is never one of

18   claim construction.  So is the claim limited to a

19   particular structure as disclosed in the spec is never

20   the question before the PTO in Dossel.

21             The question is, is there enough in the spec

22   for the claim to issue, not what will its scope be if it

23   does issue.  And that's an important difference.

24             What ultimately Aristocrat says,

25   specifically with respect to the Dossel:  From the

1    context and reviewing the application -- this is

2    Aristocrat at 1336 -- it's clear Dossel, the Dossel

3    court used algorithm in a narrow sense, referring to a

4    particularly well-known mathematic operation could be

5    used to solve the equations disclosed in the

6    application.

7         Aristocrat in this case on appeal was

8    arguing what NeuroGrafix argues now, namely that

9    reference to a general purpose computer with appropriate

10   programming discloses enough under 1126.

11        And the court rejects that and says Dossel

12   doesn't get you there.  And if you ever actually pull

13   up, as we have here, the Dossel spec, you understand

14   exactly why this is the case.

15        This is the specification in Dossel.  Dossel

16   is 57885215.  And I can't even get -- I can get it all

17   on the screen, just barely.  This is the algorithm, a

18   single algorithm disclosed in Dossel.

19        Line 6 through line 55 of Column 4 in Dossel

20   is what the Court ultimately determined is a sufficient

21   disclosure under 1126 to not have -- to overcome the

22   rejection for indefiniteness.

23        Now, if one was to construe Dossel using

24   1126 language in the claims as it does, that algorithm

25   would be the entirety of the scope of Dossel's patent

1    protection plus statutory equivalence under 1126.

2            Dossel is not inconsistent when you look at

3    the actual disclosure and what was happening when that

4    case went to the Federal Circuit.

5            THE COURT:  By the way, in reading these

6    cases, which I do every time they come out, I always

7    wonder what the equivalent would be.

8            MR. LOCASCIO:  Statutory equivalent.

9            THE COURT:  Yes.

10           MR. LOCASCIO:  That is a discussion that I

11   expect if we ever get there will be another day of the

12   difference -- I have tried to explain it to people,

13   people explained it to me, the difference between

14   statutory equivalence and doctrine equivalence.  The

15   time of analysis is the core difference between the two.

16           THE COURT:  Actually, I think you are right.

17           MR. LOCASCIO:  Thank you.  Dossel does not

18   get them where they want to be, Your Honor.  And the

19   first proposed suggestion that it's -- if you use the

20   word known versus unknown, that that's somehow a

21   distinction doesn't get you there.

22           Biomedino, Federal Circuit 2007, quote, a

23   bare statement that known techniques or methods can be

24   used does not disclose structure.

25           1126 requires structure.  It doesn't just

1    it's say known to someone in the art.  You would getting

2    around the entirely of means-plus-function claiming if

3    all you had to do was say people know how to do it.

4              And so the law and how it impacts this set

5    of claims we're going to look at, Your Honor, is simple.

6    All of these claims talk about a processor.  It is

7    undisputed that the structure disclosed in the

8    specification for that is limited to a general purpose

9    computer.

10             This falls in that line of a decade of

11   Federal Circuit law on that issue.  It is undisputed

12   that computers require software to perform their

13   functions to specification, and the witnesses here

14   acknowledge that.  So ultimately the question is what

15   algorithm is disclosed.

16             Aristocrat, Harris and a host of other cases

17   saying if you're going to use a computer-implemented

18   means-plus-function language processing, as the case is

19   here, a processor means, it is limited to the algorithm

20   disclosed in the specification.  There needs to be one.

21   And if there is not an algorithm, the claim itself is

22   indefinite.  If there is an algorithm, the proper

23   construction is limited to that algorithm.  And if there

24   are two algorithms, certainly, Your Honor, you would be

25   limited to two.

1          We don't have that situation here.  For some

2     we have agreed there is one.  We have a little bit of

3     peripheral disagreement as to scope, which I'll address

4     in a second.

5          But the proper construction, while the

6     plaintiff suggests otherwise, is to include that

7     language in the construction.  And that's what The court

8     did in Harris.

9          We've addressed Dossel.  We don't need to

10    talk about that anymore.

11         54 processor means, what we just heard

12    Mr. Giza talk about, I want to walk through that

13    briefly.  Because as Your Honor recognizes, we're really

14    disagreeing about three boxes on a flow chart.  And

15    we're actually only disagreeing about two, because we

16    suggest it goes only through 152.

17         And as I think Mr. Fenster did on one point,

18    we looked back and said we've included 154.  That's the

19    display point Mr. Giza made.  That does not need to be

20    there.  So we're now -- we've solved 33 percent of our

21    flow chart debate.

22         We now have two boxes left, whether 150 and

23    152 need to be included or not.  And quite simply, Your

24    Honor, they do.  And the reason why is if you actually

25    look at -- there were two passages Mr. Giza pointed to

1    as talking about the diffusion variable D.

2              And the second one that he didn't put on the

3    screen is Column 18, lines 26 to 30, and they were cited

4    on the slide as to the place to look for this issue.

5    And I read it, and here's what it says:

6              If the axis of anisotropy is unknown, the

7    various diffusional coefficients D computed for each

8    region of interest using different gradient orientations

9    are compared at block 150 to identify the maximum and

10   minimum values.

11             Part of the paragraph I didn't highlight

12   after that goes on to say by doing that you get the

13   magnitude of diffusional anisotropy at the point while

14   the anisotropic direction is indicated by the gradient

15   orientation.

16             So the data, Your Honor, that is the

17   function here, is to be clear, we are trying to find out

18   data representative of anisotropic diffusion.

19             The reference that the plaintiffs themselves

20   point to on Column 18 says you need block 150 to do

21   that.  And the intro is that the axis of anisotropy is

22   unknown, that means if you don't know exactly the path

23   the nerve is in.  And as you will recall from some of

24   the early discussion, and if you look back at the

25   specification, including Column 19, line 55 and other

1    places, what is alleged to be novel here and a big part

2    of the invention is these nerves follow complex paths,

3    meaning you don't know what the direction of anisotropy,

4    namely the direction the nerve is going at that point

5    is.  And so the language here in Column 18 saying that

6    the axis of anisotropy is unknown, that's a big part of

7    what they're saying to do here.  And you need block 150

8    to do it.

9            You also need block 152.  And Column 15

10   speaks to that because your discrimination of water

11   diffusion and anisotropy is then achieved by subtracting

12   the suppressed imagine from the enhanced image.  And

13   that's block 152.

14           So we agree 154 shouldn't be in there.  But

15   ultimately blocks 150 and 152 are required.

16           And with that, I will pass it back for the

17   next means-plus-function language, unless Your Honor has

18   a question.

19           THE COURT:  No.

20           MR. GIZA:  Your Honor, I want to address two

21   quick points about Dossel and one point about Claim

22   154 C.

23           First off, defendants would like us to put

24   aside Dossel because it is actually is instructive to us

25   for reasons other whether an algorithm is required or

1   not.  Dossel, if nothing else, stands for the

2   proposition that a disclosure, including a disclosure

3   that there are known algorithms, can be sufficient

4   corresponding structure for a means-plus-function

5   limitation regarding a computer or a processor, and we

6   have that situation here in some fashion that's helpful

7   to us.

