# Exhibit IND24

```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   NEUROGRAFIX, a California         )

 6   corporation; WASHINGTON RESEARCH  )

 7   FOUNDATION, a not-for-profit      )

 8   Washington corporation,           )

 9                       PLAINTIFFS,   )  CASE NO.

10          VS.                        )  CV 10-1990 (MRP)(RZX)

11   SIEMENS MEDICAL SOLUTIONS USA,    )

12   INC., a Delaware corporation and  )

13   SIEMENS AKTIENGESELLESCHAFT, a    )

14   German corporation,               )

15                       DEFENDANTS.   )

16   _____   )

17   AND RELATED CROSS ACTION          )

18   _____   )

19

20       VIDEOTAPED DEPOSITION OF AARON G. FILLER, M.D.

21                    LOS ANGELES, CALIFORNIA

22                       FEBRUARY 22, 2011

23

24   REPORTED BY: CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR

25   JOB NO.: 36551
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7                           February 22, 2011
 8                              9:03 a.m.
 9
10
11
12
13    Deposition of Aaron G. Filler, M.D., taken on
14    behalf of Defendants, held at the offices of
15    Russ, August & Kabat, 12424 Wilshire Boulevard,
16    Suite 1200, Los Angeles, California, before
17    Christy A. Cannariato, CSR #7954, RPR, CRR.
18
19
20
21
22
23
24
25
```

```
                      A P P E A R A N C E S
```

REPRESENTING THE PLAINTIFF AND THE WITNESS:

    RUSS, AUGUST & KABAT

    BY:  MARC FENSTER, ESQ.

    12424 WILSHIRE BOULEVARD

    LOS ANGELES, CALIFORNIA 90025


REPRESENTING THE DEFENDANTS:

    KIRKLAND & ELLIS

    BY:  GREGG LoCASCIO, ESQ.

    BY:  SEAN M. McELDOWNEY, ESQ.

    655 FIFTEENTH STREET, N.W.

    WASHINGTON, D.C. 20005


ALSO PRESENT:

MICHAEL MOSELEY, Ph.D.

DARREN SIRKIN, THE VIDEOGRAPHER

```
 1                          I N D E X
 2
 3   EXAMINATION BY                                       PAGE
 4   MR. LoCASCIO.............................................8
 5
 6   ----------------------------------------------------------
 7                          EXHIBITS
 8   EXHIBIT DESCRIPTION                                   PAGE
 9
10   Exhibit 11
11   United States Patent 5,560,360........................34
12
13   Exhibit 12
14   Expert Report Related to Construction of
15   Dr. Aaron Filler, M.D................................175
16
17   Exhibit 13
18   Rebuttal Expert Report of Dr. Aaron Filler, M.D. To
19   the Expert Report of Michael E. Miseley Concerning--
20   Patent No. 5,560,360..................................36
21
22   Exhibit 14
23   Single page with Equation of Conspicuity..............96
24
25
```