8          Another reason that Dossel is interesting

9   for us here is that Dossel is regarding the medical

10  imaging field.  Dossel says at 115 F.3d 947, to bolster

11  this result we note that in the medical imaging field,

12  it is well within the realm of common experience that

13  computers are used to generate images for display by

14  mathematically processing digital input.

15         The Dossel patent was dealing with matrix

16  inversion math similar to the vector tensor math

17  analysis called out in the Filler patent.

18         Now, a quick point on Claim 54C.

19         This is Column 18, line 27 is what I would

20  like to direct your attention to, Your Honor.

21         This is the point in the specification that

22  opposing counsel put up and said that, oh, look.  It

23  indicates that block 150 is actually required to

24  complete the claim language for 54C.

25         54 C requires processing the outputs to

1   generate data representative of the diffusion anisotropy

2   of the selected structure.

3          What it says at Column 18 refers to block

4   150, and it says once computer 72 determined that block

5   130 that images have been collected for all desired

6   diffusional gradient, operations proceed to block 150.

7   If the axis of anisotropy is unknown, the various

8   diffusional gradient D computed for each RLI, using

9   different gradient orientation are compared at block 150

10  to identify the maximum minimum value.

11         The diffusional coefficient D have already

12  been computed.  You already have data representative of

13  the diffusional anisotropy at that point.

14         The reason this becomes important, Your

15  Honor, is in the next limitation we're going to talk

16  about, Claim 64, block 152 is appropriate corresponding

17  structure; it is part of the algorithm for that

18  language.

19         So let's move on.

20         For Claim 64, the limitation is that it's a

21  dependent claim.  It's dependent going back to Claim 54.

22  That's why we're doing it in this order.

23         The limitation is wherein said process or

24  means is further for processing, said data

25  representative of the diffusion anisotropy of the

1   selected structure to produce a dataset that describes

2   the shape and position of the selected structure.

3          So, again, we agree on the function, that

4   is, processing said data representative of the diffusion

5   anisotropy of the selected structure to produce a

6   dataset that describes the shape and position of the

7   selected structure.

8          We agree that the corresponding structure

9   includes computer 72, front-end circuit 74, host

10  processing system 32 in equivalent.  And we agree that

11  the algorithm includes -- move on to Slide 66.

12          We agree that the algorithm includes the

13  language at Column 19, 4 through 7, for example, the

14  output of the substraction process can be divided up by

15  the signal information from a fat suppressed T2-weighted

16  spin-echo sequence using the aforementioned chest

17  technique.

18          So the dispute between the parties is

19  whether block 152 should be included as corresponding

20  structure for Claim 64.

21          On Slide 67, we explain a little further.

22          Block 152 is further processing from Claim

23  54.  The defendants have already identified blocks 152

24  as appropriate algorithm for the underlying Claim 54.

25  It's not be necessary for Claim 54; it is appropriate

1    for Claim 64.  Here it is also clearly linked to the

2    shape and position requirement of Claim 64.

3               Let's go on to Slide 68.

4               I spoke a little bit too soon, Your Honor.

5    There are some additional portions of the specification

6    that are also additional corresponding structure.  They

7    disclose additional corresponding algorithms.

8               So one place is at Column 18, lines 35

9    through 65.  This is describing subtraction neurography.

10   It says when these two penultimate images are then

11   mathematically or photographically or optically

12   subtracted from one another, a subtraction neurogram is

13   produced.

14              At Column 18, lines 53 through 55, it

15   explains that this is known for blood vessels, and it's

16   a called a subtraction angiogram there.  It is also

17   expressly linked to block 152.

18              Let me put that up.

19              Here's the portion of the specification that

20   we were just discussing, Your Honor.

21              Column 18, lines 35 -- I don't have it all

22   on the page, because otherwise we won't be able to read

23   it.  But it's lines 35 through 65.

24              And you can see at the very top, it says in

25   the preferred embodiment, the images associated with the

1    maximum minimum value of the diffusion coefficient

2    particular ROI are then used in a subtraction process,

3    as indicated at block 152.

4              So this text is clearly linked to block 152;

5    block 152 is linked to the process of generating an

6    image for display.  The image for display would show the

7    shape and position of the selected structure.

8              There's additional disclosure of

9    corresponding algorithms:  Column 18, lines 67 through

10   19, line 2.  It says, for example, in some applications

11   of known anisotropy, subtraction is unnecessary and can

12   be foregone in favor of a thresholding analysis -- a

13   threshold analysis.

14             So here, Your Honor, we have an alternative

15   to the subtraction neurography that we just spoke about.

16   We have a thresholding algorithm.  This is too is

17   clearly linked because it's described specifically as an

18   alternative to subtraction.  We have even more.

19             Next line, please.

20             We have a connected voxel with thresholding

21   algorithm.  This is related to the thresholding

22   statement we just saw, but this is at Column 21, lines

23   55 through 59.

24             At Column 29, lines 55 through 59, it says

25   comparing pixel intensity.  And it's comparing the pixel

1    intensity to image-dependent threshold level.  That's

2    the first step.

3              The second step in this algorithm is linking

4    or projecting the results in a two-dimensional analysis

5    to form a three-dimensional shape, the shape and

6    position of the nerve.

7              The development -- the formation of a 3-D

8    shape, that's clearly linking the forming of a

9    three-dimensional image described here with the

10   generation of data describing the shape and position of

11   a nerve required by Claim 64.

12             Immediately following that there is a

13   disclosure of a maximum anisotropy connection algorithm.

14   That's Column 21, line 60 through Column 22, line 5.

15   And there it describes a couple of steps.  It determines

16   the direction of maximum anisotropy at each voxel, and

17   then it uses known voxel connection routines such as the

18   one described in Saloner.  And it is described as an

19   alternative to the algorithms above; so it is also

20   clearly linked to generating the shape and position of

21   the nerve.

22             On Slide 71, we have two more examples.  We

23   have a disclosure of a three-dimensional imaging

24   technique at Column 22, lines 6 through 17.

25             I'll put that up.

1          This paragraph describes another algorithm,

2     a three-dimensional imaging technique.  The first step,

3     it tells one of ordinary skill in the art to use known

4     three-dimensional imaging sequences such as those

5     described in the Frahm article.

6          Then it says use four-dimensional analysis.

7     That's down at line 12.  The output of this sequence is

8     then processed using a three-dimensional Fourier

9     transform.

10          And finally, it says you can use the

11     algorithm in Figures 9 and 10 for additional processing.

12     It says the resultant processing used to compute D.

13          And as you recall from Figure 10, D is the

14     diffusion coefficient.  That's a reference to the

15     algorithm in Figures 9 and 10.  This is expressly linked

16     because it's given as an alternative.

17          In the first line, line 6.  This is Column

18     22.  As an alternative to the two-dimensional imaging

19     sequences described above, what was described above is

20     all the other algorithms that we just spoke about.