Page 5

1                           EXHIBITS

2   EXHIBIT DESCRIPTION                                           PAGE

3

4   Exhibit 15

5   Expert Report of Michael E. Moseley Concerning

6   U.S. Patent No. 5,560,360............................99

7

8   Exhibit 16

9   Plaintiff Neurografix's Disclosure of Asserted Claims

10  and Infringement Contentions........................124

11

12  Exhibit 17

13  Plaintiffs Neurografix and Washington Research

14  Foundation's Preliminary Claim Constructions........135

15

16  Exhibit 18

17  Amendment and Request for Reconsideration...........178

18

19  Exhibit 19

20  MR Imaging of Anisotropically Restricted Diffusion of

21  Water in the Nervous System:  Technical Anatomic, and

22  Pathologic Considerations, by Joseph V. Hajnal, et al.,

23  Journal of computer Assisted Tomography 15:(1)1-18,

24  January/February 1991...............................178

25

Page 6

```
 1  ------------------------------------------------------------
 2              QUESTIONS INSTRUCTED NOT TO ANSWER
 3
 4                       Page 124, Line 24
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

1     Los Angeles, California; Tuesday, February 22, 2011
2                        9:03 a.m.
3
4
5           THE VIDEOGRAPHER:  Good morning.
6           This is the start of tape labeled No. 1 of the
7  videotaped deposition of Aaron Filler in the matter
8  Neurografix versus Siemens in the US District Court,
9  Central District of California, Case No. CV 10-19990
10 (MRP)(RZX).
11          This deposition is being held at 12424
12 Wilshire Boulevard, Santa Monica, California, on Tuesday,
13 February 22nd, 2011 at approximately 9:03 a.m.
14          My name is Darren Sirkin from TSG Reporting.
15 The court reporter is Christy Cannariato also in
16 association with TSG.
17          Counsel, would you please introduce
18 yourselves.
19          MR. LoCASCIO:  Gregg LoCascio and Sean
20 McEldowney from Kirkland & Ellis, LLP on behalf of the
21 Defendants.  In attendance is Dr. Michael Moseley.
22          MR. FENSTER:  Marc Fenster with Russ, August &
23 Kabat on behalf of Neurografix and the witness.
24          THE VIDEOGRAPHER:  Thank you.  Will the court
25 reporter please swear in the witness.

Page 8

1        AARON G. FILLER, M.D.,
2    having first been duly sworn, was
3    examined and testified as follows:
4
5               EXAMINATION
6  BY MR. LoCASCIO:
7       Q.    Good morning, Dr. Filler.
8       A.    Good morning.
9       Q.    Have you been deposed before?
10      A.    Yes.
11      Q.    And roughly tell me how many times.
12      A.    About 250, 300 times.
13      Q.    What context generally were those depositions
14  in?
15      A.    They were mostly medical sort of personal
16  injury, med-mal.  Some of them are expert, mostly relating
17  to medical imaging in some ways.
18      Q.    In any of them were you a named party?
19      A.    Yes, I've been a named party a few times.
20      Q.    Were you ever the plaintiff or were you always
21  the defendant in those cases?
22      A.    Both.
23      Q.    Can you just tell me briefly in what context
24  you've been a plaintiff, sir, other than this case?
25            MR. FENSTER:  You mean him personally?

Page 121

1  particular calculation.
2      Q.    Okay.  It sounds like two or three times
3  you've said that ratio of differences, that way to measure
4  conspicuity, is specifically you specifically in the
5  specification tell people is not the way to do it.
6            Have I heard you correctly?
7      A.    Yeah.  Because we say that --
8      Q.    Can you just tell me where you're reading