21          The final example of corresponding

22     algorithms that are disclosed regarding Claim 64 is at

23     Column 22, lines 18 through 27, where it says that -- it

24     says that the, more particularly, once the given nerve

25     has been identified -- sorry, Your Honor.

1          Go to the top of that paragraph, line 18.

2          Regardless of the routine employed -- so

3    this is supplemental to all the algorithms that we

4    already spoke about -- the system 10 may be further

5    programed to implement the projection by referring to

6    known characteristics of the structure.

7          Known characteristics of the structure, what

8    is that?  Down below, it talks about, more particularly,

9    once a given nerve has been identified in a given

10   two-dimensional image, the expert system 10 is able to

11   predict the occurrence of certain branches and mergers

12   in this structure.  So, for example, branches and

13   mergers within a particular nerve or neural tract.

14         All of these portions of the specification

15   are disclosing different algorithms, different ways of

16   processing the data representative --

17         THE COURT:  These are all known, though.

18   This is all known in the art, yes?

19         MR. GIZA:  These are all described in the

20   patent, Your Honor, yes.

21         THE COURT:  No, I'm asking.  The inventor of

22   this patent did not invent those algorithms?

23         MR. GIZA:  I think in general you're

24   correct, Your Honor.  There's a reference to a Frahm

25   article.  So that certainly was in the prior art.

1          THE COURT:  Let's be clear about this, the

2  inventor here was not the person who devised these

3  algorithms?

4          MR. GIZA:  Yes, I believe that's correct,

5  Your Honor.

6          THE COURT:  Yes.

7          MR. GIZA:  Okay.  So all of these various

8  portions of the specification are algorithms --

9          THE COURT:  That were known in the art?

10         To one skilled in the art?

11         MR. GIZA:  I believe that's correct, Your

12  Honor.

13         THE COURT:  Yes.

14         MR. GIZA:  So the appropriate corresponding

15  structure for Claim 64 is the algorithms described in

16  block 152 of Figure 10; the algorithms in the

17  specification at Column 18, line 35 through Column 19,

18  line 7; and at Column 20, line 25 through Column 22,

19  line 18 and equivalents.

20         If there are no questions, Your Honor, I

21  will turn it over.

22         THE COURT:  No, there are none.

23         MR. LOCASCIO:  Your Honor, the parties agree

24  that -- one second.  Let me back up a step here.

25         From 64, that a certain portion of the

1   specification is disclosed and it does disclose an

2   algorithm.

3           The plaintiffs want more in their claim.

4   They want all these other passages to be part of the

5   disclosed structure, which under 1126 the claim is

6   limited to.

7           It's difficult, I would -- at least on my

8   side of the room, it's difficult to keep track of all

9   these passages that the plaintiffs say disclose enough

10  structure or algorithms as is required to do this.

11          We had an exhibit that we provided the

12  Court -- what's the exhibit number? 7? 37?

13          37, that took the patent spec and put red

14  boxes all over it and give these passage numbers,

15  because at some point it was the only way we could keep

16  track of what they were pointing to.

17          THE COURT:  There are a lot of them.

18          MR. LOCASCIO:  There are.  And with the

19  exception of the ones we agree on, Passage 13, for

20  instance, is this one.

21          This is what that exhibit looked like.

22          I'm sure it was one they said, wow, I don't

23  know what this is all about.  But hopefully it made it a

24  little easier.

25          This takes each of the various columns and

1    lines that they say provides some structure, and it

2    gives it a number.  And we then walked through these

3    numbers to say why none of them satisfy the requirements

4    of 1126.

5              And it really boils down to four categories,

6    all of which the Federal Circuit has said don't cut it.

7    One, if you just describe the function but not providing

8    an algorithm; so you say one could design a function to

9    do that.  Well, that's very interesting, but it

10   certainly doesn't satisfy 1126.

11             The second is attempting to incorporate, as

12   Mr. Giza just did with the Frahm article.  Incorporating

13   their reference something else.  Well, that's not

14   sufficient under 1126.

15             The third is a person of skill in the art

16   could figure it out.  And that is clearly not the law.

17   And we'll get to that -- the point I raised earlier, the

18   Biomedino case, saying that just because telling someone

19   known techniques or methods can be used, that's not

20   satisfactory for 1126.  It doesn't provide any

21   algorithm.

22             And the last is it needs to actually be

23   linked to the function.  You can't just flow around the

24   spec and find something that seems like it's an

25   algorithm and say, oops, there you go.  I got something.

1    The Federal Circuit's rejected each of these, Passages 3

2    all the way to 12, and that's a whole section of the

3    spec that the plaintiffs point to fails to disclose

4    sufficient structure.

5              And I'm going to walk through those now

6    because Mr. Giza covered a handful of them just now.

7              First, where the specification merely

8    describes claimed functions but does not explain how the

9    patent performs that function, that's not enough.

10              And one of the sections, Mr. Giza just put

11    on the screen, Passage 9 as we've called -- that's the

12    upper right here on Slide 113, is Column 22, lines 18 to

13    25.

14              And now I've put it on the screen, line 18

15    through 25.   Okay.   And we just saw this a second ago.

16    Mr. Giza suggested this is an algorithm.   This tells you

17    what to do.

18              It says the system can be programed to

19    implement the projection by referring to known

20    characteristics of the structure.   That's the -- the

21    question we're asking is how do you do it?

22              You can program it to do a lot of things.

23    That's not an algorithm.   Indeed, it says an expert

24    system, expert in quotes, is able to predict the

25    occurrence of certain branches and mergers in this

1    structure.  This is about as far as you can get from an

2    algorithm you can use with a computer to generate those

3    branches and mergers.  Indeed, it's so hard to do that

4    they called it an expert system, but never disclosed

5    anywhere in the specification how to do it.

6              Just telling someone it can be done is not

7    an algorithm.  It certainly is not enough under 1126 to

8    identify sufficient structure clearly linked to perform

9    a function.  And that defect goes at Passages 6, 9, 10

10   and 11 that are pointed to by the plaintiffs.

11             Blackboard versus Desire2Learn hits this

12   right on the head.  The language simply describes the

13   function to be performed.  It says nothing about how the

14   access control manager ensures that those functions are

15   performed; as such, the language describes an outcome,

16   not a means for achieving that outcome.

17             Simply reciting software without some detail

18   about the meanings is not enough, and so those passages

19   do not come close to providing any structure, Your

20   Honor.

21             They also point to other people's work.

22   Passage 4 points to Basser as identifying some

23   algorithm.  Passages 7 and 8, and one of which the Frahm

24   reference was the one Mr. Giza just talked to you,

25   that's 8, that's the right side.

1                 Identifying a prior art reference has been

2    held insufficient to incorporate the algorithms from

3    those references into the corresponding structure.

4    Otherwise, you would use means language, and then you

5    would cite every piece of art that existed out there,

6    and then the person who wants to know if they're

7    infringing has to go look at all those works, divine the

8    algorithms they used, and those are now all part of your

9    claim.  That's not the way it works under 1126.