9  from?
10     A.    We're on Column 27, line 57.
11     Q.    Thank you.  Go ahead.
12     A.    So we're talking about the unique internal
13 organization.
14     Q.    And so is it your belief, sir, that when --
15 withdrawn.
16           When you earlier said, We told people
17 specifically in our specification, Do not use the
18 difference method of calculating conspicuity, is Column 27
19 where you believe you conveyed that in the disclosure?
20     A.    Yeah.  Column 27 we say that even when the
21 conspicuity doesn't permit identification, you can use the
22 second technique.  And then we go on to explain that
23 technique.  So we take this, the ratio of differences that
24 you described, using your term.
25           But we specifically say thresholding, use of

Page 122

1   thresholding processes -- this is Column 28, line 2:
2               (Reading:)  Thresholding process is used to
3           identify relatively bright regions of the image
4           potentially representative of nerve.  Within the
5           boundaries of these regions established the
6           intensity of the pixels associated with each
7           region is evaluated.  An average of intensities
8           -- image intensities for the regions are
9           computed.  And we then I can read through it but
10          it goes through and explains how we look at the
11          difference of intensities.
12      Q.      Okay.  The portion you read a second ago,
13  which ended at I think line 7 of column 28, that had not
14  yet talked about the difference method that we've been
15  talking about; right?  That's not -- you haven't read
16  anything talking about the difference, the ratio of the
17  differences as of line 7 in column 28.  True?
18      A.      Right.
19      Q.      Okay.  Do you believe starting at line 8, the
20  patent now explains not to use the ratio of differences to
21  calculate conspicuity?
22      A.      (Document review.)  Well, this is essentially
23  a method of doing the fascicle identification.  And what
24  it's doing is using a threshold to get you this difference
25  between bright and dark.  So I'm not sure that it exactly

Page 123

1  maps to the simple equation, but my recollection is that
2  this is -- this and other text in the specification leads
3  one to a method for the -- that looks at this bright to
4  dark -- and also I think we use it in the -- I guess they
5  refer to it in the infringement contentions where I lay it
6  out in more -- where it's laid out in more detail for the
7  subtraction. And here what we try to do is we're taking
8  pixel -- adjacent pixel groups and looking for these
9  differences in intensity.
10     Q.    Sir, the section we just looked at that you
11  were reading starting at line 8 of Column 28 doesn't
12  describe in the text a conspicuity formula that is akin to
13  the paragraph 24 of the Moseley report which is maximum
14  signal intensity minus min divided by maximum background
15  intensity minus min; right?
16           MR. FENSTER: Objection. Vague.
17     A.    I mean, I think this is -- my impression is
18  that this fascicle identification method is the closest
19  thing to what one might be trying to achieve a min or max.
20  But the fundamental problem is that's not something that
21  is widely used and is not what we, you know, describe.
22  And we allude to it as trying to use a -- because what you
23  use that for is a complexity measure, essentially. What
24  we're talking about you can use a complexity measure or
25  fascicle identification algorithm, but we're not going to