10   Passages 4, 7 and 8 fail for this reason.

11                 This was also addressed squarely by the

12   Federal Circuit in Pressure Products.  Courts cannot

13   look to the prior art identified by nothing more than a

14   title and a citation to provide the corresponding

15   structure for means-plus-function.  Simply mentioning

16   the prior art reference does not suffice as a specific

17   enough description to give the patentee a claim to all

18   those structures disclosed in that reference.

19                 Now, in response to this clear law,

20   plaintiffs point to a case called Atmel.  And they say,

21   well, Atmel says you can incorporate by reference and

22   that somehow negates Pressure Products and ignores this

23   problem.

24                 Well, Atmel actually found that in a very

25   unique circumstance that title, the actual title of the

1    reference, was a sufficient disclosure, and so thus by

2    citing that reference, you've disclosed enough.

3              Pressure Products actually addresses that

4    issue.  It says -- talks about Atmel.  Says it's unique.

5    And then it says that argument is rejected in Pressure

6    Products, and it ought to be rejected here because if on

7    the other hand the title did not disclose the prior art

8    structure, the structures in the prior art reference

9    could not be corresponding structure.

10             So the point is these processing claims

11   require an actual algorithm, Your Honor.  The title of

12   any those three works does not provide the algorithm to

13   generate 3-D data or anything else that these functions

14   require.

15             Their third argument -- and this is Passages

16   5 and 12.  Just saying someone knows you can do it.  And

17   this was -- Mr. Giza put up Passage 12, at the bottom.

18   He said, well, we tell people that in some applications

19   of known anisotropy subtraction is unnecessary and can

20   be foregone in favor of a threshold analysis.

21             That's not an algorithm by any means.  And

22   what it's saying, which is someone of skill in the art

23   might know or someone of skill in the art could figure

24   it out, the Federal Circuits rejected that under 1126.

25   And if you didn't means claiming, Your Honor, and didn't

1   resort to functional claiming, you could point things

2   out and spec that way all you want.  But if you're going

3   to use means-plus-function language, you have to under

4   1126 disclose the structure.

5              That is not sufficient to disclose the

6   structure.  The Federal Circuit has said that

7   repeatedly.

8              Med Instrumentation vs. Selecta, the correct

9   inquiry is to look at the disclosure of the patent, not

10  simply whether one of skill in the art would have been

11  able to write a software program.  And that's what

12  they're saying.  They're saying you could write an

13  algorithm to generate using the software, thresholding

14  or any of these other points.  Simply because someone of

15  skill in the art would be able to devise a means to

16  perform the function is not sufficient.

17             Lastly, they point to passages that don't

18  link to claim function, where the disclosure and the

19  specification is not an algorithm for performing that

20  function.

21             That same case, Med Instrumentation, talks

22  about what we've talked about for the last half hour

23  here, which is the duty of a patentee to clearly link or

24  associate structure with the claim function is the quid

25  pro quo for allowing the patentee to claim it in a

1    functional way under 1126.

2              And they use Passage 3 for that point.

3    Passage 3 does not describe a way of vector processing;

4    it merely describes how the output of vector processing

5    could be clinically useful.  And that's what Passage 3

6    does.

7              Passage 8 fails for the same reason.  That's

8    the Frahm reference.  It fails both because you can't

9    incorporate by reference.  But it also fails because

10   it's actually not linked to this function because it's

11   saying it's possible to carry out the signal acquisition

12   using a 3-D image sequence.  It's not generating 3-D

13   images.  It's not processing them as the claims require.

14   It just happens to be talking about a 3-D dataset, Your

15   Honor.

16             And so coming back now with that to Claims

17   54 and 64, we talked about 54 as requiring boxes 112

18   through 152, with respect specifically to 152, because

19   that seems to be where Mr. Giza and I disagree -- oh,

20   sorry, Your Honor.  Were you -- did I --

21             THE COURT:  No.

22             MR. LOCASCIO:  Okay.  If I can get us back

23   to 106 right quick.

24             Box 152, described in the specification, is

25   discrimination of water diffusion anisotropy is then

1  achieved by subtracting.  And so Claim 54, which

2  requires generating data representative of anisotropic

3  diffusion, requires you to do 150 and 152.  Once you've

4  done that -- and 152 is part of Claim 154, Your Honor --

5  it can't also become part of Claim 64, because

6  performing a step once in Claim 54 and then performing

7  it again in Claim 64 cannot support a different function

8  as Claim 64 requires.

9          And so with that, I'll pass it back to

10  Mr. Giza, because as I see it, Claim 54 we've covered.

11  Claim 64 is only the part agreed to, because Passages 3,

12  4, 5, 6, 7, 8 and 12, which are the ones NeuroGrafix

13  points, to fail for the four reasons that we looked at,

14  Your Honor.  They either try to incorporate it by

15  reference, just say you can figure it out if you're one

16  of skill in the art; talk about the function or the

17  goal, which is you can do this, or we would like to do

18  this, or aren't linked to the structure.

19          THE COURT:  Please.

20          MR. GIZA:  Just one point in rebuttal to

21  opposing counsel's argument.  He correctly states that

22  Atmel looked at the title of an article and finds that

23  that is sufficient for structure for a means-plus-

24  function limitation.  What he does is misstates

25  NeuroGrafix's argument regarding Atmel.

1          We are not taking the position that we can

2    incorporate by reference information that will add to

3    the corresponding structure to the algorithms that

4    support the means-plus-function limitations.   That's

5    very clear.

6          However, we do argue, just as was found

7    appropriate in Atmel, that in certain situations the

8    title of references that are described in the

9    specification provide the algorithm, the corresponding

10   structure that's clearly linked to the claim language.

11          THE COURT:  Now, let me ask you a question.

12   I know this sounds -- I have been following everything

13   you have said, but the last thing you said I'm not so

14   sure about.  Tell me that point again.

15          MR. GIZA:  Yes, Your Honor.

16          Federal Circuit law is clear that when you

17   have a means-plus-function claim limitation there must

18   be some corresponding structure disclosed in the

19   specification, and equally that you cannot find that

20   corresponding structure in a document that's

21   incorporated by reference.

22          THE COURT:  That's right.

23          MR. GIZA:  Atmel stands for the proposition

24   that if you have in your disclosure, in your

25   specification, the title of an article and the title

1    itself provides the information that one of ordinary

2    skill in the art would understand to disclose

3    appropriate structure for a means-plus-function

4    limitation, that can be sufficient.

5              THE COURT:  I understand now.

6              MR. GIZA:  Okay.  So with that, let's move

7    on to Claim 55.

8              This is Slide 74 -- oh, I'm sorry.  72.

9              The disputed limitation with Claim 55 is

10   limitation C, and it has two relevant parts.  It is

11   again processing means 4 and little (i)(1), vector

12   processing said outputs to generate data representative

13   of anisotropy diffusion exhibited by the selected

14   structure in the region regardless of the alignment of

15   said diffusion-weighted gradients with respect to the

16   orientation of said selected structure.