```
1   call that conspicuity.  And you could call that
2   conspicuity, but we're not calling that conspicuity.
3       Q.      And you believe this language in the patent
4   tells the reader that that is not -- do not use that way
5   in calculating conspicuity.
6       A.      Right.  We're talking -- saying the complexity
7   measure is going to be different from the straight ratio
8   of intensity measure.
9               MR. FENSTER:  When you get to a convenient
10  stop --
11      A.      Ratio average intensity.
12              MR. FENSTER:  -- stopping place.  What's your
13  plan for lunch?  It's 12:15.
14              (Exhibit 16 marked for identification.)
15              MR. LoCASCIO:  Let's go like another 10
16  minutes, then we'll take a break and talk about it mark.
17              Hand you Exhibit 16, sir, which is
18  Neurografix's disclosure of its claims and infringement
19  charts.  And I would like for you, first of all, have you
20  ever seen that before?
21      A.      I have seen this before.
22      Q.      And Exhibit 16 I would like to were you --
23  withdrawn.
24              Were you involved in the preparation of this
25  document?
```

Page 125

1        MR. FENSTER: Actually, I will instruct you
2  not to answer on the grounds of attorney-client privilege.
3        Q.    Is today the first time you've seen it?
4              You may answer yes or no.
5        A.    No, this is not the first time I've seen it.
6        Q.    Had you seen it before it was submitted to
7  Siemens, the Defendants?
8        A.    I did see it before it was submitted.
9        Q.    I want to direct your attention, sir, to page
10 -- at the very bottom of page 4 of the attachment. So
11 there's a chart, sir, created by plaintiffs. And then the
12 very bottom of 4 there's one line of a section that gets
13 cut off.
14             And so starting there, if you look at the left
15 side, that's the claim language. The right side of this
16 is alleged to be where it's found in the accused product.
17 Do you understand that?
18       A.    Mm-hmm.
19             MR. FENSTER: Objection to the extent it
20 misstates it.
21       Q.    If you read the language on the left,
22             (Reading:) Processing the output to
23          generate a," and then you carry over to the next
24          page, "data set describing the shape and position
25          of said nerve, said data set distinguishing said

1  confusion in this.  So we can certainly resubmit the
2  invalidity contentions to clarify that for you.
3       Q.    So your position now, sir, now that we've
4  talked about this in your deposition, is that the text on
5  the top of page 7 in that box in Exhibit 16, the first
6  sentence of that does relate to [1](e)[1], as it's
7  described in this chart, the conspicuity of 1.1.  The next
8  two sentences that describe the difference method of
9  measuring that ratio do not relate to [1](e)[1] and ought
10 to have been in the [1](e)[2] box?
11      A.    I think what happened is --
12      Q.    Is that --
13      A.    -- this is from the draft invalidity
14 contentions for Oak Tree, and --
15            MR. FENSTER:  Let me caution you not to reveal
16 work product and communications with counsel or how these
17 were prepared.
18      Q.    So your answer, sir, is that the box that
19 we're looking at for [1](e)[1] in Exhibit 16 in the
20 attached chart from Neurografix, for lack of a better
21 word, is wrong?
22      A.    No.  I said that it refers to the fascicle
23 identification portion, whereas the first sentence refers
24 to the 1.1 conspicuity.  I'm not quite sure if the lines
25 have some legal significance, you know, in the box.

Page 134

1            MR. FENSTER:  I think he's politely saying I
2    screwed up, but I should have put that down in [1](e)[2].
3       Q.     Your opinion, sir, is it is part of [1](e)[1]
4    or the conspicuity limitation; that one way to measure
5    that is the use of NIH ImageJ software.
6       A.     Yes.
7       Q.     And everything after that, which describes as
8    we talked about, what is equation 24 or the equation in
9    paragraph 24, the Moseley report, was included in
10   [1](e)[1] here but should no longer be there?
11      A.     It should be.  It relates to [1](e)[2], which
12   is analyzing the output for information representing the
13   fascicles.  Because if you look at what's opposite that,
14   yeah, it just simply says it has had the verbal analysis.
15   So you have a reading a report from one of the infringing
16   institutions whereas, you know, this analysis gives you a
17   mathematical method of doing the fascicle identification
18   that correlates with the text in the patent where we talk
19   about the fascicle identification as an alternate to
20   conspicuity.
21           So I think, you know, you have to go with what
22   the specification says and for the point of view of
23   infringement.  That's -- I would take it to say that the
24   first line is the conspicuity correlated to the text and
25   then the second part is fascicle identification.

Page 135

1        (Exhibit 17 marked for identification.)
2    Q.   I'm hopeful that we -- my goal here is to not
spend a lot more time, to just close out conspicuity and
then we'll take a lunch.
         I want to show you Exhibit 17, which are
Neurografix's claim constructions from the Oak Tree case.
I take it, as with this case, you were an active
participant in managing that litigation. Fair?
9    A.   Yes.
10   Q.   And I take it this is not the first time
you've seen the proposed claim constructions in the Oak
Tree case asserting the same '360 patent; fair? You had
seen that before?
14   A.   Yes, I've seen this before.
15   Q.   And you reviewed them before they were filed
or served; am I correct?
17   A.   Yes, I did.
18   Q.   Turn to page 6, please. This was
Neurografix's proposed construction of conspicuity in the
Oak Tree case where the same patent was at issue.
"Conspicuity refers to the visual contrast (in terms of,
for example, intensity, color, and/or complexity) between
the tissue (e.g. nerve) and surrounding background
tissue."
25       Did I read that correctly on page 6 of

Page 179

1          C E R T I F I C A T E

2

3   STATE OF CALIFORNIA          )
4                                )SS.:
5   COUNTY OF LOS ANGELES        )

6

7       I, CHRISTY A. CANNARIATO, a Certified
8   Shorthand Reporter within and for the State
9   of California, do hereby certify:
10      That Aaron G. Filler, M.D., the witness
11  whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such
13  deposition is a true record of the
14  testimony given by such witness.
15      I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage; and that I am
18  in no way interested in the outcome of this
19  matter.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand this 23rd day of February, 2011.
22
23
24  _____
25      CHRISTY A. CANNARIATO, CSR #7954