17             And little (i)(2) little (i), processing

18   said data representative of anisotropy diffusion to

19   generate a dataset describing the shape and position of

20   said selected structure in the region, said dataset

21   distinguishing said selected structure from other

22   structures in the region that do not exhibit diffusion

23   anisotropy.

24             So it's easier to break this down into the

25   two separate (i) and little (2)(i).

1          For Claim 55-CI, that's the vector

2    processing portion of this claim.  The parties agree

3    that appropriate corresponding structure, an algorithm

4    for vector processing, is disclosed in Column 20, lines

5    36 through 21, lines 23.

6          In particular, defendants are agreeing that

7    equations 3 through 6 in the specification are an

8    appropriate algorithm linked -- clearly linked to the

9    vector processing.

10         Here is Column 20 in the specification.  And

11   I want to point out some relevant steps in the algorithm

12   that both sides agree is disclosed here.

13         First, at line 35, it says that image

14   information is collected from, for example, four

15   multislice sets using a zero diffusion gradient B zero

16   and diffusion gradient B(sub xy), B(sub yz) and B -- oh,

17   I'm sorry.  Those are commas.  B(sub x), B(sub y) and

18   B(sub z) in the x, y and z respectively.

19         So there's an initial collection or there

20   are signal intensities obtained at that point.

21         Further down in this section it indicates

22   that the signal intensity is included in equation 3 to

23   normalize the resulting imagine intensity.  So there's a

24   normalization step here.

25         Third, there's a use of an effective

1   gradient or an effective vector.  The direction of the

2   effective gradient associated with this pixel image

3   includes components beta (xy), beta (xz) and beta (yz)

4   computed in the following manner.  And we have some

5   equations, equations 4, 5 and 6.  And these include some

6   trigonometric function, further processing.

7          So those are at least four steps that you

8   can take away from the specification where both parties

9   agree this is corresponding structure, this is

10  appropriate algorithm for Claim 55-C1.

11         If we look at Slide 75, this is a graphic

12  that NeuroGrafix put together with the assistance of one

13  of ordinary skill in the art, Dr. Filler, and we broke

14  up the specification into the various steps.  And this

15  is just a way of visualizing the text.

16         When we look at a flow chart, we naturally

17  connect that with an algorithm in software terms.  So

18  that's all we've done here.  We've taken some relevant

19  portions of the spec and we said, look, these are the

20  steps they're calling out.  There are other steps in

21  addition.  But this is at least one way one of ordinary

22  skill in the art would look at that disclosure.

23         And again, everything on the left-hand side

24  of this slide, the parties agree that's appropriate

25  corresponding structure that's clearly linked to Claim

1    55-CI.

2            On the right-hand side is the disputed

3    portion.  So this is the portion, Column 21, lines 35

4    through 47.  And what's disclosed there -- and I think

5    we hit upon it earlier with regard to the vector

6    processing limitation in the claims where it's not a

7    means-plus-function limitation.  And the question is, is

8    there an algorithm there.

9            Of course there is.  As you can see -- and

10   we've done the same thing as we did with the language

11   that the parties agreed was an algorithm.  We simply

12   broke it down into the steps, and we found three

13   relevant steps.  Although you could certainly break it

14   down different ways.

15           First, there's using the diffusion gradient

16   info to calculate diagonal and off-diagonal components.

17   And that's coming from the language, the title diagonal

18   and off-diagonal components of the self-diffusion

19   tensor, a tensor, as counsel from both sides I think

20   have indicated is a form of matrix math.  It's a form of

21   vector processing.  But it's a higher order calculation.

22   It's three axes or more.  It's the same fundamental

23   math.

24           The second step in this tensor algorithm is

25   to use the matrix, use the tensor to calculate MR

1   diffusion anisotropy data to calculate an effective

2   vector.  That also comes from the language diagonal and

3   off-diagonal components of the self-diffusion tensor

4   because it would indicate to one of ordinary skill in

5   the art the use of matrix math, the use of tensor math.

6           And the third step is transform the

7   coordinates to get the orientation of the neural fibers.

8   That's the last portion.  It's in the specification at

9   Column 21, lines 43 to 45, where it describes

10  transforming the coordinates of the MR diffusional

11  anisotropy data.

12          So here we have a tensor algorithm just like

13  the agreed-upon algorithm that is part of the

14  corresponding structure for vector processing.  It's

15  clear that this is also clearly linked with vector

16  processing.

17          I'll show you the portion of the

18  specification that we've been talking about.

19          This is Column 21, lines 35 through 47, and

20  you can see the first sentence here:  Alternative forms

21  of vector analysis can also be applied.

22          So this whole paragraph talks about other

23  forms of vector analysis that are part of the vector

24  processing means-plus-function limitation here.

25          If there are no questions on that

1    limitation, I will move on to 55-C2(i).

2                    THE COURT:  No.

3                    MR. GIZA:  Let's go to Slide 76.

4                    Just to focus us, we're looking at the

5    second portion of Claim 55.  It's processing said data

6    representative anisotropy diffusion to generate a

7    dataset describing the shape and position of said

8    selected structure in the region, the dataset

9    distinguishing said selected structure from other

10   structures in the region that do not exhibit diffusion

11   anisotropy.

12                   So again, this goes back to diffusion

13   anisotropy, which Your Honor will remember is the

14   property of different tissues to diffuse water in a

15   certain direction as opposed to equally in all

16   directions.  And this is processing to distinguish

17   tissue that has diffusion anisotropy --

18                   THE COURT:  What is the difference here?

19                   MR. GIZA:  So, Your Honor, the defendants

20   argue that there is no appropriate corresponding

21   structure for Claim 55-C2(i).  And we have found

22   appropriate algorithm corresponding structure for

23   processing the data representative of anisotropic

24   diffusion to generate a dataset describing the shape and

25   position of the selected structure and the rest of this

1    claim language.

2              Now, Your Honor, you will probably recall

3    that this language is very familiar.  This is quite

4    similar to the language that is in Claim 64.  And as you

5    might expect, the same portion of the specification

6    support and describe corresponding structure algorithms

7    for Claim 55-C2(1).

8              Let's go to Slide 77.

9              So there are four portions of the

10   specification that disclose algorithms supporting Claim

11   55-C2(i).  The first one is the connected voxel with

12   thresholding algorithm.  That's at Column 21, lines 55

13   through 59.

14             And if you will indulge me, I'll just put

15   that up quickly.

16             So at line 55, it reads:  For example, the

17   location of the nerves in a given image plane can be

18   detected by comparing pixel intensity to some threshold

19   level.

20             So there's an algorithm that describes two

21   steps:  Comparing the pixel intensity to a dependent

22   threshold; and then immediately following that is the

23   language a three-dimensional image can then be formed by

24   linking or projecting the results of these

25   two-dimensional analyses over a desired volume.

1              So again, the first step is comparing pixel

2    intensity to a threshold.  And the second step is

3    linking and projecting these results of the

4    two-dimensional analysis to form a three-dimensional

5    image.

6              As we discussed for Claim 64, that's clearly

7    linked to the language in Claim 55-C2(i) to generate a

8    dataset describing the shape and position of said

9    selected structure.  The shape and position, for

10   example, of a nerve.

11             Second point, maximum anisotropy connection

12   algorithm.  This is immediately following in the

13   specification, Column 21, line 60 through Column 22,

14   line 5.

15             Again, we have what can be described as

16   least a two-step algorithm.  First, identifying the

17   direction of maximum anisotropy for each pixel and then

18   using known voxel connection routines such as Saloner.

19   And this can be used to generate an image.

20             It's expressly described as an alternative

21   to the language immediately above the connected voxel

22   with thresholding algorithm.  So it is clearly linked to

23   the same Claim 55-C(2) language generating a dataset

24   describing the shape and position.

25             The third bullet point here, three-

1    dimensional imaging technique.  Again, we've discussed

2    this in the context of Claim 64, Column 22, line 6

3    through 17.  It involves using the 3-D imaging

4    sequences, performing a 3-D Fourier analysis, and then

5    using the algorithm in Figures 9 and 10.  Again, this is

6    described expressly as an alternative to the previous

7    two.  It is expressly clearly linked.

8              The last bullet point on Slide 77, you can

9    supplement the above algorithm with the known path of

10   the structure.  Again, this is clearly linked with Claim

11   55-C2 because it's described as a supplement to the

12   algorithms that we just described above.

13             THE COURT:  Give him a chance.

14             MR. GIZA:  Okay.

15             MR. LOCASCIO:  Your Honor, with respect to

16   55-C1, the plaintiffs contend that it's not only the

17   actual formula -- just step back a second.  Let's

18   take -- we spent a lot time on a lot of these passages.

19             But every single one of these is presented

20   in means-plus-function claim for processer or processing

21   means, which we all agree when the structure disclosed

22   is just a computer -- which is what is disclosed here.

23   And we need an algorithm that would be used by one to

24   program said computer to perform that function.

25             So while there's a lot of talk about

1    algorithms and one line in a specification, the

2    algorithm disclosed must be capable then being

3    programmed as the software to a computer to perform a

4    function.  These complex neural tracing 3-D imagery, it

5    -- one line in a spec, just as sort of stepping back and

6    say, okay, this is all interesting.  But one line in a

7    spec saying you can do this is nowhere near, to be

8    perfectly blunt, the kind of algorithmic disclosure of

9    any of the art -- I'm talking about any of the cases

10    that have found sufficient structure for a computer

11    means.

12              THE COURT:  Whose algorithm can it be?

13              MR. LOCASCIO:  Well, it doesn't -- I don't

14    believe it has to be -- if the only point of novelty was

15    that, it would have to be the applicant, for sure.  If

16    it's performing a function or some -- if the algorithm

17    to perform the function is not the point of novelty but

18    its claim to means language, it doesn't need to be novel

19    for the applicant.  But it certainly needs to be

20    disclosed.

21              THE COURT:  I agree about that.  Now, that

22    is from what I have derived from this case.

23              MR. LOCASCIO:  And so, for instance, if they

24    took the formulas from Basser, if that was sufficient to

25    be an algorithm, it was actually in that underlying

1    reference, and in the specification they said we're

2    going to use the description -- whether they called it

3    Basser's or didn't give him credit or not, but then they

4    walked through a 20-line section using formulas and ways

5    to do it or had a flow chart, that could be enough to be

6    an algorithm.

7            But just pointing to Basser or point to

8    Frahm is not. And Atmel, plaintiffs say, no, no, we're

9    only saying Atmel is the title that self-discloses this.

10   And then we went through 55-C1.

11           And what Mr. Giza said is they created this

12   handy chart -- this was, I think, Exhibit 3 or D to

13   their -- the plaintiffs' reply brief.

14           No?  I have it wrong?

15           Pardon me.  Opening brief.

16           And the left side, Your Honor, it certainly

17   looks a lot like these are -- these aren't that

18   different from this great chart.

19           The left side is four boxes long.  And they

20   say that's the algorithm we all agree on.  So how on

21   earth could the defendants dispute that the right side

22   isn't also an algorithm.  It's three boxes.  It's almost

23   as many boxes as the left.

24           The algorithm we agreed on, equations 3

25   through 6, is in the specification.  And what they have

1    boiled down to the four boxes on the left looks like

2    this in the actual specification.

3            It starts here.  It has formulas.  And then

4    it keeps on trucking on to Column 21, all the way to

5    there.

6            And so when they disclose that level of

7    detail as to how to do it with mathematical formulas, we

8    said, okay, there's your algorithm.  And that is

9    supposedly depicted in summary fashion over here on the

10   left.  And they say, well, the right side is also an

11   algorithm disclosed fully in the specification.

12           Well, that let's look at the specification

13   they point to for those three boxes.

14           Under Atmel, it is the title, and the title

15   alone, of the Basser reference.  Diagonal and

16   off-diagonal components of the self-diffusion tensor,

17   colon, their relation to an estimation from the NMR

18   spin-echo signal.  That's it.

19           That's the title.  And their contention is

20   that is an adequate disclosure of an algorithm you could

21   program your computer to do to generate this work.  And

22   then they depict it by taking that, whatever, 15 words

23   of text and turn it into this flow chart and say, well,

24   it's a flow chart now, so it's an algorithm.

25           It's not, Your Honor.  55-C1 is not

1    describing sufficient structure of the Basser reference

2    by the title they have on the screen in this

3    specification, Your Honor.  To suggest that, it does not

4    only turn Atmel on its head, but to throw away all of

5    the cases under 1126.  At this point now, we're

6    incorporating by reference, and that's the end of the

7    analysis.  That's what they're doing here.

8          55-C2, the plaintiffs point to four

9    passages.  The defendants' contention, Your Honor -- can

10   you just type 127 on here.  It's Slide 127.

11         55-C2 is an extension of 55-C1, obviously.

12   So it can't use the same structure to perform a separate

13   function.  And they point us to four passages and say

14   that's sufficient structure to have an algorithm to

15   generate this processing and generate a dataset

16   describing the shape and position.

17         And 6, 7, 8 and 9, two of those are depicted

18   on Slide 116, Your Honor.  Slide 116, Passage 7, they

19   point to is incorporating Saloner by reference.  Passage

20   8 is incorporating Frahm by reference.  Neither of those

21   provide sufficient structure to actually prepare and

22   generate the software to do that.

23         The other two passages, 6 and 9, are on the

24   left side, which this is the classic it-can-be-done

25   disclosure:  A 3-D image can then be formed by linking

1    or projecting the results of these two-dimensional

2    analyses over the desired volume.   That's it.

3              They contend that is a sufficient algorithm

4    to program a computer to generate a 3-D image.

5              Interestingly, the other one is the expert

6    system we talked about before.   I don't need to rehash

7    that for the Court.   That's all they identify for C2.

8              The fact of why there's no algorithm in here

9    to do that, Your Honor, is because they haven't figured

10   it out and they hadn't done it yet.   And Dr. Siruta said

11   as much.   In his deposition, he said they hadn't

12   developed software for actually doing this.   And that

13   hadn't happened not only in 1992, it hadn't happened

14   when he left the company in 2004.

15             When asked if there's any software

16   algorithms necessary -- that are necessary on the

17   scanner to generate these images, he said there is

18   software necessary, but his group had not come up with

19   it.   And neither had Dr. Filler or anybody else that was

20   part of the team at that time.

21             So it's not surprising that there's no

22   actual algorithms disclosed in the spec to do these

23   things, because they had not been done.   And to now

24   point to other references, Your Honor, and suggest that

25   that's sufficient structure violates the Federal

1    Circuit's guidance about not incorporating by reference

2    as well as not relying on just what one of skill in the

3    art could figure out.  Because at base, these are all

4    computer-based processing means which, as Your Honor

5    recognized, there's a significant body of case law

6    requiring something much more than the plaintiffs point

7    to here.

8              As a result, 55-C2 doesn't disclose any

9    algorithm in the specification to support that function,

10   and as a result it's indefinite.

11             THE COURT:  All right.

12             MR. LOCASCIO:  Thank you.

13             MR. GIZA:  Let me make just two quick points

14   in rebuttal to what opposing counsel has just argued.

15             First, he flashed up a couple of the

16   portions that I discussed earlier and said, look,

17   there's a title of an article in this portion of the

18   specification, so that can't be sufficient disclosure.

19             Well, Your Honor, as we went through those

20   various portions, I pointed out the language in the

21   specification in that title, all around that title

22   itself, that described how Dr. Filler and the other

23   inventors anticipated using the disclosure of that

24   article as part of their invention.

25             The title of that article alone gives

1    sufficient indication to one of ordinary skill in the

2    art as to what sort of algorithm is appropriate to

3    implement these claims.

4            The second point, opposing counsel's

5    argument appears to come down to the point that he

6    doesn't think that the disclosure in the specification

7    is sufficient.

8            He says, Look, it's only five lines or it's

9    only a paragraph.  Here's one where it's two paragraphs

10   or three paragraphs, and that's sufficient.

11           Well, as we discussed before we started

12   going into the means-plus-function claim, the

13   sufficiency of the disclosed structure and its clear

14   link to the recited function is judged through the lens

15   of what a person of ordinary skill in the art would

16   have.  And in this case -- in this case it's a high

17   level.

18           THE COURT:  All right.  Now you can go on to

19   other claims, or you can go on to your contention about

20   step-plus-function.  And then we'll adjourn.

21           You can answer to what he says.

22           MR. LOCASCIO:  Thank you, Your Honor.

23           MR. GIZA:  If I could just go on to Claims

24   58 and 61 briefly.  Those are the last two

25   means-plus-function claims.  We can handle those

1    together relatively quickly, I believe.

2                THE COURT:  You've got to do that.

3                MR. GIZA:  We're looking at Slide 78.  We've

4    put up the language of Claims 58 and 61.  It's very

5    similar.  It has a rather lengthy preamble.  And then

6    the operative claim language is analyzing the data

7    representative of --

8                THE COURT:  That's right.

9                MR. GIZA:  -- anisotropic diffusion to

10   determine how to relate this dataset, and said

11   additional data sets describing the shape and position

12   of cross-section of said neural tissue.

13                And based upon the results of said analyzing

14   the data representative of anisotropy diffusion that

15   first step, combining said dataset, and said additional

16   data sets to generate said further data sets that

17   describes the three-dimensional shape and position of

18   the segment of said neural tissue, thereby allowing a

19   three-dimensional shape and position of curved neural

20   tissue to be described.

21                And this is essentially the same language in

22   both of these claims.

23                THE COURT:  It is.

24                MR. GIZA:  NeuroGrafix contends that there

25   is ample supporting structure for this.  It includes of

1    course, as we have including throughout, computer 72,

2    front end circuit 74, postprocessing system 32 and

3    equivalents.

4              In addition, algorithms supporting this can

5    be found at Columns 21, lines 55 through 59; Column 21,

6    line 16 through 23; Column 19, 33 through 38, Column 21,

7    line 60 through Column 22, line 5, and those

8    equivalents.

9              Let's look quickly at Slide 80.

10             THE COURT:  I have it in front of me.

11             MR. GIZA:  Okay.  I'll walk you through the

12   various algorithms that are disclosed supporting Claims

13   58 and 61.

14             First, there's a simple projection

15   algorithm.  That's at Column 19, lines 33 through 38.

16             The first step would be to identify the --

17             THE COURT:  I have it here, and I can refer

18   to it.

19             MR. GIZA:  Pardon me, Your Honor?

20             THE COURT:  I have your reference right in

21   front of me.

22             MR. GIZA:  Okay.

23             So in Column 19, line 33, it talks about the

24   simple form of a three-dimensional image generation.  So

25   we know right off the bat that we're talking about

1    three-dimensional image generation.  That's right out of

2    the claim language where we're generating a three-

3    dimensional image of the shape and position of the

4    neural tract.

5              It describes the high signal-to-noise ratio,

6    S/N ratio of the two-dimension neurograms produced by

7    system 14.  Readily allows the image nerve cross-

8    sections to be identified and then linked together to

9    form three-dimensional projection of a neural structure.

10             So again, we have a two-step algorithm here.

11   We have identification of the nerve.  And then we have

12   linking of the nerve cross-sections.  And this is all

13   expressly linked to the recited function, the

14   three-dimensional image generation.

15             The next portion is the connected voxel with

16   thresholding algorithm, Column 21 through lines 55

17   through 59.  We have already talked about this in

18   context with the other claims that have this very

19   similar claim language of shape and position of a nerve.

20   I won't go through that again.

21             We also have on Slide 81, we have an

22   orientation contrast algorithm.  This is at Column 21,

23   line 16 through 23, where we use arc 10 images.  It

24   describes these as being alternatives to the other

25   disclosed algorithms.

1          Then we assign an intensity of the pixel in

2     direct proportion to the angular output.

3          And the third step is we are able to trace

4     the neural tract.  This is all at Column 21, line 16

5     through 23.

6          And finally we have --

7          THE COURT:  Let me stop you.  You have this

8     down here.

9          MR. GIZA:  Yes, Your Honor.

10         THE COURT:  I understand the point.

11         MR. GIZA:  Okay.

12         THE COURT:  Do you want to say anything?

13         MR. LOCASCIO:  All I need to say, Your

14    Honor, is we don't believe that any of these -- these

15    are the same four passages we've looked at before.

16         THE COURT:  Yes.

17         MR. LOCASCIO:  We call them 6, 7, 10 and 11.

18         THE COURT:  Yes.

19         MR. LOCASCIO:  And 6 and 7 they say are also

20    part of the independent claim that these are penned

21    from.  So you would be using the same structure to

22    perform two different functions, which I don't believe

23    you can do.  Certainly it doesn't do it here.

24         One of them, 7, is incorporating Saloner by

25    reference.  The other three just say it can be done.

 1    And we don't believe that's sufficient structure for an

 2    algorithm.

 3                    Thank you.

 4                    THE COURT:  Now, let's go on to

 5    step-plus-function.

 6                    MR. GIZA:  Yes, Your Honor.

 7                    THE COURT:  What is the point here that you

 8    want to make?

 9                    MR. GIZA:  So with regard to claim --

10                    THE COURT:  It is not a means-plus-function.

11                    MR. GIZA:  It's not a step-plus-function,

12    Your Honor.  Yes, that's correct.

13                    THE COURT:  No, it should not be construed

14    as a means-plus-function claim.

15                    MR. GIZA:  That's right, Your Honor.  It

16    should not be construed under Section 112, paragraph 6.

17    In this particular instance, they are -- it's a method

18    claim.  So it would be a step-plus-function format.  And

19    defendants are arguing that the step-plus-function

20    analysis should be applied.  We're arguing that it

21    should not.

22                    So looking at Slide 82, the analysis goes as

23    follows.  First, there's no steps for language.  The

24    Federal Circuit in Masco was very clear.  The steps for

25    language is required for the presumption of applying,

1    Section 112, paragraph 6.  There's no presumption for

2    alternative language like steps of.

3              The Federal Circuit said, well, that form

4    has been used, you know, through, you know, for decades,

5    and so we don't want to change patentee's expectation on

6    a subtle wording choice.  They have to say steps 4 to

7    invoke 1126 to invoke the presumption.

8              And the next bullet point, Masco says where

9    the claim drafter has not signalled his intent to invoke

10   Section 112, paragraph 6 by using the steps 4 language,

11   we are unwilling to resort to that provision to

12   constrain the scope of coverage of a claim limitation

13   without a showing that the limitation contains nothing

14   that can be construed as an act.

15             THE COURT:  We are going to let him answer

16   that because I already read your points.

17             MR. GIZA:  Okay.

18             THE COURT:  And then we are going to

19   conclude.  You know this argument.

20             MR. LOCASCIO:  I know this argument, Your

21   Honor.  The defendants do not contend that we are

22   entitled -- that there is a presumption, Your Honor, a

23   step-plus-function, just like means-plus-function.

24             The language itself gets you a presumption

25   which is rebuttable, but it also is -- can be

1    demonstrated, and some claims indeed are

2    step-plus-function, if that phrase is not used.

3              In the analysis, Masco Corp., the gear

4    system's case we cite, point to if it is a method claim

5    with a step and a function, but it doesn't actually tell

6    you what acts to perform to perform the function, well,

7    then it's no different than -- well, then it's just

8    considered under 1126 in the method context.

9              And here, these claims are.  This is Claim

10   36 on the screen.

11             Now, remember, Claim 55 talks about a

12   process or a process or means.  This is the step of

13   processing said data representative anisotropic

14   diffusion.  The function is to generate a dataset

15   describing the shape and position.

16             THE COURT:  That is what the function is.

17             MR. LOCASCIO:  And that is exactly the same

18   function, not surprisingly, as it was is back in Claim

19   55.  And I'm not suggesting, Your Honor, that there's

20   presumption that if you have it both as an apparatus and

21   as a method that you automatically turn all those

22   methods into step-plus-function.

23             But what I am saying is when you have

24   language like this that doesn't tell you any act to

25   perform in the claim to do it.  Okay.  What do I do to

1    process that to generate that dataset?

2              It doesn't say anything.  There's no act at

3    all.  And where there is no act, doesn't tell you how to

4    do it, well, then we're back in the 1126 analysis.  And

5    that is the case for Claim 36.  As a result for this

6    instance, it's also the claim for 39, 46 and 49.  It's

7    also the case for those three claims.

8              In those claims it is the function -- or the

9    step is to generate by analyzing and then the -- you

10   know, how do you do that analysis.  It's the same issue.

11             And for all of these, Your Honor, a claim

12   cannot be construed so broadly as to cover every way to

13   do it in a method claim either, just like in an

14   apparatus claim.

15             And so here we're faced with having not

16   identified any way or how to do it.  No acts.  It's 1126

17   that applies.  And I grant you, the number of

18   step-plus-function cases is a lot smaller than the

19   number of means-plus-function cases.  But that doesn't

20   mean when you're faced with claim language like this, we

21   ignore it and we just run away from 1126.  This is

22   exactly the kind of case that 1126 step-plus-function is

23   designed to address.  And where there is no structure,

24   Your Honor, having failed to identify any algorithm that

25   does this, all of these, Your Honor, are indefinite:

1   36, 36E, 39, 46 and 49.

2              THE COURT:  Yes.

3              MR. LOCASCIO:  And so I think that's about

4   as short as I can make that point, Your Honor.

5              THE COURT:  All right.  Now let me ask you,

6   we're going to conclude it this way.  You heard me

7   answer to the point of novelty.  What in your opinion is

8   the point of novelty here?

9              MR. LOCASCIO:  For the entirety of the

10  invention, Your Honor?

11             The vector processing equations that are

12  defined -- I think equations 3, 4, 5 and 6?

13             THE COURT:  Yes.

14             MR. LOCASCIO:  I don't know that those are

15  in the art.  I don't know that we've identified that.

16  They're certainly described as the patentees' as their

17  own lexicographer as to what vector processing is.

18             THE COURT:  Yes.

19             MR. LOCASCIO:  To the extent there are

20  method claims that are means-plus-function processing

21  means that are narrowly construed -- because that's the

22  only algorithm disclosed, that aspect, Your Honor, seems

23  to my account to be the only point of novelty.  The

24  apparatus claims, okay, that -- pardon me.  Do I -- I

25  may have it backwards.

1            The earlier claims basically saying get a

2   conspicuous nerve, I think there's zero point of

3   novelty, Your Honor, at base.  Use the MRI machine.

4   Generate an image using existing prior art pulse

5   sequences to get an image that has a nerve that is some

6   way determined to be conspicuous when that existed in

7   the art, I don't think there's any point of novelty for

8   that.  The only thing that I'm not aware of being

9   clearly not a point of novelty is the vector processing

10  math.

11           If I'm missing something, I'm sure someone

12  will --

13           THE COURT:  The vector processing interested

14  me very much.  Now, let's go back to what you said

15  referencing the patentee.  Tell me again.  I asked this

16  question before and I don't want to leave it, because I

17  want to know what is the point of novelty?

18           MR. FENSTER:  Your Honor --

19           THE COURT:  Yes.

20           MR. FENSTER:  -- you need to look claim by

21  claim.  One of the points of novelty --

22           THE COURT:  Now, let me ask you --

23           MR. FENSTER:  Yes.

24           THE COURT:  -- is that the position, I need

25  to look claim by claim?  Because I thought when I came

```
 1

 2

 3                   CERTIFICATE OF REPORTER.

 4

 5   COUNTY OF LOS ANGELES      )

 6                              )  SS.

 7   STATE OF CALIFORNIA        )

 8

 9   I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR

10   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

11   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

12   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

13   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

14   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

15   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

16   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

17   JUDICIAL CONFERENCE OF THE UNITED STATES.

18

19

20   DATE:  APRIL 4, 2011

21

22   _____

23   SHERI S. KLEEGER, CSR

24   FEDERAL OFFICIAL COURT REPORTER

25
```