UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE MARIANA R. PFAELZER, U.S. DISTRICT JUDGE

PRESIDING

NEUROGRAFIX,                          )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )   No. CV 10-1990-MRP
                                      )
                                      )
SIEMENS MEDICAL SOLUTIONS USA,        )
INC.,                                 )
                                      )
          Defendant.                  )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, OCTOBER 5, 2011

**MOTIONS**

_____

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

2

1    **APPEARANCES OF COUNSEL:**

2

3

4         **For the Plaintiff:**

5

6              Russ, August & Kabat
               By:  MARC A. FENSTER
7              By:  ANDREW A. WEISS
               By:  FREDRICK UNG
8              12424 Wilshire Blvd 12th Fl
               Los Angeles, CA 90025
9              Phone: (310) 826-7474
               Fax:   (310) 826-6991
10             E-mail: mfenster@raklaw.com
               E-mail: aweiss@raklaw.com
11             E-mail: fung@raklaw.com

12

13

14

15

16        **For the Defendant:**

17

18

19             Kirkland & Ellis LLP
               By:  GREGG LOCASCIO
               By:  SEAN M. McEldowney
20             655 Fifteenth Street NW Suite 1200
               Washington, DC 20005
21             Phone:  (202) 879-5290
               Fax:    (202) 879-5200
22             Email: gregg.locascio@kirkland.com
               Email: sean.mceldowney@kirkland.com

23

24

25

1    **LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 5, 2011; 11:10 A.M.**

2                                    - - - - -

3

4              THE CLERK:  In the matter of calendar item 1, case

5    No. CV 10-1990, NeuroGrafix versus Siemens Medical Solutions

6    USA, Inc.

7              Counsel, please state your appearances for the

8    record.

9              MR. FENSTER:  Good morning, Your Honor.  Marc Fenster

10   with Russ, August and Kabat.  With me today is Andrew Weiss and

11   Fredricka Ung -- U-n-g -- and we're here on behalf of the

12   plaintiffs.

13             MR. LoCASCIO:  Good morning, Your Honor.  On behalf

14   of the defendants, Siemens Medical Solutions and Siemans A.G.,

15   Gregg LoCascio from Kirkland and Ellis, LLP, along with my

16   partner, Sean McEldowney.

17             THE COURT:  Now, let's do it in the order it's here.

18   Let's start with this motion for -- let's not do it that way.

19   Just a minute.

20             Let's start with the reconsideration motion, which is

21   No. 3 on the calendar.

22             MR. FENSTER:  Your Honor, may I approach?  I have

23   binders with slides we'll be using today for the court and for

24   the clerks.

25             THE COURT:  Thank you.

*UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*
*COURT REPORTER DEBORAH K. GACKLE*

```
 1              THE CLERK:  Thank you.

 2              THE COURT:  Have you seen these?

 3              MR. LoCASCIO:  Yes, Your Honor.  We exchanged them

 4   when we got in this morning.

 5              THE COURT:  All right.  That's fine.

 6              MR. FENSTER:  Your Honor, we respectfully ask the

 7   court to reconsider its ruling that claims 36, 39, 46 and 49

 8   are step-plus-function claims.  The Federal Circuit has never

 9   applied step-plus-function claims to a method or process

10   claims, ever.  Every time that it has come up before the court,

11   where the lower court applied step-plus-function claims, the

12   Federal Circuit reversed.  The only situation in which the

13   Federal Circuit even allowed a step-plus-function construction

14   to be applied was in the majority opinion in Seal-Flex, and

15   that is the opinion in which Judge Rader penned his concurring

16   opinion explaining why the court should have reversed the

17   court's claim construction and held that it was not

18   step-plus-function; and that is the Seal-Flex concurring

19   opinion that this court cited in its claim construction order.

20              Slide three, please.

21              The application of a step-plus-function doctrine in

22   this case is just contrary to Federal Circuit law.  What Masco

23   says is that, "... we are unwilling to resort to that

24   provision" -- meaning Section 112, paragraph six -- "to

25   constrain the scope of a claim limitation without a showing
```

1    that the limitation contains nothing that can be construed as

2    an act."

3            Each of these claims are not written in

4    means-plus-function form.

5            Next slide.

6            First, they're not written in means-plus-function

7    format, so they are presumptively not means-plus-function.

8    Moreover, it can't be construed unless there is a showing that

9    the limitation contains nothing that can be construed as an

10   act.

11           Now, the court goes further -- the Federal Circuit

12   says that "Where a preamble" -- this is next slide, please --

13   "Where a preamble sets off the steps of a claimed method with

14   the phrase, 'comprising the steps of,' as opposed to 'the steps

15   for,' that is further indication that the patentee did not

16   intend to invoke Section 112, paragraph six."  And that is how

17   paragraph 36 is set out.  It is a method including the "steps

18   of," and then it goes through and lists the steps, the acts,

19   which are exposing, exposing, sensing, vector processing and

20   processing.  Each of the claims that this court held were

21   step-plus-function contain acts.

22           Next slide.

23           THE COURT:  Because they have an "i-n-g" on the end

24   of the verb?

25           MR. FENSTER:  No, Your Honor, not only that.  Each of

1    the acts -- a-c-t-s, acts -- that are recited in claims 36, 39,
2    46, and 49 are transitive verbs.  "Processing" is "to operate
3    on."  It is a verb with an object.  It's a transitive active
4    verb.  That is true with "analyzing" and "combining."  These
5    are active verbs with objects.  They are acts acting upon an
6    object.
7           The Federal Circuit in -- Judge Rader, in his
8    concurring opinion in *Seal-Flex*, cited by this court, explained
9    the difference and explained when an "i-n-g" verb -- or an
10   "i-n-g" word should be an act and not a function.
11          THE COURT:  Yes, I know that.
12          MR. FENSTER:  And what the court said is that a
13   function corresponds to what the element accomplishes, whereas
14   "acts" correspond to how the function is accomplished.
15          THE COURT:  Let me shortcut this a little bit.  I
16   realize that whoever drafted the claim was perhaps not
17   intending this to be step-plus-function, and you're asking the
18   court to look at what the person intended who drafted the
19   claim.
20          MR. FENSTER:  In part, but I'm asking the court to
21   apply the Federal Circuit law.  The Federal Ciruit law says
22   this claim is presumed not to be step-plus-function --
23          THE COURT:  I understand about the presumption; I'm
24   not quarreling with that.
25          MR. FENSTER:  Yes.  I think that the courts do look

1   to whether the patentee intended to invoke Section 112,

2   paragraph six, they do look to the language to see whether that

3   intent was evoked, they look to the file history to see whether

4   or not the patentee intended to invoke 112, six.  All evidence

5   in this case undisputably indicates that the patentee did not

6   intend to invoke 112, paragraph six.  I agree with Your Honor

7   that's not the end of the inquiry.

8           THE COURT:  No, it isn't.

9           MR. FENSTER:  So what we have to do is follow the

10  analysis set forth by Judge Rader in *Seal-Flex*, and in

11  *Seal-Flex*, that patent dealt with -- go back to seven -- you're

12  on seven -- so that patent claimed "Spreading an adhesive tack

13  coating for adhering the mat..."

14          THE COURT:  Let me cut through this point, too.

15          MR. FENSTER:  Okay.

16          THE COURT:  Is this claim that we're looking at a

17  claim for software?

18          MR. FENSTER:  No.

19          THE COURT:  What is it?

20          MR. FENSTER:  It's a process claim.  It's a method

21  claim.  This is claim 36, Your Honor.  It's a method for

22  utilizing an MRI machine.

23          THE COURT:  And a computer.

24          MR. FENSTER:  And a computer to determine the shape

25  and position of a structure.

8

```
 1                THE COURT:  Moreover, it's a standard computer, isn't
 2    it?
 3                MR. FENSTER:  No, I don't believe it is, Your Honor.
 4                THE COURT:  Well, now, who programmed the computer to
 5    do what you want it to do?
 6                MR. FENSTER:  A computer is not claimed in this
 7    method claim.  I think that there are process -- there are
 8    apparatus claims in claims 54 and 55, in those claims, which do
 9    claim the apparatus.
10                THE COURT:  Wait.  How do you process the
11    information, the data set at this -- on this limitation?  How
12    do you process it?  With a computer, don't you?
13                MR. FENSTER:  Yes --
14                THE COURT:  Wait.  It's not just any computer, is it?
15    It's one that is programmed.
16                MR. FENSTER:  The method claim does not specify, nor
17    require, nor could it, the apparatus used to perform the steps.
18                THE COURT:  So you use whatever is at hand, do you
19    not?
20                MR. FENSTER:  This claim would be met if that
21    processing step is done with anything.
22                THE COURT:  That's right, with anything.  But it has
23    to be a programmed computer.  It's a software step.
24                MR. FENSTER:  I disagree with the court's
25    characterization, Your Honor.  This is not -- this is -- it is
```

9

1    a process claim, it is a method claim.  It is not limited to

2    any particular apparatus.  It is improper and, in fact, would

3    render the claims indefinite under IPXL if we had mixed

4    apparatus and method claims.  This is not an apparatus claim,

5    and I think that it is improper for the court to be looking --

6    to be thinking about this as an apparatus claim and what's --

7            THE COURT:  All right, then.  This is your broadest

8    set of claims.  You just process however you process on

9    whatever is at hand.

10           MR. FENSTER:  I disagree with that characterization

11   as well, Your Honor.

12           THE COURT:  You tell me how to read it.  You tell

13   me -- all right.  Let's get right to it.  You tell me,

14   Mr. Fenster, that this step, this limitation, do you see it,

15   (e), is it?

16           MR. FENSTER:  Yes.

17           THE COURT:  You process the data representative of

18   what you want to generate a data set describing the shape and

19   position.  Now -- et cetera.

20           You do that on a computer which has been programmed

21   to permit one skilled in the art to do it, right?

22           MR. FENSTER:  I think that the answer is right, but

23   the question is irrelevant to the analysis of

24   step-plus-function.

25           THE COURT:  Go ahead.

10

1          MR. FENSTER:  For step-plus-function, you only look

2     to see whether an act is recited, and Judge Rader counseled

3     us --

4          THE COURT:  All right.  Let me just grant you this.

5     I'm not purporting to have a real dispute with you, I'm trying

6     to get out what you're saying.  Let's assume it's not a

7     step-plus-function claim, just as you say.  Now you tell me the

8     processing is done some way by somebody, and but they have to

9     begin with a computer, don't they?

10         MR. FENSTER:  I don't believe so.  So that is a fair

11    question, Your Honor.

12         THE COURT:  You wouldn't have to begin with a

13    computer?  You said that in the patent.

14         MR. FENSTER:  I think as a practical matter that is

15    how it's done, but as a matter of claim construction, no.

16         THE COURT:  Oh, well, but the processor is a computer

17    under the patent.

18         MR. FENSTER:  But the claim -- this claim, claim 36,

19    does not claim a processor, it claims a method, and I believe

20    that it is -- that the court is confusing the analysis of the

21    means-plus-function apparatus claims with this method claim in

22    claim 36; and claim 36 requires the step of processing the data

23    to perform a function, which is to generate a data set, and the

24    act is processing.

25              Now, it is a fair question to say, Well, what does

1   processing mean?

2              THE COURT:  That's right.

3              MR. FENSTER:  Okay.  So that is a fair question, and,

4   in fact, that's what the Federal Circuit did in -- I'll find

5   the case in just a second.  But when they found that it's not

6   step-plus-function, they remanded to the court to say, Okay,

7   determine what "processing" means or "determining" means.

8              THE COURT:  That's precisely what I'm asking you.

9              MR. FENSTER:  That is an absolutely fair question,

10  and it's one that has not been presented to the court.  And

11  honestly --

12             THE COURT:  Oh, yes it has.  Whether you have

13  presented it or the court's presented it to itself, it has been

14  presented.

15             MR. FENSTER:  Okay.  Well, my apologies to the court.

16  I don't believe that we have briefed the meaning of

17  "processing" on its own.

18             THE COURT:  Okay.  Then I will present it to you.

19             MR. FENSTER:  I'm not prepared to answer what

20  "processing" means.  "Processing" means to operate on the data

21  in order to generate a data set.  I am not prepared to offer a

22  claim construction of processing right now because that's not

23  where -- I apologize that I'm not.

24             THE COURT:  Well, wait.  Let's just look at the --

25  we're now on a controversy that I cannot resolve with you this

```
 1   way.  I'm saying to you, first of all, assume for a minute that
 2   it's not step-plus-function.  I understand what your objection
 3   to that is.  You'd be limited to whatever is in the spec, and
 4   you'd have to have a link with that, and there isn't anything
 5   in the spec except references.  Wait.  Let me -- I can clear up
 6   what is wrong with my thinking if I just point out to you that
 7   on column 11 -- we have to have this out now because if we
 8   don't, we're going to -- column 11 says, A computer, 72, and
 9   the front-end circuit, 74, form the processing system, 16, the
10   input and the -- and so on and so on -- as shown in six.
11   Computer, 72, and circuit, 74, cooperatively control and
12   synchronize the operation of the MRI system, 14, as well as
13   processing a display.  The acquired data, the computer, 72, is
14   an IBM-compatible personal computer.  Then it tells you about
15   it.
16              Somebody's got to program the computer.
17              MR. FENSTER:  I agree with you that for the
18   means-plus-function apparatus claims, we do have to analyze
19   what is doing the processing because those were
20   means-plus-function claims.
21              THE COURT:  Don't you have to do it now?  If it's a
22   software patent, irrespective of whether it's
23   step-plus-function, wouldn't you have to have -- point out some
24   way of programming or --
25              MR. FENSTER:  No.
```

13

```
 1              THE COURT:  No?

 2              MR. FENSTER:  Absolutely not.  Your Honor --

 3              THE COURT:  So your skilled -- your person skilled in

 4   the art uses whatever is there.

 5              MR. FENSTER:  If they process in order to generate a

 6   data set to determine the shape and position, which is the

 7   function recited, then they perform the steps set forth in the

 8   method.  Now, it is a fair question to say, Do we need any

 9   further construction of processing the data or not?

10              THE COURT:  That's right.

11              MR. FENSTER:  We submit that it has a common,

12   ordinary meaning, and the only challenge -- the only question

13   raised before the court --

14              THE COURT:  What is its common, ordinary meaning?

15   It's in here.

16              MR. FENSTER:  I think the common, ordinary meaning of

17   processing the data is operating on the data in a way to

18   generate the data set, but it's not -- the common, ordinary

19   meaning is not the apparatus used or the software or the

20   algorithm or the computer used to do it.

21              THE COURT:  Could you do it without a computer?

22              MR. FENSTER:  No.  But, again, Your Honor, that is

23   irrelevant to the question of whether this is

24   step-plus-function, and if it's not step-plus-function, then

25   we're in normal claim construction --
```

```
 1              THE COURT:  I am abandoning step-plus-function.  I'm

 2   now saying to you let's assume for a minute that it's not.

 3              What flows from that conclusion?

 4              MR. FENSTER:  Okay.  What flows from that conclusion

 5   is the court needs to determine if any claim construction is

 6   necessary as a normal act, as a normal word, "processing,"

 7   whether that word is so unclear that the court needs to give

 8   guidance to the jury to tell them what "processing" means.

 9   This is not a question that was raised before the court.  The

10   only issue raised before the court on -- at the claim

11   construction phase initially was what was Siemens' position

12   that this is step-plus-function.  That's it.  We disagreed, but

13   there was no alternative if it's not step-plus-function, what

14   is the proper claim construction.

15              THE COURT:  You're asking the alternative now.  I'm

16   asking.

17              MR. FENSTER:  And our position is it doesn't need

18   claim construction, that it is just to operate on the data

19   that -- processing the data is something that the jury will

20   understand.

21              THE COURT:  How would they understand it?

22              MR. FENSTER:  It's not --

23              THE COURT:  Can't do it by hand.

24              MR. FENSTER:  I think -- I think it would be improper

25   for the court -- if we go through a claim construction process
```

1  where we say, Okay, what is proper claim construction, and

2  defendant and plaintiff exchange proposed claim constructions

3  and brief it to court, we'll come up with a proper claim

4  construction.  That claim construction would not be limited to

5  a particular algorithm or a particular apparatus for doing it.

6          THE COURT:  No?  Why?

7          MR. FENSTER:  Because it would be improper to import

8  an apparatus limitation into a method claim.  Method steps are

9  generally --

10         THE COURT:  So how does your expert explain to them

11 what's to be done here?  Your expert says you process on this

12 computer that we have attached to the MRI machine.

13         MR. FENSTER:  Yes, but that doesn't mean -- just

14 because the infringement analysis shows that a computer is used

15 to perform that step does not mean that the proper claim

16 construction would limit it to a particular apparatus or not.

17         THE COURT:  I want to put it very directly to you:

18 Just any way you process would be infringing.  I mean, you'd

19 meet the infringement requirement for this limitation.

20         Isn't that true?

21         MR. FENSTER:  Your Honor, claim 36 is a very specific

22 claim.  What it requires is that you use, in step (a) --

23         THE COURT:  Oh, I know what you do in step (a).

24         MR. FENSTER:  Well, Your Honor, this is important

25 because this is -- you're asking me an open-ended question to

1    suggest that this is a very broad claim, and it is not.

2              THE COURT:  Any way you process under your theory,

3    any way an expert will get on the stand and say, Well, there's

4    always a computer attached to the MRI machine, and any way you

5    process using that computer you're infringing.

6              MR. FENSTER:  If you perform the step of processing

7    data representative of anisotropic diffusion to generate a data

8    set that describes the shape and position, then, yes, I believe

9    that that act --

10             THE COURT:  Any way you do it.

11             Now, let's assume for a minute that the years go by

12   and various companies come up with better ways to do that.  It

13   doesn't matter whether they have a better way or not, any way

14   you do it will infringe.

15             MR. FENSTER:  Your Honor, I'm troubled by the

16   court -- by what I perceive as the court's disposition to

17   invalidate the patent.

18             THE COURT:  You are totally wrong.  You are

19   completely wrong, Mr. Fenster.

20             MR. FENSTER:  I hope so.

21             THE COURT:  I do really have to stop you right there.

22             MR. FENSTER:  Okay.

23             THE COURT:  You don't need to think that I have spent

24   all these hours on this patent with the idea of invalidating

25   it.  I would not venture that if I were you.

1          MR. FENSTER:  Okay.  I apologize to the court.

2          THE COURT:  You have absolutely no idea of the amount

3     of time that's been spent on this, none.  You have no idea.

4     And, consequently, you must not jump to the conclusion that you

5     jumped to.  I don't want to do you a disservice; I do want to

6     understand what you're talking about.

7          MR. FENSTER:  Okay.  So, Your Honor, the --

8          THE COURT:  That's my job.

9          MR. FENSTER:  I appreciate that, Your Honor.

10          The processing step -- so in a claim -- in a claimed

11    method, you look to determine whether a method is comprised of

12    certain steps that accomplish certain functions that are

13    recited.  If those acts are performed, then the claim is met --

14    and, yes, it may be that after-developed technology further

15    improves the processing, that's not -- if anything, that's an

16    enablement question, it's not a claim construction and it's not

17    an infringement question.  But the case law, as I understand

18    it, has developed such that when a claim specifies the acts in

19    a method claim or the elements of an apparatus claim, it is

20    broad enough to encompass certain after-developed technology.

21          And so, yes, I do agree that if someone performs the

22    steps as recited in claim 36, however they do it, with whatever

23    apparatus they do it, claim 36 will be infringed.  That is my

24    understanding of claim 36, and I believe that it's fully

25    supported from a 112 perspective in terms of enablement by the

1   specification.  The specification fully enables how to perform

2   each of the steps of claim 36 and that's what the law requires.

3   And then if -- see what comes up with a new and better MRI

4   machine or a new and better algorithm for processing but still

5   performs the steps of these methods, it's covered.

6           THE COURT:  You and I perfectly agree on your

7   position, perfectly.

8           MR. FENSTER:  Okay.

9           THE COURT:  But there's no reason why we can't

10  discuss it, is there?

11          MR. FENSTER:  Not at all, and I love the discussion,

12  I really do.

13          THE COURT:  Well, let me tell you:  It was hard to

14  get to this point.  That's what you're saying, isn't it?

15          MR. FENSTER:  Yes, Your Honor.

16          THE COURT:  Let me hear from the other side.

17          MR. FENSTER:  Sure.

18          MR. LoCASCIO:  Good morning, Your Honor.

19          THE COURT:  I'm not on your side.

20          MR. LoCASCIO:  I don't come in anticipating that the

21  court, in any court, much less this one, leans one way or the

22  other.  My view is Your Honor's job, and you've done to date,

23  call them balls and strikes, to interpret the law.  That is

24  what the court, as I understand it, is here to do.  That's

25  claim construction in a nutshell, and I don't think either

1    side, frankly, disagrees with that, Your Honor.

2            THE COURT:  All right.

3            MR. LoCASCIO:  Let me start off with -- two questions

4    Your Honor asked.  I just want to give an answer to those as

5    you asked them.  I was looking through the patent and thinking

6    about some of those issues, and now I want to walk through some

7    points we prepared on this, Your Honor.

8            First off, I think Your Honor identified exactly

9    where in the patent the processing is described, and that was

10   column 11.  I believe Your Honor was reading from line nine

11   through about 16 or 17.

12           THE COURT:  Right.

13           MR. LoCASCIO:  The distinction between the apparatus

14   and the method claims are the apparatus, as Your Honor

15   determined, covers this black box to process.  It's

16   means-plus-function --

17           THE COURT:  Right.

18           MR. LoCASCIO:  The method claims cover using that

19   black box to process.  That's the difference between those

20   claims.  And either the step-plus-function claims are

21   step-plus-function without any identified structure, which is

22   what Your Honor found, i.e., indefinite; they are

23   step-plus-function with structure, which you'd have to go back

24   to the specification to find it.  There is none.  Or, on

25   Mr. Fenster's analysis, that we just go ordinary meaning and

1    ignore 112, paragraph six.  At that point, what would happen to

2    this claim is it would be not enabled.

3              There's no route through this.  Mr. Fenster would

4    like to have it not be a claim construction issue, but nowhere

5    in this patent does it tell you how you would do that

6    processing.  I want to talk about how it is step-plus-function

7    under 112, six, and Your Honor's construction of that is

8    correct and consistent with Federal Circuit law.

9              But even if the hypothetical Your Honor played out

10   with Mr. Fenster of it's not step-plus-function, Well, where do

11   we go from there from a claim construction standpoint?

12   NeuroGrafix' view would be you need do nothing.  I disagree.

13   But the ultimate outcome of doing nothing would then create the

14   very same problem that's recognized when you actually look at

15   what does it describe to perform this.  There's no enablement

16   at all of this, and, indeed, it's not an issue for today,

17   although it's now, sort of, become one a little bit.

18             The inventor -- one of the inventors, Dr. Tsuruda,

19   testified that at the time they filed this, they had no

20   software algorithm to do it, they'd never done it.  It was a,

21   Hey, wouldn't it be great if we could do this?

22             And the way they've claimed it, it's

23   step-plus-function.  At the end of the day, if it wasn't, it

24   wouldn't be enabled.  But let me, sort of, back up now to the

25   step-plus-function analysis and start off where Mr. Fenster

```
 1  did.

 2           What's the state of the law?  Well, the Federal

 3  Circuit law we can look at, we can talk about.  I want to talk

 4  about the four primary cases at issue --

 5           THE REPORTER:  Excuse me.  Counsel, please slow down.

 6           MR. LoCASCIO:  Sure.  Pardon me.  Thank you for

 7  letting me know.

 8           Thirty-five U.S.C. 112 is the law, and it says you

 9  can have means-plus-function and step-plus-function.  And

10  NeuroGrafix' position seems to be there's no such thing as

11  step-plus-function.  There are points in the reply brief where

12  they say if it could even be found -- if claims could ever be

13  found to be step-plus-function, well, that's certainly not the

14  law.  Paragraph six of Section 112 of 35 U.S.C. makes clear

15  they exist.  And let's look at what the Federal Circuit has

16  actually said.

17           The key is what does the claim say?  It all comes

18  back to not what the inventors intend, absent disclosure of

19  that --

20           THE COURT:  Well, it is a, kind of, general rule

21  about how to write it.  There are some general rules about how

22  to write these things.

23           MR. LoCASCIO:  If we look at the section we're

24  talking about --

25           THE COURT:  (E).
```

*UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*
*COURT REPORTER DEBORAH K. GACKLE*

```
 1              MR. LoCASCIO:  (E), exactly.  Claim 36(e), processing
 2    the data to generate.  And the difference between this and the
 3    claim language in the earlier Federal Circuit cases is -- let's
 4    talk about Seal-Flex last -- okay -- the other three, Cardiac
 5    Pacemakers, Masco and O.I. Corp.  The claim language in those
 6    is not a "step for" or a "step to" or something akin to a verb
 7    "processing to" or "processing for."
 8              The language -- I have just my notes on these.  We
 9    can pull the actual case up.  But Cardiac Pacemakers, for
10    instance, is determining a condition -- zoom out here --
11    determining a condition of the heart from among.  That is a
12    traditional piece in a method claim, it's a step, but it
13    doesn't have function.  It's not a "step for" doing anything.
14    It's just determining a condition.  It's not surprising that
15    the Federal Circuit said that's not 112, six.
16              Masco is transmitting a force applied to a dial or
17    applied to a knob.  Again, it's not a "step for" or "step to"
18    do anything.  O.I. Corp., passing the analyte slug through a
19    passage, et cetera.  Again, there's not a verb "to do"
20    something in any of those.  So the fact that the Federal
21    Circuit in each of those cases said it's not 112, six shouldn't
22    surprise anyone?
23              In Seal-Flex, by contrast, it is spreading adhesive
24    tack for adhering.  So what you have is a verb, "spreading," to
25    accomplish something:  Spreading for adhering.  And that is
```

23

1   akin to the situation we have here because the language here is

2   "processing the data set to generate."  And in *Seal-Flex*, the

3   court said the parties agreed it was 112, six, even though it

4   wasn't presumptively so, and that was left standing on appeal.

5         In this case, we have similar language.  We have

6   "processing the data to generate a data set."  So it comes down

7   to is it presumptively means-plus-function?  They don't use the

8   magic words "step for," although I want to -- actually, I left

9   the clicker over there.

10        Sean, can you just type slide seven?

11        Your Honor, may I approach with some slides?

12        THE COURT:  Do.

13        MR. LoCASCIO:  Thank you.

14        And what we see here in slide seven, Your Honor --

15   I've got it on the screen, as well, is -- pardon me.  What we

16   handed Your Honor has several sections.  We put them in the

17   order we had wrongly anticipated we might proceed through here.

18   So there is a tab called "Step-plus-function," which is the

19   last tab, and slide seven in that deck is what I've got on the

20   screen right now, which talks about how processing doesn't

21   describe or cite an act.  And Mr. Fenster put up some

22   definitions of processing and analyzing.  Those were not in the

23   briefing on Markman; what I've got on the screen was.

24        On the right side in slide seven is a dictionary

25   definition of "processing," and it's previously before Your

24

1   Honor.  "Processing" means put through the steps of a

2   prescribed procedure.  And if you look then below, the *O.I.*

3   *Corp.* quote on page seven, steps -- "We interpret the steps to

4   refer to the generic descriptions of elements of a process."

5            So by using "processing," Your Honor, in some ways

6   we've just synonymized "steps" and "processing."  The

7   definition of "process" is to put something through certain

8   steps.  The court -- the Federal Circuit has determined "steps"

9   to be a generic description of the elements of a process,

10  whereas "acts" refers to how to actually do it.

11           So the idea that "processing" tells one how to do it

12  is inconsistent with the ordinary meaning and definition of

13  "processing," which means put it through steps.

14           At the end of the day, this claim, Your Honor, is

15  not -- I'm not arguing it's presumptively step-plus-function --

16           THE COURT:  You can't.

17           MR. LoCASCIO:  I'm not.  We agree that I can't

18  because -- and I'm not.

19           But the language that they actually used here is

20  virtually synonymous with saying "steps to generate" because

21  given they've said "processing to generate."  And whether that

22  was artful to try to avoid the presumption or not, doesn't

23  matter.  The specification in the file history here never

24  describe -- never give any indication that we should deviate

25  from how this claim is written.  And how the claim is written,

1    you have to come back to, Your Honor, how the function is

2    accomplished.  If I back up a slide, to slide five, the act

3    here --

4             THE COURT:  Well, Mr. Fenster says that it doesn't

5    matter how you do it.

6             MR. LoCASCIO:  The Federal Circuit in *Seal-Flex* and

7    *O.I. Corp.* say you have to describe in your claim how to do it,

8    and if you do not, while the presumption may exist in one

9    direction, it would be overcome and rebutted, as Your Honor

10   found, in the *Markman* decision if they don't describe it.

11            THE COURT:  Well, let's just assume, because

12   Mr. Fenster does not want a step-plus-function analysis of this

13   claim because it would limit him to what is in the spec, and

14   there isn't anything in the spec.  And, consequently, we have

15   to take another tack here for the purpose of discussion.

16            Let's assume for a minute that the motion to

17   reconsider is granted and it's not construed as a

18   step-plus-function claim.  What then?

19            MR. LoCASCIO:  If it's not construed as a

20   step-plus-function at all, and, obviously, I expect Your Honor

21   already recognizes that we disagree with that presumption.

22            THE COURT:  Of course.

23            MR. LoCASCIO:  I know.  Just wanted to make clear

24   that any reader of this later in life says, Okay, Mr. LoCascio

25   didn't say we were onboard with this.

26

```
 1            If that was the case, I think you'd have an issue

 2    where, if it was ordinary meaning -- which is Mr. Fenster's

 3    only proposed construction for this -- then you'd have a

 4    situation where the claim is not enabled.

 5            THE COURT:  Is what?

 6            MR. LoCASCIO:  Not enabled.  That's where I think

 7    that would go.

 8            THE COURT:  Is it described?

 9            MR. LoCASCIO:  I don't believe how to accomplish

10    it -- which would be what you would need to describe here -- is

11    anywhere in this specification, Your Honor.  All it says is you

12    could use a computer to process, but it doesn't tell you what

13    that computer would have or frankly how you would do this.

14            THE COURT:  Let's go to the next step.

15            MR. LoCASCIO:  Okay.

16            THE COURT:  Let's assume that, whatever meaning you

17    give it and that an expert gets to testify about how this would

18    be done, there is no limitation on infringement with respect to

19    this limitation, is there?

20            MR. LoCASCIO:  I agree.  There would be none.  At

21    this point, it's using an MRI machine and processing it in some

22    way to generate this data.

23            THE COURT:  No, it's using an MRI machine and a

24    computer.

25            MR. LoCASCIO:  Correct, Your Honor, and the computer
```

```
 1    of some sort does some sort of processing that is undefined,

 2    and if that happens, ergo, you infringe.

 3              THE COURT:  Well, now, what's the -- let me also

 4    pursue one other avenue.  If it's pointless to you, still

 5    answer it.

 6              MR. LoCASCIO:  I would have anyway, but thank you for

 7    reminding me.

 8              THE COURT:  All right.  Where is the point of novelty

 9    here?

10              MR. LoCASCIO:  Your Honor raises a question that we

11    identified as well.  And if I can go --

12              Sean, type 28.  Flip there.

13              THE COURT:  Where am I?

14              MR. LoCASCIO:  Slide 28, Your Honor.  Slide 28 looks

15    to what does this limitation matter?  Is this the point of

16    novelty or not?

17              THE COURT:  Just one second.

18              MR. LoCASCIO:  Sure.

19              THE COURT:  Oh, I see.  All right.

20              MR. LoCASCIO:  What Slide 28 talks about in the

21    context of Cardiac Pacemakers -- because in Cardiac Pacemakers,

22    the limitation at issue, which was not a verb "to do" something

23    or a verb "for doing" something, talked about how that step was

24    frankly not the point of novelty.

25              Here, NeuroGrafix is -- the processing piece of this
```

1   claim is, in fact -- was described as the point of novelty.

2   These are plaintiff's, NeuroGrafix's, opening and reply *Markman*

3   briefs.  The first quote -- this is the bottom of the page --

4   the inventors figured out how to create three-dimensional data

5   sets representative of neural tissue.  Okay.  Putting aside

6   that the only testimony to date is that they hadn't.  Where is

7   that in the patent?  It's nowhere.  It's not described, it's

8   not disclosed.  They don't tell you how to do it.

9           And so with respect to these claims, Your Honor, the

10   use of this term, "processing," in these claims to generate a

11   particular data set, that is the point of novelty.  And as

12   *Honeywell* and other cases say, where we're talking about the

13   alleged point of novelty, we can't just gloss over the

14   indefiniteness issues because that's the core of the matter.

15   If you don't look to see if they actually describe it and

16   describe in this case the way of performing, the "how" to

17   perform that function, well, then, the claim is, as you

18   identified, very broad -- charitably, what is called very

19   broad.

20           And the point of novelty in which they obtain a

21   patent was that improvement, which is never described or

22   discussed anywhere and now would be, in essence, read out of

23   the claim because the claim would be so broad as to encompass

24   any way to do it, regardless of the alleged novel improvement

25   over the prior art.  So, hopefully, that answers Your Honor's

```
 1    question on that score.

 2              THE COURT:  Well, let's let Mr. Fenster speak now.

 3              MR. FENSTER:  Your Honor, first, let me just correct

 4    what Mr. LoCascio said regarding the four primary Federal

 5    Circuit cases.  First, with respect to *Masco*, he said that it

 6    was different than this case because it was transmitting a

 7    force but didn't say to do something.  The language of -- and

 8    he didn't have the case in front of him.  I put the case on the

 9    Elmo for the court.  Here is the language that *Masco* -- that

10    the *Masco* Federal Circuit court looked at, that it was

11    transmitting a force applied to the dial to drive the lever.

12    Just like this case is processing to generate a data set, just

13    like in *Seal-Flex*, it was adhering -- or spreading the adhesive

14    to adhere.  And in that case, *Masco* reversed the lower court --

15    lower court's finding that it was step-plus-function.

16              In *Seal-Flex*, while the majority opinion left alone

17    and just did not address the parties' agreement that

18    step-plus-function applied, it is Judge Rader's thoughtful

19    concurrence, that this court cited in its claim construction,

20    which did go through and say not withstanding the parties'

21    agreement, I think it incumbent upon the court to analyze the

22    112, six issue --

23              THE COURT:  So do I.

24              MR. FENSTER:  -- and doing so, Judge Rader found it

25    was improper to apply step-plus-function notwithstanding the
```

1    parties' agreement.

2            THE COURT:  I think he's right about what he says

3    here, that you must analyze it, and that is why I asked you all

4    the questions I asked you.

5            MR. FENSTER:  So, now, with respect to -- you asked

6    what is the point of novelty and would this cover any method?

7    And, Your Honor, I have to object to Mr. LoCascio's

8    characterization, and the court's, to this extent:  That it

9    would cover any method.  Claim 36 is a very specific method,

10   and the point of novelty, Your Honor -- and if you'll allow me

11   to just walk through the claim -- this is a specific claim.

12   This requires exposing to a predetermined arrangement of

13   diffusion-weighted gradients and vector processing in order to

14   generate a data set that shows the nerve, as distinguished from

15   surrounding structures that do not show diffusion anisotropy.

16           THE COURT:  Yes, I know.

17           MR. FENSTER:  That is the point of novelty of this

18   claim.  The point of novelty of claim 36 is this combination of

19   using a predetermined arrangement of diffusion-weighted

20   gradients and vector processing in order to generate the data

21   set in order to show the nerve in a way that was previously

22   unknown.

23           This is an important invention, Your Honor.  It is

24   used daily to materially help people.  A very dear friend's

25   daughter yesterday got a neurogram of her face to show how to

1    correct some surgery –– how to surgically correct some damage

2    that was done to her nerves during brain cancer surgery.  This

3    is important:  Up until 1992, it was unknown how to image

4    nerves outside of the brain and cerebral spinal fluid.

5            University of Washington has this patent now that

6    describes lots of different methods for doing it.  The method

7    of claim 36 is different than the other claims.  The method of

8    claim 36 is specific and it's limited to the specific

9    combination of diffusion-weighted gradients and vector

10   processing in order to show the image separate from –– to

11   generate this data set.  That's the point of novelty.

12           And when we get to enablement, we'll show enablement,

13   and when we get to anticipation, we'll see whether Siemens can

14   come up with any piece of prior art that shows a combination of

15   a predetermined arrangement of diffusion-weighted gradients and

16   vector processing.  I have yet to see that prior art.  But that

17   is the point of novelty of this claim.

18           So, Your Honor, in terms of your question of where do

19   we go next, if the court perceives that further construction of

20   processing as an ordinary term and not a step-plus-function

21   term is warranted, then I suggest that we go ahead and brief

22   that issue.  We'll exchange ––

23           THE COURT:  What does "processing" mean?

24           MR. FENSTER:  Exactly.  We'll go ahead and exchange

25   proposed constructions.  It's not something we did before

 1    because the only issue was whether it was step-plus-function,

 2    and Siemens didn't urge an alternate claim construction in the

 3    event it lost the step-plus-function proposal.

 4           So what I would suggest is if the court wants --

 5    thinks that further explanation or construction or processing

 6    as an ordinary term is warranted, let's have an expedited, or

 7    not, claim construction process where we exchange terms and

 8    brief it for the court to decide.  I don't know that a separate

 9    hearing is necessary, but the court -- that's obviously within

10    the court's discretion.

11           THE COURT:  All right.  Let's go on to the others.

12           MR. LoCASCIO:  Your Honor, if I may.  Before we get

13    there, I just want to raise one point.  That's -- I think all

14    of us now agree that the analysis of Judge Rader in *Seal-Flex*

15    is what needs to be done; I contend the court has done that.

16    And indeed --

17           THE COURT:  I have done that.  I don't care whether

18    you think it's done in writing or we have covered it.  That is

19    what prompted all this.

20           MR. LoCASCIO:  And my point is only that the claim

21    language here, *Seal-Flex* says you have to look at it.  And in

22    *Seal-Flex* -- ultimately, Judge Rader, when he does look at it,

23    says this is, despite the presumption, 112, six,

24    step-plus-function, but it does, in fact, disclose how to do

25    it.  And in that case, quite differently than here.  The two

33

1   verbs -- if we can think of that -- are "spreading" for

2   "adhering," and doesn't just say, Figure out how to adhere.  It

3   says "spreading an adhesive tack coating," and the court

4   found -- or Judge Rader found that that was a description of

5   how to adhere the mat to the foundation.

6           THE COURT:  Well, here's my problem:  He wasn't

7   looking at a software patent.

8           MR. LoCASCIO:  I agree.  He found structure -- he

9   found a way to do it there because it described one.  And I

10  think there is some analogy with respect to software patents,

11  given the federal circuit's -- call it criticism of generic

12  "processing means" claims.  In the means context, the term

13  "processor" has been described and found to be insufficient to

14  satisfy.  A "processing means" or a "processor" is not enough

15  without an algorithm.  And those are the *Aristocrat* and other

16  cases that we've talked about in the original round on this.

17          And so I agree the uniqueness of a software

18  implementation, as here, if -- as we see in claim 36(e), here

19  "processing" to generate.  The function, Your Honor, no one --

20  nothing in this claim tells one how to do it.  And so just like

21  the analysis that *Seal-Flex* requires, the analysis here is,

22  Well, does that tell me enough about how do it?  In *Seal-Flex*

23  they did.  Here, they do not.  And no one from NeuroGrafix

24  identifies any specifics in the claim where it would need to be

25  or either in the -- or even in the specification about how one

1  actually does that processing.  And absent that, when you have

2  language here that has a function of generating a data set,

3  with the only thing perceived by even NeuroGrafix to be an act

4  of processing, whereby, every account, it's done through some

5  computerized means, that alone is insufficient to satisfy their

6  obligations under 112, six.

7       This is a case where the presumption is overcome and,

8  indeed, there is no description of how.  The act, as it would

9  be argued by NeuroGrafix, of processing is just taking steps,

10 taking steps to generate.  And if they said it that way, it

11 would be prima facie 112, six.  They didn't.  They used the

12 word "processing," but it had no description, Your Honor, of

13 the key question from all of the Federal Circuit precedents,

14 how to do it.

15      THE COURT:  Let's go on.

16      MR. FENSTER:  Your Honor, may I briefly address this

17 before we go on and lose the point?  May I respond?

18      THE COURT:  I will never lose the point that -- what

19 we're talking about.

20      MR. FENSTER:  We're about to move to a different

21 motion.  May I just respond on this?

22      THE COURT:  Yes.

23      MR. FENSTER:  Your Honor, Mr. LoCascio urges that

24 "processing" doesn't mean anything and it is, therefore, not an

25 act.  It is contrary to the Federal Circuit's decisions.  So in

1    *Cardiac Pacemakers*, the court looked at determining -- the

2    claim language in *Cardiac Pacemakers* was "determining a

3    condition of the heart from among a plurality of conditions of

4    the heart."

5            Now, two things about this:  One I would submit, Your

6    Honor, that "determining" is no more generic than "processing,"

7    That "determining," which was found to be an act sufficient to

8    reverse a step-plus-function finding in *Cardiac Pacemakers*, is

9    just like processing.  The steps of "determining" -- Mr.

10   LoCascio could make the exact same argument with respect to

11   "determining," and the Federal Circuit went the other way.

12           The other important point about *Cardiac Pacemakers* is

13   that this is software.  How do we think that the determining a

14   condition of the heart was done?  It was done with software

15   just like this.  And, Your Honor, there is no support in

16   Federal Circuit or other case law that I found to suggest that

17   the step-plus-function analysis, as to whether a recited verb

18   is a function or an act, is different in the software claim, or

19   in a claim that involves software, than in a claim that

20   doesn't.

21           There is nothing to suggest -- and I haven't gone

22   through and specifically analyzed all of the cases to see did

23   this involve software or didn't it, but there has never been a

24   distinction drawn by the court as to determining whether

25   something is an act or a function based on whether or not

36

1    software is involved.  And, Your Honor, just based on the few

2    cases that we have before us today, I would suggest that

3    *Cardiac Pacemakers* suggests that it doesn't and that that is

4    not a valid distinction to find a step-plus-function contrary

5    to the great weight of law.

6            Second, let me point out that *Caterpillar*, which is a

7    Northern District of Indiana case, which was cited by the

8    defendants for step-plus-function analysis, and it was affirmed

9    without opinion by the Federal Circuit.  The *Caterpillar* case

10   involved four recited acts or functions.  They were

11   "providing," "determining," "retrieving" and "using."

12           And this is at 961 F. Supp. at 1256, I believe, where

13   it says, "Claim one involves the actions of providing,

14   determining, retrieving and using."

15           Again, "determining," just like in *Cardiac*

16   *Pacemakers*, was found to be an act.  It was not a generic.  And

17   what Mr. LoCascio is now arguing, that it doesn't tell you how

18   you determine, is exactly the argument that was rejected in

19   *Masco*, where the Federal -- where the defendant argued that the

20   transmitting -- a force was a step-plus-function, but it

21   doesn't tell you how to transmit the force.  And what the

22   Federal Circuit said -- is it rejected that argument.  It said

23   that it doesn't have to tell you exactly how, it is enough

24   that -- transmitting a force does describe how the lever is

25   driven then into the cam.  And it was the lower court that

1   reasoned that the word "transmitting," without more, does not

2   explain how the force is transmitted.  That's exactly

3   Mr. LoCascio's argument here, that we don't say how the data

4   set is processed.

5           And what the Federal Circuit said is it reversed and

6   said transmitting a force does describe how the lever is driven

7   into the cam.  Just as in this case, how the data set is

8   generated is by processing.  And so we urge the court to find

9   that there is no step-plus-function.

10          THE COURT:  All right.  Let's go on.

11          MR. FENSTER:  Thank you, Your Honor.

12          MR. LoCASCIO:  My suggestion would be to go to the

13   conspicuity.

14          THE COURT:  Fine.  Let's do that.

15          MR. LoCASCIO:  So, Your Honor, the first -- the

16   second tab in the slide that we handed up called "conspicuity"

17   are the slides I'm going to walk through now on this question.

18   And as Your Honor knows, in claims one, claims three, seven,

19   11, 12 and 18 and their dependent claims there is a conspicuity

20   of a nerve that is at least 1.1 limitation.  And with respect

21   to that, what Siemens raised in its *Markman* briefing were two

22   questions:  How does one calculate the conspicuity, and then

23   how would a user choose -- one of skill in the art choose an

24   ROI, or a region of interest, to measure that conspicuity.

25          And with respect to that second question, the court's

1    *Markman* decision identified that this was an open question.

2    Siemens made a persuasive showing that this underlying method

3    of selecting a region of interest -- on slide four of the

4    deck -- in the calculation of conspicuity is a subjective

5    inquiry that renders the claim indefinite.  And what came out

6    of that from Your Honor's decision were two core questions:  Do

7    experts agree on the method of making ROI selections and

8    whether the infringement or noninfringement would depend on who

9    actually makes that measurement, because that would be the

10   textbook case of indefiniteness if expert one for the plaintiff

11   says, I measured it, I used an ROI, it infringes; expert for

12   the defense says, I measured it, I used an ROI, it does not

13   infringe.  The patent itself must in that situation disclose or

14   explain how one does that so that those calculations and the

15   question of infringement or noninfringement is consistent.

16            And based on Your Honor's order, we had a telephone

17   conference and we laid out a whole plan to deal with this, and

18   the plan was we'd have nonexpert discovery, we'd have expert

19   reports -- and both sides submitted them -- and then we'd file

20   briefs.  And for Siemens, Dr. Bryan, who was the expert

21   specifically on this question of conspicuity, he's new to this

22   phase for the -- pardon me -- for the defendants.  For the

23   plaintiff, it's Dr. Brant-Zawadzki.  Dr. Bryan and

24   Dr. Brant-Zawadzki are practicing radiologists.  The core

25   difference between them, insofar as it matters for this motion,

39

1    is Dr. Bryan actually calculated regions of interest in

2    conspicuity measures.  Dr. Brant-Zawadzki for NeuroGrafix,

3    before he was retained in this case has never done so for a

4    nerve that would qualify under any of these claims, and in the

5    course of his retention, was neither asked to nor performed a

6    single ROI or conspicuity calculation.

7          Prior to this round, in the original *Markman*

8    submissions, there were -- each side had an expert:

9    Dr. Moseley for NeuroGrafix, he had done ROI and conspicuity

10   calculations, and Dr. Filler, one of the inventors of the

11   patent at issue, and the plaintiff, he had also done ROI and

12   conspicuity calculations.

13         To the court's question:  Is there an agreed-upon

14   standard in the field for creating or drawing an ROI?  All the

15   evidence in this case is no.  There is no standard.

16   NeuroGrafix concedes the point, and we'll walk through that.

17         Second, does the patent leave it to the user, or does

18   the patent, despite their no industry standard, tell you this

19   is how one does it, and the answer is no, the patent does not,

20   and we'll walk through that.

21         Third, which is the second part of Your Honor's

22   question is, okay, if there's no instruction of how to do it,

23   if it's done differently, do you get to different results?

24   Because at base, if you do, the claim is indefinite.  And I

25   want to walk through the fact that we have expert testimony,

1   both documentary records and publications that say there is a

2   difference -- if you do it differently, you get different

3   results.  Indeed, Dr. Filler's own calculations showing that

4   the same person can end up falling within the claim on image

5   and falling outside of the claim.

6           Specifically, with respect to is there a standard.

7   We have on slide nine, Dr. Brant-Zawadzki for NeuroGrafix had

8   never done so before for a nerve.  His knowledge of ROI comes

9   in other context, but even on that, he says there is no

10  industry standard.

11          First, data point on this is defendant's

12  uncontroverted facts, on summary judgment motion, was there is

13  no industry standard for selecting an ROI, there is no one way

14  in the industry.  NeuroGrafix's response to that is not to

15  dispute that fact.  They dispute it's a material fact.  We can

16  debate that.  It's not a material fact in dispute because we'll

17  see their own expert says there is no standard.  They only

18  dispute that to the fact that the extent that implies

19  conspicuity is not taught.

20          So with respect to the uncontroverted facts, they

21  don't take issue with the fact that there's no one standard.

22  Dr. Bryan in his opening report says there's no recognized

23  standard, and when you ask Dr. Brant-Zawadzki, who didn't say

24  anything about this in his report, is there an industry

25  standard?  Do you disagree with Dr. Bryan?  He says -- this is

1   on slide 11 from the deposition –– Well, there's no industry

2   standard one way of doing it.

3          The parties –– the experts agree that there's no

4   industry standard to do it.  The literature in the field

5   confirms that.  Despite many ROI options, there's no consensus.

6   This is an article –– the Ozsunar article that is cited in

7   Dr. Bryan's report.

8          On slide 12, what actually is the language of

9   specification, and this is what Dr. Brant-Zawadzki for

10  NeuroGrafix looked at when he said there are a lot of different

11  ways you can do it, and the patent, indeed, tells you –– for

12  lack of a better term –– use whatever you want to do it.  It is

13  left to the user.  This is column 14, lines 54 to 62.  Each ROI

14  may be a single pixel or voxel, or a larger region.

15         ROI selection can be performed manually, for example,

16  to moving a cursor around and over the ROI.  Alternatively, it

17  can be accomplished automatically.

18         So the specification doesn't tell you to use a

19  particular method or there is one to be used for this patent.

20  It says the ROI to be used in this analysis can be used in a

21  variety of ways, and it is left to you.

22         If it's done manually, there's no instruction or

23  direction about that size, what shape, how to place the ROI.

24  If it's done automatically, it doesn't tell you what algorithm

25  to use, what settings to use or anything of the sort.  So the

1   specification doesn't teach you which method to use.  The
2   experts agree on this.
3           Siemens' expert, Dr. Bryan, says it simply leaves
4   open the possibilities of using any method of selecting an ROI,
5   of which there are many.  NeuroGrafix's expert,
6   Dr. Brant-Zawadzki, agreed in his deposition.  This is slide
7   14, his dep at 108 to 109.  The patent itself says there can be
8   a host of different ways to do it.  He says it gives examples
9   of three, I guess, right there.  And I said:
10          *"One is single pixel or voxel, one is automatic, one*
11  *is a larger region selected manually.*
12          *"Correct.*
13      *"QUESTION:  It doesn't say which of those is the right*
14  *one to use or which of those to use to determine*
15  *conspicuity, correct?  It leaves that to the operator.*
16      *"ANSWER:  Right.*
17      *"QUESTION:  You'd agree with me different operators*
18  *could select different methods of selecting the region of*
19  *interests?*
20      *"ANSWER:  Yes."*
21          There's no disagreement from either side that the
22  patent leaves it to the user.  They admit it allows -- even
23  NeuroGrafix's opposition brief, which now tries to point to a
24  particular method, which I'll get to, this thresholding idea,
25  they even in their own brief say, Well, there are other methods

1   that the patent teaches, as well.  So even now, faced with the

2   prospect of this being definite, they still can't point to

3   because there is no place in the patent specifically tells you

4   how to do it.

5           Their fallback argument to this is, Well, we couldn't

6   have be more precise.  We said everything we could say to the

7   user about this.

8           Their own expert, and the literature, show that to be

9   not -- that's not the case.  First, we've got references first

10  on this slide 17, is the reference called Bonekamp witnesses --

11  Dr. Bryan talks about this; Dr. Brant-Zawadzki was asked about

12  in his deposition.  This is example in the art of how people

13  describe an ROI when they want consistency -- when you want to

14  know if someone down the road can do the same calculation and

15  get a consistent, predictable result.

16          And here you'll see in this Bonekamp reference, eight

17  lines of text telling the user, Here's how to do it.  Use an

18  ellipsoid ROI.  Place it on the long axis of a particular fiber

19  track.  The size is to be 16 pixels from a particular matrix.

20  There are -- even says "Raters were given a template in

21  performing the evaluation."  So it could certainly have been

22  described more specifically than it's described here in the

23  patent.  Other articles that collected in our brief in footnote

24  seven point to the same thing, and similar detailed

25  descriptions if you want to have an ROI that leads to a

44

1    consistent result, this is how you would do it.

2           NeuroGrafix's expert -- slide 18 -- was asked the

3    same thing.  "You'd agree there are more specific ways to

4    prescribe how an ROI is set forth than what's in this patent."

5           He said, "You can be more specific in prescribing

6    how, for a given purpose, to determine an ROI.  We then talked

7    about the Bonekamp article from his deposition, page 170, about

8    all the specifics.  He said, "Does the '360 patent provide

9    those sort of details?

10          Answer -- the first answer was "That's not the

11   purpose of the patent."

12          But then when asked, "Does it describe that or not,"

13   he says, "No, it does not."

14          I also disagree with his first answer, which is "it's

15   not the purpose of the patent."  In this situation, when you're

16   telling people to make a mathematical claim of conspicuity

17   based on two regions of interest, if those regions can lead to

18   different results if created differently, you do need -- it is

19   the purpose of it, to tell someone how to make it.

20          Without a standard in the field, or a particular way

21   described, users don't know how to do it.  They're left to

22   their own devices, and we know, and the evidence in this case

23   shows, that different ROIs can lead to different intensities,

24   ergo the calculation of conspicuity is different.  First look

25   at literature.

 1            This is slide 20.

 2            The Krak reference at 294, the method of ROI

 3   determination definition has a direct influence on quantitative

 4   outcome.  It is not, as NeuroGrafix suggests, irrelevant how to

 5   come up with one because the outcome will be the same.

 6   Depending on how you choose the ROI, you'll get a

 7   mathematically different answer.  The Oxidal reference says the

 8   same thing.  Subjective placement of the ROIs impacts the data.

 9   It's a collection of articles like that in our brief at

10   footnote eight.

11            The experts' work in the case confirms that.  All

12   working from the same images that originated actually from

13   Dr. Filler.  This is Dr. Bryan's analysis.  Choosing -- if you

14   see on the right side, you'll see faint yellow lines pointing

15   to small circles that are all in a nerve.  And what those show

16   at different ROIs, there's different means signal intensity,

17   and that range, Your Honor, is not a percent or two difference.

18   These are not -- as the case law would say, it would need to be

19   to not be indefinite, either equivalent or substantially

20   equivalent that you get to the same result.  We're looking at a

21   range of 60 percent differences.  And, here, where that leads

22   to a conspicuity calculation of 10 percent difference between

23   neural and non-neural tissue makes all the difference, as we'll

24   see.

25            Dr. Filler, in his original report, prior to Markman

1  gets to the same conclusion.  He measures the signal, average

2  signal intensity in the lung, which is the non-neural tissue

3  analysis.  And those numbers range from 13 to 19.  It's a

4  40 percent difference.  Dr. Moseley, same thing, depending on

5  how you set up your ROI, you can get dramatically different

6  results for what that intensity is.

7          Now, in response, all NeuroGrafix points to is a cite

8  to Dr. Bryan.  The top of the slide is their brief, footnote

9  ten.  And what it says is, Bryan suggests the signal intensity

10 will not change meaningfully if different sizes and shapes of

11 selected ROIs are used.  That's not what he said, nor is that

12 the record evidence in this case, and if you look what we've

13 put below is the actual dep testimony that they pointed to.

14 And what Dr. Bryan says there is when asked about a

15 hypothetical that doesn't exist in practice, which is a purely

16 homogenous structure, meaning every pixel in that structure has

17 the exact same signal intensity and there is no noise at all in

18 the measurement, if you selected an ROI entirely within that

19 hypothetical homogeneous noise-free section, well, yeah, you'd

20 be taking an average of identical numbers.  So there would be

21 no difference, except, depending on where you place it, it

22 could still be different.

23         So that quote by no means supports this

24 broad-sweeping proposition that the signal intensity will not

25 change meaningfully if different sizes and shapes are used.

1    Their own witnesses, Dr. Brant-Zawadzki and Filler, say

2    otherwise.

3            In response, NeuroGrafix repeatedly says in its

4    brief, "This method is definite and repeatable."  They say -- I

5    think we cite six on the slide, on slide 25.  There might be a

6    couple others as I remember the brief.  None of those point to

7    any evidentiary support at all.  The idea that the selection of

8    a region of interest, that the teaching this patent will show

9    definite and repeatable -- I know why NeuroGrafix wants to say

10   that, because that would support the idea that you don't get a

11   different result.  The fact of the matter is not does the

12   patent teaches how to do, nor does the actual evidence show it.

13           And what we have on the next handful of slides is

14   the -- are the expert disclosures that have been put in, in

15   this case.  On the left -- slide 26 -- Dr. Filler's calculation

16   on a particular image, and he says the conspicuity in that

17   instance is 1.4.  Using ROIs that are, again, in the nerve and

18   in the same section of non-neural tissue Dr. Filler selected,

19   could he select two ROIs that lead to a calculation of 1.4?

20   Sure.  But you could just as well -- one of skill in the art

21   could choose, as you see on the right side, figure six on

22   Dr. Bryan's report, choose ROIs in the nerve, ROIs outside of

23   the nerve, and get to numbers that are underneath 1.1.

24           So the core question of could two people skilled in

25   the art, based on the open-ended teachings of this patent of

1   choose an ROI, however you see fit, lead to different

2   calculations?  It's not only -- call it Filler v. Bryan, or

3   Brant-Zawadzki -- he doesn't do any calculations -- but Filler

4   v. Bryan or Filler v. Moseley, Filler's own calculations --

5   Dr. Filler ran calculations of the plexus versus the lung --

6   and these are figures five, six and seven from his February 1

7   report -- Feb. 2011 report on slide 27.  The same exact image,

8   the same exact scan, he chooses three different sets of regions

9   of interest.

10          And at first glance, these may not seem to be an

11  issue because these are all larger than 1.1.  But there are

12  claims, specifically claim 19, that has a similar conspicuity,

13  no one argued it should be calculated or deemed any different,

14  and that claim says it has to have a conspicuity of five.  And

15  what Dr. Filler's three analyses here confirm is that even the

16  same person, even the inventor, when he runs these calculations

17  with different regions of interest, gets, in one instance,

18  conspicuity above five, meaning infringement.  And in two

19  instances, gets conspicuity below five, meaning no

20  infringement.  It is the same scan that he's looking at.

21          The expert for NeuroGrafix, Dr. Brant-Zawadzki, when

22  shown these is asked, Well, with respect to this image, three

23  different ROI settings lead to one satisfying claim 19 and two

24  not.  He says with respect to the same data, this is the

25  question in his deposition, line 188.

```
 1            THE REPORTER:  Line what?

 2            MR. LoCASCIO:  180 -- page 188, I'm sorry.

 3            Same data, same scan:  "Depending how you measure it,

 4    it would satisfy claim 19 or not satisfy it, depending on the

 5    ROI selection, true?

 6        "ANSWER:  Yes."

 7            In the brief, NeuroGrafix ignores all of this test

 8    data, all of Dr. Filler's original calculations, Dr. Bryan's

 9    calculations, and just says the nerve was always significantly

10    more than 1.1 times as conspicuous than the lung except one of

11    the claims is a good example of why that alone isn't enough,

12    because we saw in claim 19, the conspicuity calculation is

13    different depending on the ROI, and that's the core question

14    here.  And even with respect to 1.1, Dr. Filler's

15    calculation -- this is shown in slide 30 -- is 2.2 or 2.31;

16    Dr. Bryan ran different ROIs on the same image and got examples

17    under 1.1.

18            Same thing on slide 31.

19            Dr. Filler gets 1.4, Dr. Bryan calculates things

20    above and things below 1.1, all depending on just where you

21    place and how big and how -- what size is your region of

22    interest.

23            Yet another example, on slide 32 and on slide 33.

24    The response to that from NeuroGrafix is these are irrelevant

25    because Dr. Filler, their position is now Dr. Filler's original
```

1   and only expert report to this court and to Siemens Medical

2   Solutions was not actually attempting to do ROI calculations,

3   consistent with the '360 patent, well that is not what his

4   report was submitted for.  His report was originally submitted

5   to show how to calculate conspicuity to support NeuroGrafix's

6   *Markman* position and how on calculate conspicuity, inherent in

7   that requires calculating an ROI.

8          And so to suggest now that Dr. Filler's calculations,

9   which confirm different ROIs lead to different results, is just

10  a -- I think their word is it's informal, it's not a formal

11  conspicuity analysis, it's an informal conspicuity analysis.

12  It's a conspicuity analysis submitted to this court for the

13  purpose of net determining whether something has a conspicuity

14  of 1.1.

15         And under that, his own selection of ROI was not, as

16  they would suggest now, slip shod and not consistent with one

17  of skill in the art.  What it is, is it now undermines their

18  position so they want to not have to be held to what Dr. Filler

19  said.  Even if you ignore Dr. Filler's calculations, what is

20  clear from the literature, from both experts, on the question

21  of regions of interest, is patent didn't tell you how to do it,

22  and if you do it different ways, you can get to different

23  results.  Dr. Brant-Zawadzki actually says the method Filler

24  used that NeuroGrafix now wants to distance themselves from,'

25  is how' the '360 patent teaches it.  He says the same thing,

1   slide 35 -- that both Dr. Bryan and Dr. Filler perform an ROI

2   calculation in their original reports which is the data we just

3   looked at, consistently with the '360 patent.

4          Whereas here, there are multiple ways of determining

5   the scope of the claim and the patent doesn't tell which way to

6   do it -- this is *Honeywell*, *Geneva Pharmaceuticals* -- that is

7   the epitome of indefiniteness because it could just as easily

8   be infringing, as non-infringing, and it depends not on what

9   the claim describes but on a subjective analysis, Your Honor,

10  and --

11          THE COURT:  All right.

12          MR. LoCASCIO:  With that --

13          THE COURT:  You've made the point.

14          MR. LoCASCIO:  Thank you.

15          THE COURT:  Mr. Fenster.

16          MR. FENSTER:  Your Honor, this claim limitation that

17  we're looking at, the patent does have this limitation that

18  limits the claims to the requirement that there be a

19  conspicuity of nerves of 1.1 relative to background tissue.

20  It's undisputed that what that means is that it requires that

21  the nerve be exactly at least 10% brighter than the surrounding

22  tissue.

23          THE COURT:  Yes.

24          MR. FENSTER:  Now, that seems -- that looks to be a

25  very specific requirement, but the court raised some questions,

1    as did Siemens Medical Solutions, about how you calculate

2    conspicuity, and first they asked, what formula do you use.  No

3    formula; the patent doesn't tell you.

4            Then he pointed the court to the formula in the

5    patent, where it says -- where it defines conspicuity as

6    contrast, and then teaches that contrast is the ratio of SN

7    over SM -- this is in the patent at column 22, where it says,

8    "A nerve-to-muscle contrast parameter, R, was then computed as

9    the ratio of S sub N, divided by S sub M, for muscle, and the

10   court found in its claim construction order that while

11   difficult, because this is a long patent and this is one line

12   therein, the court could construe conspicuity as this ratio.

13   But the court asked for guidance.  Well, is it subjective how

14   we determine this, how we calculate this ratio?  The court

15   asked two questions:  First, 23, please.

16           First, how would a person of ordinary skill in the

17   art identify whether something is nerve or background?  And

18   then second, how would a person of skill in the art select the

19   regions of interest and is that a subjective query?

20           So we showed -- and I don't think it's disputed --

21   and Siemens Medical Solutions hasn't raised it here -- that one

22   of skill in the art does know how to select the nerve.  And

23   next slide, it is undisputed that the patent teaches how to

24   select the nerve.  That one can select the nerve just by gross

25   anatomy and that the patent specifically teaches two methods

1    sufficient to identify nerve when gross anatomy is not enough,

2    and that is that the -- to identify presence of the fascicle

3    pattern -- that is at column 27, lines four through 28,

4    line 26, and that also teaches additional method of the

5    combination of diffusion weighting and fat suppression.  That

6    is at column 22, lines 33 through 36.

7          There is no real dispute, I don't believe, that at

8    this point, that one of skill in the art does know how to

9    identify a nerve, and so I will not go to what the patent

10   teaches about how you select regions of interest.

11         The experts, Your Honor, I don't know how you parse

12   through when you have competing experts, and the experts are

13   all over the place on this.  So what I do know is that the

14   expert testimony is extrinsic.  What is really important is

15   what the patent says.  And what Siemens posits, and the

16   question before the court is, does the patent tell you how to

17   calculate the region of interest?  And, Your Honor, it does.

18         First, there are two regions of interest we have to

19   identify:  The first is the nerve.  That's the numerator in the

20   ratio.  And the second is the background tissue, right?  So

21   that's the denominator in the ratio.  So, first, with respect

22   to the region of interest for the nerve, the patent tells you

23   how to do it.

24         This is slide 26.

25         It says you use a thresholding process.  It says at

1    column 20, lines two to seven, a thresholding process is used

2    to identify relatively bright regions of the image potentially

3    representative of nerve.  With the boundaries of these regions

4    established, the intensity of the pixels associated with each

5    region is evaluated and average image intensities for the

6    regions are computed.

7            Now recall, that the ratio that we -- that the court

8    found described in the patent as the contrast parameter is SN

9    or SM, those are average intensity.  This is telling you how

10   you calculate the average intensity for the nerve.  You use a

11   thresholding process.  It describes that again in slide 27 at

12   column 30, lines 58 to 76.  The system then determines the

13   boundaries of the imaged nerve in each of the two dimensional

14   images available using a thresholding process.  The patent

15   tells you how to do it.

16           What does that mean?  Slide 28.  So this is from

17   Exhibit 20 to Dr. Filler's declaration, this is just to

18   illustrate what thresholding means.  So first what he did is he

19   selected a point on the nerve -- this is slide 28 -- I'll do

20   this on the Elmo, Your Honor.  These are the same slides.

21           So this is slide 28 -- this not as good -- where he

22   selects a point within the nerve and then he uses a

23   segmentation algorithm.  So this is built-in software.  Let's

24   go back to -- I apologize, Your Honor.

25           At the top right, it shows that these are

1  segmentation parameters, and there's an algorithm that says

2  threshold.  I don't know if Your Honor can see that, about four

3  lines down on the right side?

4          THE COURT:  Yes, I can see it.

5          MR. FENSTER:  Thank you.

6          If you go to slide 29, this is the thresholding.

7  What you do is you set an intensity above which the image is

8  shown or it's highlighted and anything below the threshold is

9  not highlighted.  If you set it up to 83, it highlights the

10 nerve.  Eighty-three is the interval that is highlighted on the

11 right about mid level, do you see where it says 83 interval?

12         THE COURT:  Yes.

13         MR. FENSTER:  Okay.  The next slide, slide 30, takes

14 it one.  If you go up, if you do that interval of up one notch

15 to 84, you get a lot of stuff that is clearly not nerve.

16 That's what the thresholding process is.  You use the slider to

17 identify the nerve, and when you go too far, you get clearly --

18 you get stuff that is clearly not nerve.  So you back it down

19 to 83 and that's how you identify the nerve.

20         So the nerve is selected using the thresholding

21 process and you take the average intensity of that nerve.  Next

22 slide.

23         That -- using that thresholding process, by the way,

24 is -- basically it gives you the same result as Dr. Bryan did

25 in his opening report.  Next slide.

1          Okay.  So the patent teaches you to use the --

2    teaches one of skill in the art to use this thresholding

3    process for the numerator to find the average intensity of the

4    nerve.  You select the region of interest by thresholding, and

5    you select the whole nerve, you take the average of it.  That's

6    what the patent says to do.  Now, how do you determine the

7    non-neural tissue?  Two different sets of claims that -- and

8    the language of those dictates different results.  Claim 18 --

9    next slide -- so first, claim 18 says that you need a

10   conspicuity of the nerve that is 1.1 relative to any adjacent

11   non-neural tissue.  So here, claim 18 dictates what the

12   non-neural tissue is.  It is any adjacent non-neural tissue.

13          In other words, you find an adjacent tissue and you

14   select the whole thing.  That is  dictated by the plain claim

15   language, and it is from Exhibit 15 to Dr. Filler's

16   declaration, and what I've done is just illustrated this part

17   here is the nerve, this is the adjacent non-nerve, and what

18   he's done is just selected the non-nerve tissue and takes the

19   average of.  That's what claim 18 says to do.

20          The other claims, claims one, three, seven, 11 and

21   12 -- slide 34 -- 11, don't specify which non-neural tissue.

22   They say the non-neural tissue.  Here we have to look to the

23   specification.  The specification does tell us which region of

24   interest to use for the non-neural tissue.  Slide 35.

25          What the patent did and what it discloses, is using a

1  two centimeter elliptical region of interest.  At column 27,

2  lines 29 through 43, what it says is images from the second

3  series were post-processed by selecting manually an elliptical

4  region of interest, approximately two centimeters in diameter

5  around the sciatic nerve in each of the sections.  The patent

6  tells us how to select the region of interest.  Just as it

7  said, the contrast parameter was calculated using the ratio.

8  It says the region of interest was selected as the two

9  centimeters surrounding the nerve, and that is illustrated at

10  figure 22 of the patent.

11        So let me take you to the Elmo.  So this is

12  column 27.  This is what we just looked at where it says images

13  from the second series were processed by selecting an

14  elliptical region of interest approximately two centimeters in

15  diameter.  That's at line 30 on column 27.

16        It then goes on in the next paragraph to show is that

17  these are illustrated in the figures, and figure 22 shows an

18  axial protection of the nerve including the graft.  So

19  figure 22 shows this two centimeter region of interest.  This

20  is figure 22 from the patent.  And this image is a little hard

21  to see, so I got the original images from which this data set

22  was created.  But what it shows, this is a reverse image where

23  the dark is the sciatic nerve and the white stuff around it is

24  the background tissue.  This is a two centimeter of interest.

25  This is axial.  What they did is they took a two centimeter

1    ellipse in cross-section and stacked those up to get the

2    two-centimeter cylinder that is shown on figure 22.

3              Let's go to slide 37.  So, Your Honor, I apologize

4    for the bloody image on the right.  This is the original image

5    from which figure 22 was generated.  As you can see at the top,

6    it says University of Washington Research, this was dated

7    December 1st, 1992.  Do you see that at the top?

8              THE COURT:  Yes.

9              MR. FENSTER:  So this is the original image which

10   figure 22 was shown and you can see that side by side if we

11   just go briefly to 46.  So 46 shows on the left, the image that

12   we're looking at, the original image, and on the right is

13   figure 22 from the patent.  Though it's not quite scale, you

14   can see that they're the reverse image of each other.  That the

15   nerve shown in white on the left is shown in dark on the right,

16   but that that is the exact same image of the sciatic nerve that

17   is described in the patent.

18             Do you see that, Your Honor?

19             THE COURT:  Yes, I do.

20             MR. FENSTER:  So let's go back to 37 and look at the

21   original image.

22             The original image shows a -- the neurogram that was

23   generated using the image and the region of interest -- the

24   two-centimeter region of interest that was selected, that is

25   shown in figure 22 on the left, and on the right, you see the

1   operative -- the surgical paragraph that was taken during

2   surgery.  And at the top, what they're doing is pointing to the

3   sciatic nerve.  This sciatic nerve was cut by a knife, and if

4   you can look right in the middle of the image on the right, you

5   can actually see some little black sutures where it goes from

6   being, sort of, a nice, normal image of the sciatic nerve to an

7   injured portion of the nerve.  In the middle there are little

8   black sutures.  That's where they sewed the nerve back

9   together.

10          On the left is the neurogram using the invention that

11  was shown of that nerve.  And the patent tells you and

12  illustrates if figure 22, taking this two centimeter region of

13  interest, those are the three components that we need to

14  calculate conspicuity.  You identify the nerve, you take the

15  region of interest of the nerve, it's determined by

16  thresholding, and you divide it by the region of interest of

17  surrounding tissue and the patent says to use a two centimeter

18  surround.

19          The patent discloses how to do it.

20          Now, let's go to 41.  We originally proposed that the

21  court construe conspicuity as the continuing arrest as it's

22  defined in the patent where it's defined exclusively as the

23  contrast between the nerve and any adjacent non-neural tissue

24  as least 1.1 times.  Indefiniteness -- the Federal Circuit law

25  in indefiniteness says that claims are presumed valid and that

1    we shouldn't invalidate a claim unless a narrowing construction

2    cannot properly be adopted.  That's in the *Microprocessor*

3    *Enhancement* case on slide 20.

4            So what we would propose in terms of narrowing

5    construction is the following:  This is on slide 42:  So we

6    would propose the following narrowing construction consistent

7    with the specification:  Contrast, conspicuity should be

8    defined as the contrast in, for example intensity and color,

9    between nerve and any adjacent non-neural tissue at least 1.1

10   times.  Then specify how to contrast is calculated as described

11   in the patent.  Contrast is calculated by dividing, one, the

12   average signal intensity of a region of interest of nerve as

13   determined using a thresholding process, by, two, the average

14   signal intensity of the non-neural tissue, for claim 18, region

15   of interest for the non-neural tissue is the brighter adjacent

16   non-neural tissue, and for the other claims, the region of

17   interest is the non-neural tissue.  It's an approximately two

18   centimeter ellipsoid surrounding the nerve.

19           That is the best guidance that we have from the

20   patent.  The patent is not perfect, Your Honor, and I wish that

21   it said this is the only way to do it but it doesn't.  But it

22   does disclose how to do it.  Just as the court struggled to

23   find that the contrast could be calculated using the formula,

24   the ratio, we ask you to find that the court -- that the

25   regions of interest are specified.  It does tell the reader

1   that they used threshold, and they used the two centimeter

2   region of interest for the non-neural tissue.

3          Unless you have any questions, Your Honor?

4          THE COURT:  No.

5          Please.

6          MR. LoCASCIO:  Your Honor, pardon the expression, but

7   this question of regions of interest is in some ways from

8   defendant's perspective, whether it's herding cats or whack a

9   mole or whatever you want to call it, this proposed

10  construction from NeuroGrafix never existed and they did not

11  take the position that the patent specified how to calculate

12  regions of interest in this manner until their opposition brief

13  via attorney argument and a belated submission from Dr. Filler.

14  The process in this case was we had a whole *Markman* hearing and

15  we identified this.

16         THE COURT:  I know.

17         MR. LoCASCIO:  We had an expert process.

18  Dr. Brant-Zawadzki, NeuroGrafix's expert, does not say any of

19  the things that Mr. Fenster just walked through.  He doesn't

20  say it needs to be done by thresholding.  He never even

21  mentions the two-centimeter portion of the specification.  I

22  want to walk through what the specification actually shows to

23  respond to Mr. Fenster.  Even now, this position continues to

24  evolve and change.

25         Our Exhibit 15 -- if we're incorrect about this, I'm

62

1    sure Mr. Weiss will point it out -- to the Filler declaration I

2    have is not the alleged Exhibit 15 that Mr. Fenster just put on

3    the screen.  This color document, this slide, slide 37, that

4    Mr. Fenster showed, put it on the Elmo -- was never produced,

5    has never been turned over in discovery, it's not even in the

6    late Filler submission.  The first time we saw it was this

7    morning, with these decks, and, let's step back, it frankly

8    doesn't tell anyone who is reading this patent anything since

9    it's not in the patent.  It doesn't even have the two

10   centimeters on it on the right side.

11        But this concept of the evolving and moving

12   interpretation of how to construe conspicuity, how to determine

13   the region of interest, is an effort in the face of -- as

14   Mr. Fenster puts it, a patent they don't like the way it's

15   written.  That is how the patent is written.  We have to

16   construe it based on the actual patent and on its specification

17   and file history.  None of that supports what we're now hearing

18   on opposition to this conspicuity motion from NeuroGrafix.  The

19   actual patent says, for instance, column 14 --

20             THE COURT:  Wait a minute.

21             MR. LoCASCIO:  -- line 53 to 62 --

22             THE COURT:  Wait a second.

23             MR. LoCASCIO:  Sure, Your Honor.

24             THE COURT:  What line are you on?

25             MR. LoCASCIO:  I am in column 14, line 53, Your

63

1   Honor.  If it helps, I'll put it up on the screen.

2          THE COURT:  No.  Go on.

3          MR. LoCASCIO:  Okay.  It says one or more regions of

4   interest within an image can be identified.  Each ROI may be a

5   single pixel or voxel or larger region.  It can be done

6   manually; it can be done automatically.  Mr. Fenster and

7   NeuroGrafix's position is the determination of an ROI for the

8   nerve is different than it is for the non-neural tissue.  And

9   for the nerve, it need be automatic via a thresholding process.

10  First of all, that is inconsistent with the language of the

11  specification, column 14.

12          It even then says after you do one of these methods,

13  what I've highlighted in line 63 and 64, next you calculate the

14  average image or pixel intensity within that ROI.  What

15  Mr. Fenster pointed out, if this is how you get conspicuity:

16  Calculate this average of intensity from the ROI.  It's right

17  here in column 14, which as the specification gets to that

18  point, this is in the section if you go back to one page, to

19  column 11, this is all within the heading of neurography

20  system.  "Neurography" being the term plaintiff used to

21  identify nerves in MRI image.

22          In that process, this is how you can calculate an

23  ROI.  Doesn't say have to, it gives you full latitude to do so.

24  What NeuroGrafix points to -- and I note -- points to now for

25  the first time is that we ought to look at column 27, 28 on

64

1   this issue -- columns 27 and 28 contain both the two centimeter

2   reference NeuroGrafix points to and this thresholding concept.

3   And the intro to that section is the fascicle identification

4   and nerve enhancement.  And so they're talking about in a

5   specific process of identifying fascicles which is what all of

6   this points to, and actually figure 22 that Mr. Fenster shows

7   is preceded by two other figures showing a cross-section of

8   that nerve, identifying fascicles, these are figures 20 and 21.

9   Twenty showing in the middle there, that same sciatic nerve,

10  calling them white dots inside of a larger white circle, zoomed

11  in, in figure 21.

12          Sure, one way of doing it for fascicular

13  identification is described as thresholding.  We'll get to it

14  in a second.  It doesn't tell you how you go about that, any of

15  those settings Mr. Fenster puts on the screen, none of those

16  are in the patent at all.  But to suggest that this passage

17  is -- now governs region of interest calculations across the

18  whole patent would read out the very language in column 14 on

19  how to use a neurography system, namely, select an ROI, in a

20  host of ways.

21          So coming back to defendant slide deck, both expert

22  reports, both experts point that what language column 14 says,

23  this is what the patent describes.  In the face of that,

24  NeuroGrafix now points thresholding, and the two centimeters

25  they do so through attorney argument because the only

1    alternative to that would be to say that the Filler declaration

2    they put in with their opposition is expert testimony, which is

3    a bit of a catch-22 for them because they don't want to say

4    that because then they would be frontally violating the

5    scheduling order and the disclosure obligations they have.  So

6    instead they now had to back up to the position of it's not

7    even evidence what is in the Filler declaration.

8            In their opposition to the motion to strike, they say

9    it's neither expert testimony nor even fact evidence that the

10   court can rely on.  It is purely demonstrative.  Well, then all

11   it is demonstrative of is attorney argument to try to avoid

12   what their own expert testimony is, Your Honor.  This is a --

13   the fourth or fifth definition NeuroGrafix has put forth for

14   how to calculate the ROI, and it is, in my view, Your Honor,

15   the last-ditch effort to find a way around the actual language

16   of the patent.

17           The patent doesn't tell you how to do it and they

18   have to acknowledge because their own calculations show it that

19   if you do it different ways, you get to a different result.

20   This Filler submission, Your Honor, as we've talked about, it's

21   after the expert deadline, there's no ability to really respond

22   or depose Dr. Filler on it, but they argue this thresholding

23   process is somehow used to draw ROIs for conspicuity.  Indeed,

24   they say it has to be the way to do it.  And contrary to his

25   report and their brief, Dr. Filler himself, before we knew this

*UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*
*COURT REPORTER DEBORAH K. GACKLE*

1    was going to be his story, either sheer happenstance or I am

2    incredibly prescient, Your Honor, when we deposed Dr. Filler

3    six months or, though I don't have the date on here, he was

4    asked about this language and how you calculate conspicuity,

5    and he said, This fascicle identification approach is not what

6    we're calling conspicuity.  This is from page 123 in the

7    deposition.

8            THE COURT:  I've read it.

9            MR. LoCASCIO:  Dr. Filler himself, when he was

10   actually deposed, when he put in an actual expert report, said,

11   This is not the way to do it.

12           Their expert then comes in, in the wake of that, and

13   says it does not describe a way to do it.  Even if you were to

14   say, okay, despite all of that, thresholding is now going to be

15   the way the patent describes it, Dr. Bryan, and even

16   Brant-Zawadzki, admit in their deposition, this description of

17   thresholding -- this is slide 41 -- is so vague as to be

18   useless.  It doesn't tell you -- all of the settings, when you

19   look at that screen shot Dr. Filler submitted with the

20   opposition brief in a minute -- that determines the results of

21   your thresholding.  It's not however you do it, you get to that

22   result.  Dr. Bryan and Brant-Zawadzki say it doesn't tell you

23   how to threshold the image, and so that's great.  You can use

24   one automatic method being called thresholding, but it doesn't

25   get you there.

```
 1            Dr. Bryan showed -- and these are materials we
 2    submitted in his timely expert reports, what you see in the
 3    left is the overall image, and what thresholding basically is,
 4    is if you think about, if you have a contrast dial, which is
 5    now a button --
 6            THE COURT:  I know.
 7            MR. LoCASCIO:  -- on your TV, if you turn it down
 8    enough, it goes black.  If you turn it all the way up, the TV
 9    goes white, and somewhere in between certain pixels lit up,
10    depending how bright they are vis-a-vis the rest of the image.
11    And thresholding just says we're going to cut it off at a
12    point.  And what showed on the right side is a 60% threshold.
13    So we will take the 60% brightest images or brighter pixels on
14    that image.  And what it shows is you can't see any -- not
15    many, very few to no, non-neural tissue -- pardon me, neural
16    tissue.  What you see there is bone and other things show up
17    from the thresholding.  So just the concept of putting a
18    threshold in on the images at issue doesn't automatically make
19    the nerves just pop out; you have to do a lot more than that,
20    and there's no description of how to do it.  Dr. Bryan was
21    asked, Could I use the thresholding to select the bright areas
22    of nerves?  That answer to that question is no.
23            So what Dr. Filler submits is his report doesn't
24    simply use thresholding.  It's a specific segmentation
25    algorithm using this Osirix software -- this will not be a
```

1    surprise, none of this is anywhere in the specification or the

2    patent.  It doesn't say -- the patent doesn't say use this

3    what's called region growing algorithm, it doesn't say how to

4    do the threshold, it doesn't tell you any of these settings he

5    particularly applies.

6            Is this a way one could not do it?  Sure.  It's not

7    "the" way the patent describes.  The patent says nothing about

8    this other than use automatic thresholding unless, of course,

9    you want to use pixel, voxel, or manual settings.

10           THE COURT:  I have the point.

11           MR. LoCASCIO:  These choices, Your Honor -- the last

12   point I want to address is the two-centimeter issue.  They

13   point to column 27 and the two centimeter ellipse.  They say

14   that that should be the way you construe ROI calculations for

15   conspicuity for non-neural tissue.  It's a matter of first

16   principles:  The idea that the patent where it talks about

17   conspicuity is suggesting -- as Mr. Fenster must now fall back

18   to -- to use different methods to measure and determine the ROI

19   for neural versus non-neural -- claim 18 versus the other

20   claims -- is not how you ought to construe these claims, it

21   doesn't make sense.

22           But even their own language, claim 27 talking about

23   the sciatic nerve says this region of interest, two centimeter,

24   this is column 27, slide 45, was selected to exclude blood

25   vessels.  Blood vessels are non-neural tissue.  So the two

69

1   centimeters discussed here in the actual language of the

2   specification is designed to exclude the non-neural tissue

3   because the sciatic nerve, coincidentally enough, has a

4   diameter of approximately two centimeters.  So they were

5   actually choosing neural tissue with that two centimeters, not

6   non-neural tissue.

7           Dr. Bryan talked about this.  Top of slide 46.

8   There's no specific diameter disclosed as to how to do this

9   throughout the patent, and specifically until the Filler

10  submission comes in and the opposition brief, NeuroGrafix's own

11  expert, Dr. Brant-Zawadzki said, quote, "With respect to how to

12  select a region of interest in the '360 patent, does the patent

13  describe a particular size or shape region to use?

14          Answer, No, it is exactly the opposite of what

15  NeuroGrafix now argues.

16          And they point to slide 47 -- this is actually the

17  image that was Exhibit 15 to the Filler report that we got.

18  The bottom right of this image, not what Mr. Fenster showed.

19  It has that red circle, which is allegedly that two centimeter

20  region of interest.

21          THE COURT:  Yes.

22          MR. LoCASCIO:  Dr. Filler himself sort of cuts pieces

23  out of it.  He manually excludes some portion, he allows the

24  algorithm to draw, what I assume, is around the green section.

25  This is all in Dr. Filler's late submission.  This is

*UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*
*COURT REPORTER DEBORAH K. GACKLE*

1    quintessential expert testimony.  This not a demonstrative.

2    This is their opinion to support -- the only thing they use to

3    support this two centimeter distinction.  Putting aside that it

4    wasn't disclosed or adequately tested because it couldn't be

5    because of the way they approached it.  Inconsistent with their

6    own expert, Dr. Brant-Zawadzki, but it also adds things that

7    aren't in the specification.  It's, again, a subjective way

8    Dr. Filler chooses to select the ROI.  That's not disclosed.

9    All of these are steps he had to come up with himself that are

10   not set forth in the patent.

11         And the last slide I have under the *S.O.I.TEC Silicon*

12   case, this concept of adding techniques that do not appear in

13   the patents cannot be used to satisfy the claim, Your Honor.

14   You can't read things in that aren't disclosed there to get

15   around the indefiniteness problem.

16         And so where we end on this issue is conspicuity

17   requires a region of interest.  These claims didn't tell you

18   how to do it, and the patent itself says you can use any method

19   you want in a basket of them.  And all the experts who

20   submitted expert disclosures in this case say you can use

21   different methods.  Those methods lead to different

22   calculations, and mathematics itself, and indeed the experts

23   admit that doing it via different calculations gets you to a

24   different result.  And in the face of that, the claims are

25   indefinite, Your Honor.

```
 1              THE COURT:  All right.  Now, do you want to say
 2   something else?
 3              MR. FENSTER:  Briefly, Your Honor.
 4              First, Your Honor, Mr. LoCascio's --
 5              THE COURT:  Where are you now?
 6              MR. FENSTER:  Column 14 of the patent.
 7              THE COURT:  Yes.
 8              MR. FENSTER:  And Mr. LoCascio suggested that the
 9   thresholding, the method of selecting the ROI is somehow
10   inconsistent with column 14.  It is not.  Column 14 says that
11   the region of interest may be a single pixel or many, and it
12   may be automatically or manually selected.  That is entirely
13   consistent.  When you do the thresholding process to select the
14   entire region, the entire nerve, it may be as small as a voxel
15   or it may be many; and you can do that thresholding process
16   manually or automatically, and you can do the two-centimeter
17   surround automatically or manually.
18              What the patent describes later as how it did the
19   calculation and how it selected the regions of interest is not
20   inconsistent with column 14.  Second, what Mr. LoCascio showed
21   you with respect to Dr. Bryan's thresholding process of the
22   60% -- do you recall that image?
23              THE COURT:  Yes, I do.
24              MR. FENSTER:  And his analogy of the television
25   contrast --
```

1      THE COURT:  I do.

2      MR. FENSTER:   -- that is just not how thresholding

3  is done.  You don't pick a random threshold and say let's see

4  what happens.  You use a slider, and you adjust it until you

5  get the nerve, which you can identify through gross anatomy,

6  and when it goes above that and selects things that are clearly

7  not nerve, which you know through gross anatomy, that's how you

8  use the thresholding process to identify the region of

9  interest.   That's what the patent describes.

10      Dr. Bryan is playing games with Your Honor.  Your

11  Honor, in the real world, the conspicuity is much greater than

12  1.1.  When the conspicuity of the nerves generated using this

13  method are much brighter -- and it's obvious just by the naked

14  eye to see that the nerves are brighter than the background --

15  then there's no question that that conspicuity element is met.

16  This is only -- their argument is only focused at the very

17  fringe argument -- which we don't even know if it exists in the

18  real world -- where the conspicuity is right around 1.1.  Where

19  it's obvious -- as it will be in most cases -- that the

20  conspicuity is so much greater than 1.1, just by looking at it,

21  the method of calculation is irrelevant.

22      Your Honor, we don't know whether this is an academic

23  question right now or if this is a real question, whether this

24  patent does reasonably apprise one of skill in the art, what

25  the bounds of the claim are in a real-world context, and, Your

1    Honor, I submit to you that --

2              THE COURT:  Say that once more.

3              MR. FENSTER:  Yes.

4          Your Honor, this is an important point.  If you --

5    the overwhelming majority of neurography studies, if done

6    right, have a conspicuity that is far above 1.1.  It's not even

7    close.  You know by looking at it you don't have to do a

8    calculation, you know by looking at it that it's much more than

9    10%.  You only have to do the calculation if it's right at the

10   borderline, if it's right near 1.1.

11             Well, if it's right at 1.1, you haven't done a good

12   image.  You haven't done it right.  And, Your Honor, if you

13   allow us to proceed to discovery and we get to even a

14   representative sample of accused neurography studies, I submit

15   to you that what the evidence will show is that the

16   overwhelming majority you can -- there's no dispute, no way you

17   could possibly calculate it, wouldn't show that the 1.1

18   conspicuity element is met.  We don't know until we get a

19   representative sample of accused studies whether this is

20   something that we're talking about on the fringe or whether

21   this is a real problem.

22             The patent law does not require absolute specificity.

23   What it requires is that the claims reasonably apprise one of

24   skill in the art, whether or not they're practicing the claim.

25   Your Honor, by analogy, if I were to draw a line on a piece of

74

1   paper, this piece of paper shows a definite line, and that's

2   what the claims have to do.  But if I zoomed in on with a

3   microscope, this line would look like a mountain, and you'd say

4   I have no idea where this line actually is, what the boundaries

5   of this are.  And, Your Honor, I submit to you that that is

6   what is happening here.  We're focused in so close to the

7   borderline that these cases don't exist in the real world.

8           THE COURT:  Let's go on.

9           Please.

10          MR. FENSTER:  All right, Your Honor.

11          MR. LoCASCIO:  Your Honor, if I may, before we move

12   on, I have one thing I want to show that we didn't have a

13   chance to talk about responding directly to what Mr. Fenster

14   just said.

15          At the end of the day, this 1.1 calculation is the

16   basis -- the point of novelty.  It's how this claim was issued.

17          THE COURT:  Well, I'm looking at what the examiner

18   said.

19          MR. LoCASCIO:  Specifically --

20          THE COURT:   -- so I can derive that on my own.

21          MR. LoCASCIO:  You don't need me to explain that, to

22   be sure.

23          THE COURT:  No.

24          MR. LoCASCIO:  What I want to direct your attention

25   to is this is not a hypothetical exercise.  The plaintiffs

```
 1   themselves -- NeuroGrafix said on the right side on this screen
 2   I've got, see, it says it's undisputed that the images in
 3   Exhibit A to Dr. Filler's rebuttal report -- this is his expert
 4   report from the first round of Markman -- were made using the
 5   method disclosed in the claim by the '360 patent.  So using the
 6   method that's disclosed in this patent, Dr. Filler made images.
 7   This isn't some hypothetical line exercise.  This is --
 8            THE COURT:  That's all right.  You don't have to say
 9   that.
10            MR. LoCASCIO:  The image that Dr. Filler submitted
11   had a conspicuity -- this is on slide 26 -- of 1.4.  It's not
12   10, it's not 100, it's not so far away from 1.1.  That same
13   image, if you chose your ROI, as one of skill in the art can,
14   if you look at the two images, Dr. Filler's in the green boxes,
15   you can see his selection of the square -- with the light blue
16   one -- if you can distinguish the difference -- it's different
17   for me to -- is the nerve.  The green circle to the left of
18   that is the non-neural tissue, and he gets 1.4.
19            THE COURT:  Stop.  Now, let's go on.
20            MR. LoCASCIO:  Okay.  The last issue, Your Honor, I
21   believe is the summary judgment.
22            THE COURT:  Yes.
23            MR. LoCASCIO:  Okay.  Let me walk through that.
24   Specifically, there are -- probably the easiest way to think of
25   it is three bases.  The point of this was, Your Honor, to
```

76

1    address things from Your Honor's claim construction to narrow

2    issues in this case.  And, first, this is the slide deck called

3    "anticipation."  I don't -- we've got three different issues,

4    the first of which is pronounced -- as I've been told by

5    various obvious people who work in this industry -- *Hajnal* --

6    H-a-j-n-a-l.  The *Hajnal* reference, it is agreed, teaches every

7    single thing in claim three.  The only debate being how to deal

8    with the language of claim 3(d), 3(d)(iii) as it's been

9    described.

10          They -- NeuroGrafix has previously explained that

11   this means applying a pulse sequence.  That's what step (d) is,

12   applying a pulse sequence to the patient through the MRI

13   machine and getting a result.  What it does is talk about T2

14   weighting, namely, having an echo time and repetition time that

15   are different enough, Your Honor, that that generates a

16   particular response image.  And the point of that, the way it's

17   written is to exploit this characteristic inherent in nerves.

18   And so the parties, Your Honor, took that definition, they

19   looked at what the claim said, and during the course of claim

20   construction, came to an agreement that what this meant is T2

21   weighting.

22          During the *Markman* hearing -- slide seven --

23   NeuroGrafix said claim three is long T2 waiting.  During the

24   hearing, Mr. Fenster said the same thing:  This claim relates

25   to long T2 waiting.  The agreed-upon construction of this

1  phrase, is shown on the right, a combination of echo time and

2  repetition time designed to take advantage of the differences

3  in T2 values of the nerve compared to surrounding tissue.  This

4  is commonly referred to as a T2 weighted sequence.  *Hajnal*

5  discloses and uses a T2 sequence.  It's not disputed that it

6  does.

7          And so the only basis for noninfringement is that the

8  claim requires something more than a T2 weighted sequence,

9  which is inconsistent with how the parties agreed this would be

10 construed.  Claims four and five depend from claim three and

11 specifically apply echo time limitations or repetition time

12 limitations, TE and TR, to the broader language of T2 weighting

13 in claim three.  They confirm that what claim three talks about

14 is using T2 weighting with something of this ratio.

15          NeuroGrafix admits that *Hajnal* discloses those

16 particular ranges, so claims four and five are disclosed by

17 *Hajnal*.  The only difference for those, like three, is their

18 new proposed claim construction of that term.

19          This idea that -- obviously, if it meets the

20 dependent, it must meet the independent, I don't need to spend

21 the court's time.

22          The opposition brief from NeuroGrafix never

23 acknowledges or mentions the parties had agreed on what this

24 term meant.  Their expert, when he submitted his report on this

25 issue, was never told or informed that this is what it meant.

1    They argue now that we should apply a new term or a new

2    limitation to claim three to avoid the *Hajnal* reference.  That

3    new construction is incorrect.  They argue that despite the

4    agreement, this element requires the user to check when running

5    a scan the actual T2 times of all of the non-neural tissue in

6    that particular image as the neural tissue.

7           This is not met -- and then they argue that this is

8    not met in *Hajnal*, figure five, and the basis for that

9    argument, Your Honor, is just a recycled version of the nerve

10   argument that we had as to does the nerve -- is it limited,

11   Your Honor, to areas outside of the -- I think the term was the

12   arachnoid space when we had this discussion originally or not.

13   And this argument was never raised, and this court's -- here

14   and the Northern District under the rules we all agreed to

15   follow say you cannot on the purpose of summary judgment ignore

16   the stipulated construction because then we would just have

17   parties at summary judgment shifting their positions around so

18   they can avoid summary judgment.

19          The whole point of what has been a, I think, helpful,

20   thorough -- we're going to get to -- there are claims that

21   obviously are not part of this summary judgment motion, there

22   are claims not part of the indefiniteness argument.  To get to

23   the heart of what this case is really about, we have had a

24   process in place, and that process -- I think all sides would

25   agree -- has been valuable.  What the -- but that process has

 1   teeth, and when you agree to the construction, you can't later

 2   on change it to avoid summary judgment.

 3          Now, they argue it's not meant because the image has

 4   shorter T2 times for the non-neural tissue than the nerve.

 5   That ignores claim six because claim six depends from four,

 6   which depends from three, and says the non-neural tissue

 7   includes fat, and fat has a longer T2 constant than nerve.

 8   Their position is, Well, it doesn't always, and depends on how

 9   you take the image.  But the fact of the matter is there are

10   references and places you can point to where fat -- this is the

11   whole point of fat suppression, because that's a different

12   technique to -- for lack of a better term -- to knock the fat

13   out of the image so you see the nerve more clearly.  Fat having

14   a higher T2 time means claim six, if you -- you cannot

15   interpret claim three the way they suggest, but you can

16   interpret it the way they agreed to, because if you take it now

17   their new construction, then claim six doesn't make any sense,

18   and that is an improper way of construing a claim, to have the

19   dependent claim -- use a term -- inconsistently or be outside

20   of the dependent claim.

21          They also argue that, Well, we're not looking at, and

22   *Hajnal* doesn't really apply because it's somehow inside the

23   brain or the arachnoid space.  The reason we filed this motion,

24   Your Honor, is because their only argument before this

25   opposition as to why *Hajnal* didn't anticipate is the *Hajnal*

1    reference, figure five, shows that trigeminal nerve, which is

2    cranial nerve five, inside the arachnoid space, and their

3    argument was, Well, that doesn't count because our claim is

4    somehow limited when we use the term "nerve."

5           The court rejected that argument.  The court says,

6    You elected to include in your nerve description, cranial

7    nerves.  They could have said "peripheral" or "autonomous

8    only," but they include cranial nerves three through 12.  All

9    of these nerves have a portion inside the arachnoid space.  The

10   court's construction, which they do not dispute, they have not

11   sought reconsideration on it, means that all pieces of that

12   nerve, including the pieces inside the arachnoid space, are

13   subject to the claim scope.  By doing so, if a prior art

14   reference, like *Hajnal*, shows that piece of that nerve -- which

15   there's no dispute.

16          This is trigeminal nerve -- cranial nerve five, the

17   trigeminal nerve.  It's one of the nerves that's covered by the

18   claim, and they admitted to the Patent Office -- also why we

19   thought this motion would clean up the claims that need not be

20   in this case anymore -- NeuroGrafix themselves admitted it

21   shows 1.1 conspicuity.  Their argument now is where it shows

22   1.1 conspicuity, despite being a cranial nerve three through

23   12, renders it outside because of this arachnoid space.  That

24   argument has been rejected.  That is the basis for

25   Dr. Brant-Zawadzki's -- their expert's argument they don't

1   infringe -- pardon me -- that it's not anticipated.  He says

2   it's construed to not count nerves that start in the arachnoid

3   space.  He was asked, Well, are you aware that that issue was

4   construed by the court?

5           His interpretation is only look at the nerve outside

6   of the subarachnoid space.  That is inconsistent with the

7   court's claim construction.  He was never informed of that,

8   that's unfortunate, but that means his opinions on the issue

9   under *Liquid Dynamics*, *Chicago Mercantile*, basic common sense

10  would say, Well, if he is opining on something other than the

11  law the court has applied, namely, the claim construction, his

12  opinions are irrelevant and should not be considered.  By

13  construing or analyzing the wrong construction, his opinions

14  need to be disregarded.

15          Even under NeuroGrafix's new proposed construction,

16  *Hajnal* shows tissues such as bone.  Those also have shorter T2

17  constants than their nerve.  So the idea that you have to dive

18  down into the prior art and into every image and analyze the T2

19  times of every single piece of flesh in there is not what the

20  claim requires, it's not what the parties agreed, but even if

21  you did that, the *Hajnal* reference would still anticipate.

22          So lastly, just to look at this claim language, claim

23  three, Your Honor, which is in column 37, parties agreed what

24  the language meant, and the new interpretation also just

25  doesn't make sense.  Their new interpretation is --

1    highlighter -- it is to select in combination of echo and

2    repetition time.  That exploits a characteristic, spin-spin

3    relaxation coefficient of peripheral nerves, cranial nerves

4    three through 12, and --

5              THE REPORTER:  Counsel, please use the microphone.

6              MR. LoCASCIO:  Sorry.  Wherein said spin-spin

7    relaxation coefficient is substantially longer than that of the

8    surrounding tissue.

9              And what NeuroGrafix does in their brief is they use

10   ellipses and brackets to change "exploits a" characteristic

11   spin-spin relaxation coefficient, into the word "the."  They

12   make a limitation that says "the spin-spin relaxation

13   coefficient."  They then say this language, "Of peripheral

14   nerves or autonomic nerves" -- which is plural, it is the

15   characteristic that those nerves have -- they changed that to

16   be "the nerve," meaning the nerve being imaged.  That is not

17   what the claim language says, and what they're trying to do is

18   take this generic T2 weighting, which the parties agreed it

19   meant originally, and turn it into something else, saying you

20   have to look at the relaxation coefficient of the nerve being

21   imaged.

22             That's not what this language actually says, and when

23   they talk about it in their brief, they change the words around

24   to be a new limitation called "the" characteristic relaxation

25   coefficient "of" the nerve.  It's not what it says; that

83

1   limitation doesn't exist in this provision of claim three, and

2   the parties knew that when we agreed to what this language

3   meant, and now NeuroGrafix, to avoid summary judgment, should

4   not be able to change its tune.

5          With respect to the other claims, Your Honor, the

6   means-plus-function claims, there's no dispute.  They don't

7   agree ultimately with Your Honor's claim construction.  They're

8   not contesting it here; they've reserved their right, I

9   believe, for appeal.  But for summary judgment on the

10  indefinite means-plus-function claims, NeuroGrafix agrees

11  summary judgment is proper.  With respect to the

12  step-plus-function claims, the only argument to avoid summary

13  judgment on those is the reconsideration issue we've already

14  argued.

15          THE COURT:  All right.

16          Please, Mr. Fenster.

17          What are we looking at?

18          MR. FENSTER:  Your Honor, this is at column 23, the

19  bottom of 23, and the top of 24.

20          Your Honor, the patent recognized for the first time

21  that the T2 relaxation time of nerve is substantially longer

22  than that of muscle.  This was new.  Prior to that, based on

23  Dr. Moseley's work and others --

24          THE COURT:  Where are we on --

25          MR. FENSTER:  Describing it first.  I haven't quoted

1    yet, Your Honor.

2              THE COURT:  Right.

3              MR. FENSTER:  So what this says is that the use of TE

4    processing had previously been considered unfeasible, meaning

5    it was previously thought that it was unfeasible to distinguish

6    nerve from muscle using TE time -- TE processing, as described

7    in Moseley.

8              Surprisingly -- it goes on at the top of column 24 --

9    "Surprisingly, however, measurements have been conducted

10   indicating that the T2 of muscle is approximately 27

11   milliseconds, while the T2 of peripheral nerve is approximately

12   55 milliseconds, providing a factor of two difference between

13   the two types of tissue.  This was a key revelation in the '360

14   patent, that the T2 of nerve is substantially longer than the

15   T2 of muscle.  Claim three is limited to those situations where

16   the nerve has a longer T2 than the tissue that surrounds it.

17             Your Honor, the limitation claim, 3(d), is shown on

18   the screen.  This is in slide 11.

19             Claim three is explicitly limited to the situation at

20   the bottom wherein said spin-spin relaxation coefficient is

21   substantially longer than that of other surrounding tissue.

22   This requires that the T2 of nerve be substantially longer than

23   the surrounding tissue.  Claim three is limited to that

24   particular situation to take advantage of this particular

25   revelation in the '360 patent.  It is expressly so limited.  It

1    is undisputed, Your Honor, that the *Hajnal* reference does not

2    meet that limitation.

3            In *Hajnal* the nerve is surrounded by gray matter and

4    cerebral spinal fluid.  And on page 12, we have the T2 times

5    for gray matter, cerebral spinal fluid and white matter, which

6    is the nerve.  Gray matter, which is the surrounding tissue, is

7    59.8; cerebral spinal fluid, which is the other surrounding

8    tissue, is 166; and the nerve, the cerebral white matter, is

9    56.8.  It is not substantially longer than, and it is

10   undisputed that, the T2 of nerve is not substantially longer

11   than the surrounding tissue in *Hajnal*.

12           Slide 13.

13           This is showing the relevant times -- T2 times, as

14   applied to the *Hajnal* reference.  The nerve is 56.8, and the

15   cerebral spinal fluid and gray matter, the background, are both

16   longer than the nerve T2 time.  So the spin-spin coefficient of

17   nerve -- it is undisputed that the spin-spin coefficient refers

18   to the T2 time -- is longer than -- is not longer than that of

19   the surrounding tissue in the *Hajnal* reference.  It does not

20   meet that "wherein" language.

21           So the next slide, slide 14, the claim requires that

22   the T2 of nerve be substantially longer than the T2 of

23   surrounding, but that limitation is not met in *Hajnal*.  In

24   *Hajnal*, the T2 of the surrounding is actually longer than that

25   of nerve.  That limitation is simply not met by the explicit,

1    clear, express language in the patent.

2            We're not interpreting anything.  We're not asking

3    for any kind of construction.  We're asking the court to apply

4    the plain language of the claim, which requires that the

5    spin-spin coefficient of nerve be substantially longer than

6    that of the surrounding tissue.  That limitation is not met,

7    and undisputedly so, by *Hajnal*.

8            Now, the way Siemens argued this, frankly, Your

9    Honor, is litigation by ambush, and I don't say that lightly.

10   But, Your Honor, what they referred to is a "gotcha" argument

11   based on a stipulation, an agreed construction.  So this is at

12   slide 15.  The agreed construction is that the combination of

13   echo time and repetition time that exploits the characteristic

14   spin-spin, that is T2 weighting.  I agree with that.  That's

15   what we agreed to at the time.  We did not agree to waive the

16   requirement that the T2 time of nerve be longer than that of

17   the surrounding tissue.  We just agreed that this language

18   means that the process of selecting time -- echo time and

19   repetition time to exploit that characteristic is how you'd --

20   is T2 weighting, and that is how you determine whether or not

21   the T2 of nerve is longer than that of surrounding tissue.

22           Now, this stipulation was not even mentioned in

23   Siemens' opening brief.  We never were put on notice that they

24   were somehow reading that our agreed construction somehow

25   waived this limitation.  It was never flagged until

87

1  Mr. LoCascio pulled it out at an "ah-ha" moment, as a "gotcha"

2  moment, during the deposition of Dr. Brant-Zawadzki.  That is

3  the first time I learned, and that was after our opposition,

4  and that is why we had to ask for the permission to file the

5  surreply.

6          That is the first time I learned that their basis for

7  saying that this 3(d)(e) element -- or 3(d)(iii) element was

8  raised -- was met because of our agreement.  That is the first

9  time.  And, Your Honor, this was not flagged in the opening

10 brief, and if they thought that we waived or changed the clear

11 language of the claim based on a stipulation, it should have

12 been spelled out so we could have addressed it in the

13 opposition because that is absolutely not what we agreed to.

14         The plain language of the claim requires that the

15 spin-spin characteristic of nerve be longer than that of

16 surrounding tissue.  That element is not met by *Hajnal*.  If the

17 court somehow thinks that we waived this by this agreement,

18 that is absolutely not what NeuroGrafix and the plaintiffs

19 intended by this agreement.  We meant to resolve, in good

20 faith, the disputes, and this was language that we thought we

21 could agree to that the -- what this was referring to is T2

22 weighting to exploit the T2 characteristic.  And that's how you

23 determine whether or not that "wherein" limitation is met.

24         Now, Mr. LoCascio raised the point that we somehow

25 didn't challenge the claim construction because we didn't seek

88

1    a motion for reconsideration.  Just to protect the record,

2    obviously we maintain that where the court ruled against the

3    plaintiffs that the nerve wasn't limited to outside the

4    arachnoid space, we maintain our position that that was -- that

5    our position on that was correct.  I respect the court's

6    decision on it, and we'll take that up on appeal, if necessary,

7    later.  But we're -- I hope the court understands that we're

8    not waiving that because we didn't seek a motion for

9    reconsideration of that.

10          The argument -- Mr. LoCascio, who I generally believe

11   has a really excellent understanding of patent law -- made a

12   statement about dependent versus independent claims that I

13   think is just not right in this particular circumstance.  This

14   is defendant's slide 13, and defendants are making the argument

15   that because *Hajnal* meets the limitations in dependent claims

16   four and five, it must necessarily meet the broader claim

17   (d)(iii), and that is -- that's just not -- that's not an

18   accurate statement of the law, and it's not logical.  Just

19   because you meet a narrowing limitation of three and four does

20   not mean you infringe the independent claim or that the prior

21   art teaches the independent claim.

22          You can teach -- *Hajnal* may meet the limitations of

23   four and five, but if it doesn't meet the underlying

24   independent claim, it doesn't anticipate any of them.  And what

25   we've shown clearly is that the express language of claim three

89

1    is not met; therefore, the fact that *Hajnal* does meet the

2    specific limitations in four and five is irrelevant.  There is

3    no anticipation of claims three, four and five unless they show

4    anticipation of three first, and this limitation of three is

5    not met, and I don't think that this argument that because four

6    and five are met, three must, therefore, be met follows.  I

7    think that is contrary to law.

8              THE COURT:  Is that it?

9              MR. FENSTER:  Yes, Your Honor.

10             MR. LoCASCIO:  If I might briefly, Your Honor, I

11   actually think Mr. Fenster and I agree.  I think this is a core

12   enough premise that we both agree with the concept that if you

13   infringe an independent -- pardon me -- if you infringe a

14   dependent claim, you, as a matter of fact, infringe the

15   original -- if you infringe a dependent claim, you must

16   infringe the independent claim it depends from.  If we disagree

17   about that, we can disagree, and I'm fairly confident that that

18   is the law.

19             THE COURT:  Is that what you said?

20             MR. FENSTER:  Your Honor, I said that in order to

21   infringe for infringement, of course, you must -- in order to

22   infringe claim four, you must infringe claim three.  But

23   Mr. LoCascio's point, I think, is that if you meet the

24   limitation of four, then you necessarily meet the limitation of

25   three, as well.  That is the part that I disagree with.

1          MR. LoCASCIO:  I don't see the difference in those

2     two things.  If you meet the limitations of four, you infringe

3     claim four.

4          THE COURT:  I don't know exactly what we just did.

5          MR. LoCASCIO:  I think where the difference is, if I

6     might --

7          THE COURT:  And if a court just goes along with

8     something the court doesn't understand in a patent case, the

9     court is making a bad mistake, and I didn't understand that

10    point.

11         MR. LoCASCIO:  If I might state my position that

12    Mr. Fenster started with, I think this will clear this all up

13    before I get to the points I want to make, and the first is

14    claim four and five have additional limitations that are --

15         THE COURT:  I understood that.

16         MR. LoCASCIO:  -- that are acknowledged to be in

17    *Hajnal*.  So the entire analysis of all three claims -- I think

18    Mr. Fenster and I can agree -- it comes down to this limitation

19    Mr. Fenster believes is in claim three that we believe is not.

20    And my view is if claim three has a limitation not found in

21    *Hajnal*, then four and five would not be invalid, just like

22    claim three would not be invalid --

23         THE COURT:  That's what he said.

24         MR. FENSTER:  We agree on that.

25         MR. LoCASCIO:  I thought I brokered a solution.  I

91

```
 1    don't know that I have.

 2           MR. FENSTER:  I believe, Your Honor, Mr. LoCascio's

 3    point -- and Mr. LoCascio can correct me if I'm wrong -- this

 4    is claim four, Your Honor.  Claim four narrows claim three to

 5    say where, in the step of selecting the echo time repetition --

 6           THE COURT:  I know that.

 7           MR. FENSTER:  Okay.  Where the echo time is greater

 8    than milliseconds.

 9           THE COURT:  Yes.

10           THE WITNESS:  Okay.  And what I heard Mr. LoCascio to

11    say is that if Hajnal meets this limitation of selecting 60

12    seconds, or greater, then it must necessarily meet the

13    limitation of (d) in step three.

14           Is that what you said?

15           MR. LoCASCIO:  Your Honor, we believe claim four and

16    five, as written, talking about the setting of those TE and TR

17    times, confirms what was the agreed upon in our reading of the

18    language of (d)(iii), but at base, I don't think Mr. Fenster

19    and I have a difference of opinion on this.  If there is a

20    limitation in claim three that is not satisfied by Hajnal, just

21    satisfying a particular feature of the additional dependent

22    claim four would not render three, nor four, invalid.

23           MR. FENSTER:  We agree on that.

24           THE COURT:  That's right.

25           MR. LoCASCIO:  I think we all went around just on
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**COURT REPORTER DEBORAH K. GACKLE**

```
 1   words that -- semantic disagreement --

 2           THE COURT:  I think now words are killing you.

 3           MR. LoCASCIO:  To respond --

 4           THE COURT:  You know, if one listens carefully, one

 5   must come to the conclusion that you agree about this.

 6           MR. LoCASCIO:  We do, on this issue.  My view and

 7   Siemens' view is three, four and five rise and fall together --

 8           THE COURT:  They do --

 9           MR. LoCASCIO:  -- I think Mr. Fenster's view is the

10   same.

11           THE COURT:  That's right.

12           MR. LoCASCIO:  And so I want to address a couple --

13           THE COURT:  They do rise or fall together.

14           MR. LoCASCIO:  It could be possible that they

15   wouldn't, if NeuroGrafix had identified something unique about

16   the additional limitations in four and five, and our point was

17   that they do not; ergo, they all rise and fall together, Your

18   Honor.

19           THE COURT:  That's right.

20           THE WITNESS:  Now, I want to respond to two points

21   Mr. Fenster made.  First, the suggestion, Your Honor, that this

22   was -- in his words -- by ambush, I want to direct the court's

23   attention, and Mr. Fenster's apparently, to two different

24   passages in the opening brief on this issue.  First, the chart

25   where we laid out why we think the *Hajnal* reference meets the
```

1   limitations, page 11 of Siemens' opening brief.  On the left,

2   we have claim language.  On the right, we have the *Hajnal*

3   disclosure, and we say, *Hajnal* discloses the T2 weighted

4   sequence see D.I. 99-1 at 15, stipulating the combination of

5   echo time, TE, and repetition time, TR, referred to in step (d)

6   as commonly called T2 weighting.  That is the parties'

7   stipulated construction.

8           In addition, page three of Siemens brief, the

9   parties -- footnote four -- in the exhibit to the joint claim

10  construction statement stipulate that the language in claim

11  three requiring a combination of echo time and repetition time

12  that exploits a characteristic spin-spin relaxation coefficient

13  of peripheral nerves, cranial nerves three through 12, and

14  autonomic nerves wherein said spin-spin relaxation coefficient

15  is substantially longer than that of surrounding tissue means

16  using what is commonly referred to in a T2 weighted sequence.

17  Again, cite D.I. 99-1 at page 15.

18          So the suggestion that nowhere in the opening brief

19  was this raised that this was some "gotcha" is false, Your

20  Honor.  The parties are operating -- and have always been

21  operating -- under, first, the agreed-upon construction, and on

22  issues we did not agree on, Your Honor's claim construction

23  order.  And on that basis, we sought summary judgment, and we

24  continue to believe we are entitled to summary judgment because

25  there is no dispute under the parties' agreed-on construction

94

 1   that *Hajnal* meets all of the limitations.

 2         The only other point I want to make is if we actually

 3   look at the claim language -- because Mr. Fenster's argument is

 4   put aside the parties' agreements because we didn't mean it,

 5   and the practice -- the procedure, and what we've gone through

 6   for over a year, suggests we cannot simply, on summary

 7   judgment, allow either side to change their tune and change

 8   their positions on claim construction.  But this premise is

 9   also wrong.  If you look at claim -- the agreed-upon term 10 --

10   this is the parties' agreed language.  This is slide 15 in the

11   NeuroGrafix deck -- it not only refers to claim three, it

12   refers to claim 25, and in claim 25, the language "is" is

13   replaced by "of these nerves being."

14         And what that refers to, Your Honor, is this

15   collection of things, peripheral nerves, cranial nerves three

16   through 12, and autonomic nerves.  "Of these nerves being" is

17   not "the nerve being imaged."

18         It is generic description of T2 weighting and the

19   difference between TE and TR in these type of nerves.  And the

20   language in the claim itself, in claim three, that Mr. Fenster

21   put up, is slide 11 from the NeuroGrafix's deck.  What

22   NeuroGrafix points to is the last portion of the claim

23   language, limitation (d) in claim three.  Their position is the

24   words "wherein said spin-spin relaxation coefficient is

25   substantially longer" is a stand-alone limitation.  It was

1   previously agreed that this whole thing means T2 weighting, but

2   if you actually look, claim construction 101, it is "Said

3   spin-spin relaxation coefficient," meaning there is antecedent

4   basis for that in this claim.  "Said" as opposed to "a."  And

5   if you look, "said spin-spin relaxation coefficient" -- if you

6   see my blue arrow -- refers to "a characteristic spin-spin

7   relaxation coefficient" of all three of the possible types of

8   nerves at issue.

9          And so as the parties agreed is what the claim

10  actually means.  It says, "Selecting the combination of echo

11  and repetition time."  Claims four and five then tell us what

12  those times should be.  That exploits something, and what is it

13  exploiting?  It's exploiting, i.e., the concept of T2

14  weighting, a characteristic spin-spin relaxation coefficient.

15  That is inherent in peripheral nerves, cranial nerves three

16  through 12, and autonomic nerves, and that inherent spin-spin

17  relaxation coefficient is substantially longer than that of

18  surrounding tissue.

19          It is not -- as NeuroGrafix now contends -- an

20  additional limitation that requires one to go in and determine

21  the coefficient of every single thing in the surrounding tissue

22  and the nerve to divine whether or not you have fallen within

23  the scope of this claim.  If that was their position, it would

24  have been a significant difference of opinion between the two

25  parties, it would have been significant issue to be addressed

1   at claim construction, it would not have been agreed that this

2   is simply T2 weighting.

3           And to Mr. Fenster's point that Dr. Filler and others

4   invented or came up with the idea of T2 weighting, we are

5   pulling up the cite that Dr. Filler, in his own deposition,

6   makes abundantly clear.  They did not invent T2 weighting.

7   They were not the first to image a nerve with T2 weighting.

8   This is not something, Your Honor -- T2 weighting is not the

9   invention, it's in the art, it's described that way, and this

10  is just applying that known technique, and it is not an

11  additional limitation as they contend.

12          Thank you, Your Honor.

13          MR. FENSTER:  Your Honor, Dr. Filler did not invent

14  T2 weighting; he doesn't claim to have --

15          THE COURT:  Well, I know he didn't.

16          MR. FENSTER:  What he invented was a way to image

17  nerves in the situation where the T2 of nerve is longer than

18  that of surrounding tissue, as opposed to where it's shorter

19  than, which is usually the case in the brain and in the

20  arachnoid space.  I'm not re-arguing the claim construction

21  with respect to the definition of nerves, but the claim itself

22  explicitly says -- limits it to that the spin-spin coefficient

23  is -- of nerve is longer than that of surrounding tissue.

24          Now, unless you agree that we intended to and did

25  waive that limitation, and even that we could, this limitation

97

1    that wherein said spin-spin relaxation coefficient,

2    substantially longer than that of other surrounding tissue,

3    that is the only way that you find summary judgment.  And, Your

4    Honor, that is just not what we intended, and it's not what we

5    agreed to.

6            This claim 3(d) does refer to T2 weighting, and you

7    do use the prior art technique of T2 weighting to determine

8    whether or not this limitation is met, whether or not the T2 of

9    nerve is longer than the T2 of the surrounding tissue.  You can

10   not read that limitation out of the claim, and that is what you

11   have to do in order to find that *Hajnal* meets that limitation.

12           THE COURT:  All right.  Is there anything further?

13           MR. LoCASCIO:  I think, in the course of this

14   discussion, we've -- it has been discussed in some measure.  If

15   Your Honor wishes to hear separate argument --

16           THE COURT:  No, no.

17           MR. LoCASCIO:  -- what I'll call the procedural

18   aspect motion -- Siemens' position is we stand on our briefs on

19   those issues.

20           THE COURT:  I don't want to hear any more about the

21   expert.

22           MR. LoCASCIO:  Then I don't believe we have any other

23   motions before Your Honor.

24           MR. FENSTER:  Nothing further, Your Honor.

25           THE COURT:  It will be submitted.  I'll let you know

```
 1    if there is to be anything further.  Thank you.

 2              MR. LoCASCIO:  Thank you, Your Honor.

 3              MR. FENSTER:  Thank you, Your Honor.

 4              (Proceedings concluded at 1:50 p.m.)

 5                        - - - - -

 6                  C E R T I F I C A T E

 7

 8         I hereby certify that the foregoing is a true and

 9    correct transcript from the stenographic record of

10    the proceedings in the foregoing matter.

11

12                                   October 15, 2011

13    /S/_____    _____

14        Deborah K. Gackle                        Date
          Official Court Reporter
15        CSR No. 7106

16

17

18

19

20

21

22

23

24

25
```

'
'360 [8] 44/8 50/3 50/25 51/3 69/12 75/5
 84/13 84/25
'comprising [1] 5/14
'the [1] 5/14

/
/S [1] 98/13

1
1.1 [23] 37/20 47/23 48/11 49/10 49/14
 49/17 49/20 50/14 51/19 56/10 59/24 60/9
 72/12 72/18 72/20 73/6 73/10 73/11 73/17
 74/15 75/12 80/21 80/22
1.4 [5] 47/17 47/19 49/19 75/11 75/18
10 [4] 51/21 73/9 75/12 94/9
10 percent [1] 45/22
10-1990 [1] 3/5
10-1990-MRP [1] 1/10
100 [1] 75/12
101 [1] 95/2
108 [1] 42/7
109 [1] 42/7
11 [11] 12/7 12/8 19/10 37/19 41/1 56/20
 56/21 63/19 84/18 93/1 94/21
112 [17] 4/24 5/16 7/1 7/4 7/6 17/25 20/1
 20/7 21/8 21/14 22/15 22/21 23/3 29/22
 32/23 34/6 34/11
1149 [1] 1/25
11:10 [1] 3/1
12 [10] 37/19 41/8 56/21 80/8 80/23 82/4
 85/4 93/13 94/16 95/16
1200 [1] 2/20
123 [1] 66/6
12424 [1] 2/8
1256 [1] 36/12
12th [1] 2/8
13 [3] 46/3 85/12 88/14
14 [14] 12/12 41/13 42/7 62/19 62/25 63/11
 63/17 64/18 64/22 71/6 71/10 71/10 71/20
 85/21
15 [9] 56/15 61/25 62/2 69/17 86/12 93/4
 93/17 94/10 98/12
16 [3] 12/9 19/11 43/19
166 [1] 85/8
17 [2] 19/11 43/10
170 [1] 44/7
18 [8] 37/19 44/2 56/8 56/9 56/11 56/19
 60/14 68/19
180 [1] 49/2
188 [2] 48/25 49/2
19 [5] 46/3 48/12 48/23 49/4 49/12
1990 [1] 3/5
1992 [2] 31/3 58/7
1:50 [1] 98/4
1st [1] 58/7

2
2.2 [1] 49/15
2.31 [1] 49/15
20 [5] 45/1 54/1 54/17 60/3 64/8
20005 [1] 2/20
2011 [4] 1/19 3/1 48/7 98/12
202 [2] 2/21 2/21
21 [2] 64/8 64/11
213 [1] 1/25
22 [14] 52/7 53/6 57/10 57/17 57/19 57/20
 58/2 58/5 58/10 58/13 58/25 59/12 64/6
 65/3
23 [3] 52/15 83/18 83/19
24 [2] 83/19 84/8
25 [3] 47/5 94/12 94/12
26 [4] 47/15 53/4 53/24 75/11
27 [12] 48/7 53/3 54/11 57/1 57/12 57/15

63/25 64/1 68/13 68/22 68/24 84/10
28 [10] 27/12 27/14 27/14 27/20 53/3 54/16
 54/19 54/21 63/25 64/1
29 [2] 55/6 57/2
294 [1] 45/2

3
30 [4] 49/15 54/12 55/13 57/15
31 [1] 49/18
310 [2] 2/9 2/9
312 [1] 1/24
32 [1] 49/23
33 [2] 49/23 53/6
34 [1] 56/21
35 [3] 21/14 51/1 56/24
36 [19] 4/7 5/17 6/1 7/21 10/18 10/22 10/22
 15/21 17/22 17/23 17/24 18/2 22/1 30/9
 30/18 31/7 31/8 33/18 53/6
37 [4] 58/3 58/20 62/3 81/23
39 [2] 4/7 6/1

4
40 percent [1] 46/4
402A [1] 1/24
41 [2] 59/20 66/17
42 [1] 60/5
43 [1] 57/2
45 [1] 68/24
46 [5] 4/7 6/2 58/11 58/11 69/7
47 [1] 69/16
49 [2] 4/7 6/2

5
5200 [1] 2/21
5290 [1] 2/21
53 [2] 62/21 62/25
54 [2] 8/8 41/13
55 [2] 8/8 84/12
56.8 [2] 85/9 85/14
58 [1] 54/12
59.8 [1] 85/7

6
60 [4] 67/12 67/13 71/22 91/11
60 percent [1] 45/21
62 [2] 41/13 62/21
620-1149 [1] 1/25
63 [1] 63/13
64 [1] 63/13
655 [1] 2/20
6991 [1] 2/9

7
7106 [1] 98/15
72 [3] 12/8 12/11 12/13
74 [2] 12/9 12/11
7474 [1] 2/9
76 [1] 54/12

8
826-6991 [1] 2/9
826-7474 [1] 2/9
83 [3] 55/9 55/11 55/19
84 [1] 55/15
879-5200 [1] 2/21
879-5290 [1] 2/21

9
90012 [1] 1/24
90025 [1] 2/8
961 [1] 36/12
99-1 [2] 93/4 93/17

A
a-c-t-s [1] 6/1

A.G [1] 3/14
A.M [1] 3/9
abandoning [1] 14/1
ability [1] 65/21
able [1] 83/4
about [60]
above [5] 48/18 49/20 55/7 72/6 73/6
absent [2] 21/18 34/1
absolute [1] 73/22
absolutely [5] 11/9 13/2 17/2 87/13 87/18
abun [1] 96/6
academic [1] 72/22
accomplish [3] 17/12 22/25 26/9
accomplished [3] 6/14 25/2 41/17
accomplishes [1] 6/13
account [1] 34/4
accurate [1] 88/18
accused [2] 73/14 73/19
acknowledge [1] 65/18
acknowledged [1] 90/16
acknowledges [1] 77/23
acquired [1] 12/13
across [1] 64/17
act [16] 5/2 5/10 6/10 10/2 10/24 14/6 16/9
 23/21 25/2 34/3 34/8 34/25 35/7 35/18
 35/25 36/16
acting [1] 6/5
actions [1] 36/13
active [2] 6/3 6/5
acts [10] 5/18 5/21 6/1 6/1 6/5 6/14 17/13
 17/18 24/10 36/10
actual [9] 22/9 46/13 47/12 62/16 62/19
 65/15 66/10 69/1 78/5
actually [26] 20/14 21/16 23/8 24/10 24/19
 28/15 34/1 38/9 39/1 41/8 45/12 50/2 50/23
 59/5 61/22 64/6 66/10 69/5 69/16 74/4
 82/22 85/24 89/11 94/2 95/2 95/10
adding [1] 70/12
addition [1] 93/8
additional [6] 53/4 90/14 91/21 92/16
 95/20 96/11
address [5] 29/17 34/16 68/12 76/1 92/12
addressed [2] 87/12 95/25
adds [1] 70/6
adequately [1] 70/4
adhere [3] 29/14 33/2 33/5
adhering [5] 7/13 22/24 22/25 29/13 33/2
adhesive [4] 7/12 22/23 29/13 33/3
adjacent [7] 56/10 56/12 56/13 56/17
 59/23 60/9 60/15
adjust [1] 72/4
admit [3] 42/22 66/16 70/23
admits [1] 77/15
admitted [2] 80/18 80/20
adopted [1] 60/2
advantage [2] 77/2 84/24
affirmed [1] 36/8
after [5] 17/14 17/20 63/12 65/21 87/3
after-developed [2] 17/14 17/20
again [8] 13/22 22/17 22/19 36/15 47/17
 54/11 70/7 93/17
against [1] 88/2
agree [28] 7/6 12/17 17/21 18/6 24/17
 26/20 32/14 33/8 33/17 38/7 41/3 42/2
 42/17 44/3 78/25 79/1 83/7 86/14 86/15
 87/21 89/11 89/12 90/18 90/24 91/23 92/5
 93/22 96/24
agreed [28] 23/3 39/13 42/6 76/6 76/25
 77/9 77/23 78/14 79/16 81/20 81/23 82/18
 83/2 86/11 86/12 86/15 86/17 86/24 87/13
 91/17 93/21 93/25 94/9 94/10 95/1 95/9
 96/1 97/5
agreed-on [1] 93/25
agreed-upon [4] 39/13 76/25 93/21 94/9
agreement [8] 29/17 29/21 30/1 76/20 78/4

## A

agreement... [3] 87/8 87/17 87/19
agreements [1] 94/4
agrees [1] 83/10
ah [1] 87/1
ah-ha [1] 87/1
ahead [3] 9/25 31/21 31/24
akin [2] 22/6 23/1
algorithm [11] 13/20 15/5 18/4 20/20 33/15 41/24 54/23 55/1 67/25 68/3 69/24
all [63]
alleged [3] 28/13 28/24 62/2
allegedly [1] 69/19
allow [3] 30/10 73/13 94/7
allowed [1] 4/13
allows [2] 42/22 69/23
alone [4] 29/16 34/5 49/11 94/25
along [2] 3/15 90/7
already [2] 25/21 83/13
also [10] 27/3 39/11 44/14 53/4 70/6 79/21 80/18 81/16 81/24 94/9
alternate [1] 32/2
alternative [3] 14/13 14/15 65/1
Alternatively [1] 41/16
although [2] 20/17 23/8
always [4] 16/4 49/9 79/8 93/20
am [5] 11/21 14/1 27/13 62/25 66/1
ambush [2] 86/9 92/22
among [2] 22/11 35/3
amount [1] 17/2
analogy [3] 33/10 71/24 73/25
analyses [1] 48/15
analysis [20] 7/10 9/23 10/20 15/14 19/25 20/25 25/12 32/14 33/21 33/21 35/17 36/8 41/20 45/13 46/3 50/11 50/11 50/12 51/9 90/17
analyte [1] 22/18
analyze [4] 12/18 29/21 30/3 81/18
analyzed [1] 35/22
analyzing [3] 6/4 23/22 81/13
anatomy [4] 52/25 53/1 72/5 72/7
ANDREW [2] 2/7 3/10
ANGELES [4] 1/18 1/24 2/8 3/1
anisotropic [1] 16/7
anisotropy [1] 30/15
another [2] 25/15 49/23
answer [11] 9/22 11/19 19/4 27/5 39/19 44/10 44/10 44/14 45/7 67/22 69/14
answers [1] 28/25
antecedent [1] 95/3
anticipate [3] 79/25 81/21 88/24
anticipated [2] 23/17 81/1
anticipating [1] 18/20
anticipation [4] 31/13 76/3 89/3 89/4
any [40]
anymore [1] 80/20
anyone [2] 22/22 62/8
anything [15] 8/21 8/22 12/4 17/15 22/13 22/18 25/14 34/24 40/24 41/25 55/8 62/8 86/2 97/12 98/1
anyway [1] 27/6
anywhere [3] 26/11 28/22 68/1
apologies [1] 11/15
apologize [4] 11/23 17/1 54/24 58/3
apparatus [17] 8/8 8/9 8/17 9/2 9/4 9/4 9/6 10/21 12/18 13/19 15/5 15/8 15/16 17/19 17/23 19/13 19/14
apparently [1] 92/23
appeal [3] 23/4 83/9 88/6
appear [1] 70/12
appearances [2] 2/1 3/7
application [1] 4/21
applied [9] 4/9 4/11 4/14 22/16 22/17 29/11 29/18 81/11 85/14

applies [1] 68/5
apply [6] 6/21 29/25 72/11 78/1 79/2 83/6/3
applying [3] 76/11 76/12 96/10
appreciate [1] 71/19
apprise [2] 72/24 73/23
approach [3] 3/22 23/11 66/5
approached [2] 70/5
approximately [6] 57/4 57/14 60/17 69/4 84/10 84/11
arachnoid [9] 78/12 79/2 80/2 80/9 80/12 80/23 81/2 88/4 96/20
are [90]
areas [2] 67/21 78/11
aren't [2] 70/7 70/14
argue [6] 65/22 78/1 78/3 78/7 79/3 79/21
argued [5] 34/9 36/19 48/13 83/14 86/8
argues [1] 69/15
arguing [3] 24/15 36/17 96/20
argument [27] 35/10 36/18 36/22 37/3 43/5 61/13 64/25 65/11 72/16 72/17 78/9 78/10 78/13 78/22 79/24 80/3 80/5 80/21 80/24 80/25 83/12 86/10 88/10 88/14 89/5 94/3 97/15
Aristocrat [1] 33/15
around [10] 41/16 57/5 57/23 65/15 69/24 70/15 72/18 78/17 82/23 91/25
arrangement [3] 30/12 30/19 31/15
arrest [1] 59/21
arrow [1] 95/6
art [23] 9/21 13/4 28/25 31/14 31/16 37/23 43/12 47/20 47/25 50/17 52/17 52/18 52/22 53/8 56/2 72/24 73/24 75/13 80/13 81/18 88/21 96/9 97/7
artful [1] 24/22
article [2] 41/6 41/6 44/7
articles [2] 43/23 45/9
as [100]
aside [3] 28/5 70/3 94/4
ask [4] 4/6 40/23 60/24 87/4
asked [17] 19/4 19/5 30/3 30/4 30/5 39/5 43/11 44/2 44/12 46/14 48/22 52/2 52/13 52/15 66/4 67/21 81/3
asking [8] 6/17 6/20 11/8 14/15 14/16 15/25 86/2 86/3
aspect [1] 97/18
aspect motion [1] 97/18
associated [1] 54/4
assume [8] 10/6 12/1 14/2 16/11 25/11 25/16 26/16 69/24
at [97]
attached [2] 15/12 16/4
attempting [1] 50/2
attention [2] 74/24 92/23
attorney [3] 61/13 64/25 65/11
August [2] 2/6 3/10
automatic [4] 42/10 63/9 66/24 68/8
automatically [7] 41/17 41/24 63/6 67/18 71/12 71/16 71/17
autonomic [4] 82/14 93/14 94/16 95/16
autonomous [1] 80/7
available [1] 54/14
avenue [1] 27/6
average [13] 46/1 46/20 54/5 54/9 54/10 55/21 56/3 56/5 56/19 60/12 60/13 63/14 63/16
avoid [7] 24/22 65/11 78/2 78/18 79/2 83/3 83/12
aware [1] 81/3
away [1] 75/12
aweiss [1] 2/10
axial [2] 57/18 57/25
axis [1] 43/18

## B

back [15] 7/11 19/23 20/24 21/18 25/1 25/2

54/24 55/18 58/20 59/8 62/7 63/18 64/21 65/6 68/17
background [6] 51/19 52/17 53/20 57/24 72/14 85/15
bad [1] 90/9
balls [1] 18/23
base [2] 39/24 91/18
based [9] 35/25 36/1 38/16 44/17 47/25 62/16 83/22 86/11 87/11
bases [1] 75/25
basic [1] 81/9
basically [2] 55/24 67/3
basis [7] 74/16 77/7 78/8 80/24 87/6 93/23 95/4
basket [1] 70/19
be [118]
be invalid [1] 90/22
because [55]
become [1] 20/17
been [22] 9/20 11/10 11/13 17/3 33/13 35/23 43/21 47/14 62/5 76/4 76/8 78/19 78/25 80/24 84/4 84/9 87/12 93/20 95/24 95/25 96/1 97/14
before [17] 4/10 13/13 14/9 14/10 23/25 31/25 32/12 34/17 36/2 39/3 40/8 53/16 65/25 74/11 79/24 90/13 97/23
begin [2] 10/9 10/12
behalf [2] 3/11 3/13
being [11] 43/2 59/6 63/20 66/24 76/7 80/22 82/16 82/20 94/13 94/16 94/17
belated [1] 61/13
believe [18] 8/3 10/10 10/19 11/16 16/8 17/24 19/10 26/9 36/12 53/7 75/21 83/9 88/10 90/19 91/2 91/15 93/24 97/22
believes [1] 90/19
below [5] 24/2 46/13 48/19 49/20 55/8
best [1] 60/19
better [6] 16/12 16/13 18/3 18/4 41/12 79/12
between [17] 19/13 19/19 22/2 38/25 45/22 59/23 60/9 67/9 84/12 94/19 95/24
big [1] 49/21
binders [1] 3/23
bit [3] 6/15 20/17 65/3
black [5] 19/15 19/19 59/5 59/8 67/8
blood [2] 68/24 68/25
bloody [1] 58/4
blue [2] 75/15 95/6
Blvd [1] 2/8
bone [2] 67/16 81/16
Bonekamp [3] 43/10 43/16 44/7
borderline [2] 73/10 74/7
both [9] 38/19 40/1 50/20 51/1 64/1 64/21 64/22 85/15 89/12
bottom [4] 28/3 69/18 83/19 84/20
boundaries [3] 54/3 54/13 74/4
bounds [1] 72/25
box [2] 19/15 19/19
boxes [1] 75/14
brackets [1] 82/10
brain [4] 31/2 31/4 79/23 96/19
Brant [19] 38/23 38/24 39/2 40/7 40/23 41/9 42/6 43/11 47/1 48/3 48/21 50/23 61/18 66/16 66/22 69/11 70/6 80/25 87/2
Brant-Zawadzki [6] 38/23 40/23 47/1 48/3 66/16 66/22
brief [15] 15/3 21/11 31/21 32/8 42/23 42/25 43/23 45/9 46/8 47/4 47/6 49/7 61/12 65/25 66/20 69/10 77/22 82/9 82/23 86/23 87/10 92/24 93/1 93/8 93/18
briefed [1] 11/16
briefing [2] 23/23 37/21
briefly [4] 34/16 58/11 71/3 89/10
briefs [3] 28/3 38/20 97/18
bright [3] 54/2 67/10 67/21

## B

brighter [5] 51/21 60/15 67/13 72/13 72/14
brightest [1] 67/13
broad [6] 16/1 17/20 28/18 28/19 28/23
46/24
broad-sweeping [1] 46/24
broader [2] 77/12 88/16
broadest [1] 9/7
brokered [1] 90/25
Bryan [22] 38/20 38/23 39/1 40/22 40/25
42/3 43/11 46/8 46/9 46/14 48/2 48/4 49/16
49/19 51/1 55/24 66/15 66/22 67/1 67/20
69/7 72/10
Bryan's [5] 41/7 45/13 47/22 49/8 71/21
built [1] 54/23
built-in [1] 54/23
but [67]
button [1] 67/5

## C

CA [1] 2/8
calculate [15] 37/22 50/5 50/6 52/1 52/14
53/17 54/10 59/14 61/11 63/13 63/16 63/22
65/14 66/4 73/17
calculated [6] 39/1 48/13 57/7 60/10 60/11
60/23
calculates [1] 49/19
calculating [1] 50/7
calculation [15] 38/4 39/6 43/14 44/24
45/22 47/15 47/19 49/12 49/15 51/2 71/19
72/21 73/8 73/9 74/15
calculations [19] 38/14 39/10 39/12 40/3
48/2 48/3 48/4 48/5 48/16 49/8 49/9 50/2
50/8 50/19 64/17 65/18 68/14 70/22 70/23
calendar [2] 3/4 3/21
CALIFORNIA [4] 1/2 1/18 1/24 3/1
call [5] 18/23 33/11 48/2 61/9 97/17
called [9] 23/18 28/18 37/16 43/10 66/24
68/3 76/2 82/24 93/6
calling [2] 64/10 66/6
cam [2] 36/25 37/7
came [3] 38/5 76/20 96/4
can [56]
can't [10] 5/8 14/23 18/9 24/16 24/17 28/13
43/2 67/14 70/14 79/1
cancer [1] 31/2
cannot [6] 11/25 60/2 70/13 78/15 79/14
94/6
Cardiac [10] 22/4 22/9 27/21 27/21 35/1
35/2 35/8 35/12 36/3 36/15
care [1] 32/17
carefully [1] 92/4
case [38]
cases [10] 21/4 22/3 22/21 28/12 29/5
33/16 35/22 36/2 72/19 74/7
catch [1] 65/3
catch-22 [1] 65/3
Caterpillar [2] 36/6 36/9
cats [1] 61/8
centimeter [18] 57/1 57/19 57/24 57/25
58/2 58/24 59/12 59/17 60/18 61/1 61/21
64/1 68/12 68/13 68/23 69/19 70/3 71/16
centimeters [3] 57/4 57/9 57/14 62/10
64/24 69/1 69/4 69/5
CENTRAL [1] 1/2
cerebral [6] 31/4 85/4 85/5 85/7 85/8 85/15
certain [5] 17/12 17/12 17/20 24/7 67/9
certainly [2] 21/13 43/21
certify [1] 98/8
cetera [2] 9/19 22/19
challenge [2] 13/12 87/25
chance [1] 74/13
change [9] 46/10 46/25 61/24 79/2 82/10
82/23 83/4 94/7 94/7

changed [2] 82/15 87/10
characteristic [12] 76/17 82/2 82/10 82/15
82/24 86/13 86/19 87/15 87/22 93/12 93/6
95/14
characterization [3] 8/25 9/10 30/8
charitably [1] 28/18
chart [1] 92/24
check [1] 78/4
Chicago [1] 81/9
choices [1] 96/5
choose [6] 37/23 37/23 45/6 47/21 47/22
48/1
chooses [2] 48/8 70/8
choosing [2] 45/13 69/5
chose [1] 75/13
circle [3] 64/10 69/19 75/17
circles [1] 45/15
circuit [27] 4/8 4/12 4/13 4/22 5/11 6/7
6/21 11/4 12/9 12/11 20/8 21/3 21/15 22/3
22/15 22/21 24/8 25/6 29/5 29/10 34/13
35/11 35/16 36/9 36/22 37/5 59/24
circuit's [2] 33/11 34/25
circumstance [1] 88/13
Ciruit [1] 6/21
cite [5] 23/21 46/7 47/5 93/17 96/5
cited [5] 4/19 6/8 29/19 36/7 41/6
claim [208]
claim construction [1] 13/25
claimed [5] 5/13 7/12 8/6 17/10 20/22
claims [59]
clean [1] 80/19
clear [8] 12/5 21/14 25/23 50/20 86/1 87/10
90/12 96/6
clearly [6] 55/15 55/17 55/18 72/6 79/13
88/25
clerks [1] 3/24
clicker [1] 23/9
close [2] 73/7 74/6
coating [2] 7/13 33/3
coefficient [21] 82/3 82/7 82/11 82/13
82/20 82/25 84/20 85/16 85/17 86/5 93/12
93/14 94/24 95/3 95/5 95/7 95/14 95/17
95/21 96/22 97/1
coincidentally [1] 69/3
collected [1] 43/23
collection [2] 45/9 94/15
color [2] 60/8 62/3
column [29] 12/7 12/8 19/10 41/13 52/7
53/3 53/6 54/1 54/12 57/1 57/12 57/15
62/19 62/25 63/11 63/17 63/19 63/25 64/18
64/22 68/13 68/24 71/6 71/10 71/10 71/20
81/23 83/18 84/8
column 27 [1] 57/12
columns [1] 64/1
combination [10] 30/18 31/9 31/14 53/5
77/1 82/1 86/12 93/4 93/11 95/10
combining [1] 6/4
come [9] 4/10 15/3 16/12 18/20 25/1 31/14
45/5 70/9 92/5
comes [7] 18/3 21/17 23/6 40/8 66/12
69/10 90/18
coming [1] 64/21
common [5] 13/11 13/14 13/16 13/18 81/9
commonly [3] 77/4 93/6 93/16
companies [1] 16/12
compared [1] 77/3
compatible [1] 12/14
competing [1] 53/12
completely [1] 16/19
components [1] 59/13
comprised [1] 77/11
computed [2] 52/8 54/6
computer [7] 23/7 24/8 81/4 84/6 82/12
8/14 8/23 9/20 10/9 10/13 10/16 12/8 12/11
12/13 12/14 12/16 13/20 13/21 15/12 15/14

16/4 16/5 26/12 26/13 26/24 26/25
computerized [1] 34/5
concedes [1] 59/16
concept [6] 62/11 64/2 67/17 70/12 89/12
95/13
concluded [1] 98/4
conclusion [5] 14/3 14/4 17/4 46/1 92/5
concurrence [1] 29/19
concurring [3] 4/15 4/18 6/8
condition [5] 22/10 22/11 22/14 35/3 35/14
conditions [1] 35/3
conducted [1] 89/17
conference [1] 38/17
confident [1] 89/17
confirm [3] 48/15 50/9 77/13
confirms [3] 41/5 45/11 91/17
confusing [1] 10/20
consensus [1] 41/5
consequently [2] 17/4 25/14
considered [2] 81/12 84/4
consistency [1] 43/13
consistent [8] 20/8 38/15 43/15 44/1 50/3
50/16 60/6 71/13
consistently [1] 51/3
conspicuity [55]
conspicuous [1] 49/10
constant [1] 79/7
constants [1] 81/17
constrain [1] 4/25
construction [60]
constructions [2] 15/2 31/25
construe [6] 52/12 59/21 62/12 62/16
68/14 68/20
construed [8] 5/1 5/8 5/9 25/17 25/19
77/10 81/2 81/4
construing [2] 79/18 81/13
contain [2] 5/21 64/1
contains [2] 5/1 5/9
contend [2] 32/15 96/11
contends [1] 95/19
contesting [1] 83/8
context [4] 27/21 33/12 40/9 72/25
continue [1] 93/24
continues [1] 61/23
continuing [1] 59/21
contrary [5] 4/22 34/25 36/4 65/24 89/7
contrast [14] 22/23 52/6 52/6 52/8 54/8
57/7 59/23 60/7 60/8 60/10 60/11 60/23
67/4 71/25
control [1] 12/11
controversy [1] 11/25
cooperatively [1] 12/11
core [6] 28/14 38/6 38/24 47/24 49/13
89/11
Corp [4] 22/5 22/18 24/3 25/7
correct [10] 20/8 26/25 29/3 31/1 31/1
42/12 42/15 88/5 91/3 98/9
correspond [1] 6/14
corresponds [1] 6/13
could [26] 8/17 13/21 20/21 21/12 21/12
26/12 35/10 42/18 43/6 43/21 46/22 47/19
47/20 47/21 47/24 51/7 52/12 60/23 67/21
68/6 73/17 80/7 87/12 87/21 92/14 96/25
couldn't [2] 43/5 70/4
COUNSEL [4] 2/1 3/7 21/5 82/5
counseled [1] 10/2
count [2] 80/3 81/2
couple [2] 47/6 92/12
course [6] 25/22 39/5 68/8 76/19 89/21
97/13
court [73]
court's [15] 4/17 8/24 11/13 16/16 29/15
30/8 32/10 37/25 39/13 77/21 78/13 80/10
81/7 88/5 92/22
Courthouse [1] 1/23

**C**

courts [1] 6/25
cover [3] 19/18 30/6 30/9
covered [3] 18/5 32/18 80/17
covers [1] 19/15
cranial [9] 80/2 80/6 80/8 80/16 80/22 82/3
93/13 94/15 95/15
create [2] 20/13 28/4
created [2] 44/18 57/22
creating [1] 39/14
criticism [1] 33/11
cross [2] 58/1 64/7
cross-section [2] 58/1 64/7
CSR [2] 1/23 98/15
cursor [1] 41/16
cut [3] 7/14 59/3 67/11
cuts [1] 69/22
CV [2] 1/10 3/5
cylinder [1] 58/2

**D**

D.I [2] 93/4 93/17
daily [1] 30/24
damage [1] 31/1
dantly [1] 96/6
dark [2] 57/23 58/15
data [38]
date [4] 18/22 28/6 66/3 98/14
dated [1] 58/6
daughter [1] 30/25
day [3] 20/23 24/14 74/15
DC [1] 2/20
deadline [1] 65/21
deal [2] 38/17 76/7
dealt [1] 7/11
dear [1] 30/24
debate [2] 40/16 76/7
DEBORAH [2] 1/23 98/14
December [1] 58/7
December 1st [1] 58/7
decide [1] 32/8
decision [4] 25/10 38/1 38/6 88/6
decisions [1] 34/25
deck [6] 23/19 38/4 64/21 76/2 94/11 94/21
decks [1] 62/7
declaration [5] 54/17 56/16 62/1 65/1 65/7
67/1 71/1
deemed [1] 48/13
defendant [5] 1/13 2/16 15/2 36/19 64/21
defendant's [3] 40/11 61/8 88/14
defendants [4] 3/14 36/8 38/22 88/14
defense [1] 38/12
defined [3] 59/22 59/22 60/8
defines [1] 52/5
definite [4] 43/2 47/4 47/9 74/1
definition [7] 23/25 24/7 24/12 45/3 65/13
76/18 96/21
definitions [1] 23/22
demonstrative [3] 65/10 65/11 70/1
denominator [1] 53/21
dep [2] 42/7 46/13
depend [2] 38/8 77/10
dependent [9] 37/19 77/20 79/19 79/20
88/12 88/15 89/14 89/15 91/21
depending [8] 45/6 46/4 46/21 49/3 49/4
49/13 49/20 67/10
depends [5] 51/8 79/5 79/6 79/8 89/16
depose [1] 65/22
deposed [2] 66/2 66/10
deposition [9] 41/1 42/6 43/12 44/7 48/25
66/7 66/16 87/2 96/5
derive [1] 74/20
describe [14] 20/15 23/21 24/24 25/7
25/10 26/10 28/15 28/16 36/24 37/6 43/13
44/12 66/13 69/13

described [17] 19/9 26/8 28/1 28/7 28/21
33/9 33/13 43/22 43/22 44/21 54/8 58/17
60/10 64/13 76/9 84/6 96/9
describes [9] 19/6 51/6 51/9 54/11 64/23
66/15 68/7 71/18 72/9
describing [2] 9/18 83/25
description [8] 24/9 33/4 34/8 34/12 66/16
67/20 80/6 94/18
descriptions [2] 24/4 43/25
designed [2] 69/2 77/2
despite [6] 32/23 39/18 41/5 66/14 78/3
80/22
detailed [1] 43/24
details [1] 44/9
determination [2] 45/3 63/7
determine [16] 7/24 11/7 13/6 14/5 17/11
36/18 42/14 44/6 52/14 56/6 62/12 68/18
86/20 87/23 95/20 97/7
determined [4] 19/15 24/8 59/15 60/13
determines [2] 54/12 66/20
determining [17] 11/7 22/10 22/11 22/14
35/1 35/2 35/6 35/7 35/9 35/11 35/13 35/24
36/11 36/14 36/15 50/13 51/4
developed [3] 17/14 17/18 17/20
deviate [1] 24/24
devices [1] 44/22
dial [3] 22/16 29/11 67/4
diameter [4] 57/4 57/15 69/4 69/8
dictated [1] 56/14
dictates [2] 56/8 56/11
dictionary [1] 23/24
did [23] 5/15 7/5 11/4 21/1 29/17 29/20
31/25 33/23 35/22 52/1 54/18 55/24 56/25
57/25 61/10 71/18 81/21 86/15 90/4 93/22
96/6 96/13 96/24
didn't [17] 25/25 29/7 29/8 32/2 34/11
35/23 40/23 50/21 70/17 74/12 79/25 87/25
87/25 88/8 90/9 94/4 96/15
difference [18] 6/9 19/19 22/2 38/25 40/2
45/17 45/22 45/23 46/4 46/21 75/16 77/17
84/12 90/1 90/5 91/19 94/19 95/24
differences [2] 45/21 77/2
different [49]
differently [4] 32/25 39/23 40/2 44/18
difficult [1] 52/11
diffusion [7] 16/7 30/13 30/15 30/19 31/9
31/15 53/5
diffusion-weighted [4] 30/13 30/19 31/9
31/15
dimensional [2] 28/4 54/13
direct [3] 45/3 74/24 92/22
direction [2] 25/9 41/23
directly [2] 15/17 74/13
disagree [9] 8/24 9/10 20/12 25/21 40/25
44/14 89/16 89/17 89/25
disagreed [1] 14/12
disagreement [2] 42/21 92/1
disagrees [1] 19/1
disclose [3] 32/24 38/13 60/22
disclosed [8] 28/8 69/8 70/4 70/8 70/14
75/5 75/6 77/16
discloses [5] 56/25 59/19 77/5 77/15 93/3
disclosure [3] 21/18 65/5 93/3
disclosures [2] 47/14 70/20
discovery [3] 38/18 62/5 73/13
discretion [1] 32/10
discuss [1] 18/10
discussed [3] 28/22 69/1 97/14
discussion [4] 18/11 25/15 78/12 97/14
display [1] 12/13
disposition [1] 16/16
dispute [11] 10/5 40/15 40/15 40/16 40/18
53/7 73/16 80/10 80/15 83/6 93/25
disputed [2] 52/20 77/5
disputes [1] 87/20

disregarded [1] 81/14
disservice [1] 17/5
distance [1] 50/24
distinction [4] 19/13 35/24 36/4 70/3
distinguish [2] 75/16 84/5
distinguished [1] 30/14
DISTRICT [5] 1/1 1/2 1/5 36/7 78/14
ditch [1] 65/15
dive [1] 81/17
divide [1] 59/16
divided [1] 52/9
dividing [1] 60/11
divine [1] 95/22
do [134]
doctrine [1] 4/21
document [1] 62/3
documentary [1] 40/1
does [54]
doesn't [50]
doing [12] 12/19 15/5 20/13 22/13 27/23
29/24 31/6 41/2 59/2 64/12 70/23 80/13
don't [50]
done [31] 8/21 10/8 10/15 15/11 18/22
20/20 26/18 31/2 32/15 32/15 32/17 32/18
34/4 35/14 35/14 39/3 39/9 39/11 39/23
40/8 41/22 41/24 56/16 56/18 61/20 63/5
63/6 72/3 73/5 73/11 73/12
dots [2] 64/10
down [6] 21/5 23/6 43/14 55/3 55/18 67/7
81/18 90/18
Dr [8] 20/18 38/23 38/23 40/23 46/4 47/1
49/8 66/19
Dr. [72]
Dr. Brant-Zawadzki [12] 38/24 39/2 40/7
41/9 42/6 43/11 48/21 50/23 61/18 69/11
70/6 87/2
Dr. Brant-Zawadzki's [1] 80/25
Dr. Bryan [18] 38/20 39/1 40/22 40/25 42/3
43/11 46/8 46/14 49/16 49/19 51/1 55/24
66/15 66/22 67/1 67/20 69/7 72/10
Dr. Bryan's [4] 41/7 45/13 47/22 71/21
Dr. Filler [22] 39/10 45/13 45/25 47/18
48/5 49/19 49/25 50/18 51/1 61/13 65/22
65/25 66/2 66/9 67/23 69/22 70/8 75/6
75/10 96/3 96/5 96/13
Dr. Filler's [13] 40/3 47/15 48/15 49/8
49/14 49/25 50/8 50/19 54/17 56/15 69/25
75/3 75/14
Dr. Moseley [1] 39/9
Dr. Moseley's [1] 83/23
drafted [2] 6/16 6/18
dramatically [1] 46/5
draw [3] 65/23 69/24 73/25
drawing [1] 39/14
drawn [1] 35/24
drive [1] 29/11
driven [2] 36/25 37/6
during [6] 31/2 59/1 76/19 76/22 76/23
87/2
Dynamics [1] 81/9

**E**

E-mail [3] 2/10 2/10 2/11
each [12] 5/3 5/20 5/25 18/2 22/21 39/8
41/13 54/4 54/13 57/5 58/14 63/4
earlier [1] 22/3
easiest [1] 75/24
easily [1] 51/7
echo [11] 76/14 77/1 77/11 82/1 86/13
86/18 91/5 91/7 93/5 93/11 95/10
effort [2] 62/13 65/15
eight [2] 43/16 45/10
Eighty [1] 55/10
Eighty-three [1] 55/10
either [7] 18/25 19/20 33/25 42/21 45/19

# E

either... [2] 66/1 94/7
elected [1] 80/6
element [7] 6/13 72/15 73/18 78/4 87/7 87/7 87/16
elements [3] 17/19 24/4 24/9
ellipse [2] 58/1 68/13
ellipses [1] 82/10
ellipsoid [2] 43/18 60/18
elliptical [3] 57/1 57/3 57/14
Ellis [2] 2/18 3/15
Elmo [4] 29/9 54/20 57/11 62/4
else [2] 71/2 82/19
Email [2] 2/22 2/22
enabled [4] 20/2 20/24 26/4 26/6
enablement [5] 17/16 17/25 20/15 31/12 31/12
enables [1] 18/1
encompass [2] 17/20 28/23
end [8] 5/23 7/7 12/9 20/23 24/14 40/4 70/16 74/15
ended [2] 15/25 47/25
enhancement [2] 60/3 64/4
enough [10] 17/20 33/14 33/22 36/23 49/11 53/1 67/8 69/3 76/15 89/12
entire [3] 71/14 71/14 90/17
entirely [2] 46/18 71/12
entitled [1] 93/24
epitome [1] 51/7
equivalent [2] 45/19 45/20
ergo [3] 27/2 44/24 92/17
essence [1] 28/22
established [1] 54/4
et [2] 9/19 22/19
et cetera [2] 9/19 22/19
evaluated [1] 54/5
evaluation [1] 43/21
even [32] 4/13 20/9 21/12 23/3 33/25 34/3 40/9 42/22 42/25 43/1 43/20 48/15 48/16 49/14 50/19 61/20 61/23 62/5 62/9 63/12 65/7 65/9 66/13 66/15 68/22 72/17 73/6 73/13 81/15 81/20 86/22 96/25
event [1] 32/3
ever [2] 4/10 21/12
every [7] 4/10 34/4 46/16 76/6 81/18 81/19 95/21
everything [1] 43/6
evidence [8] 7/4 39/15 44/22 46/12 47/12 65/7 65/9 73/15
evidentiary [1] 47/7
evoked [1] 7/3
evolve [1] 61/24
evolving [1] 62/11
exact [5] 35/10 46/17 48/7 48/8 58/16
exactly [9] 19/8 22/1 31/24 36/18 36/23 37/2 51/21 69/14 90/4
examiner [1] 74/17
example [5] 41/15 43/12 49/11 49/23 60/8
examples [2] 42/8 49/16
excellent [1] 88/11
except [3] 12/5 46/21 49/10
exchange [4] 15/2 31/22 31/24 32/7
exchanged [1] 4/3
exclude [2] 68/24 69/2
excludes [1] 69/23
exclusively [1] 59/22
Excuse [1] 21/5
exercise [2] 74/8 75/7
exhibit [7] 54/17 56/15 61/25 62/2 69/17 75/3 93/9
Exhibit A [1] 75/3
exist [5] 21/15 25/8 46/15 74/7 83/1
existed [1] 61/10
exists [1] 72/17

expect [1] 25/20
expedited [1] 32/6
expert [36] 7/12 17/5
expert's [1] 80/5
experts [10] 38/7 41/3 42/2 50/20 53/11 53/12 53/12 64/22 70/19 70/22
experts' [1] 45/11
explain [4] 15/10 37/23 38/14 74/21
explained [3] 6/8 6/9 76/10
explaining [1] 4/16
explanation [1] 32/5
explicit [1] 85/23
explicitly [2] 84/19 96/22
exploit [3] 76/17 86/19 87/22
exploiting [1] 95/13 95/13
exploits [5] 82/2 82/10 86/13 93/12 95/12
exposing [3] 5/19 5/19 30/12
express [2] 86/1 88/25
expression [1] 61/6
expressly [1] 84/25
extent [2] 30/8 40/18
extrinsic [1] 53/14
eye [1] 72/14

# F

face [4] 30/25 62/13 64/23 70/24
faced [1] 43/1
facie [1] 34/11
fact [16] 9/2 11/4 22/20 28/1 32/24 39/25 40/15 40/15 40/16 40/18 40/21 47/11 65/9 79/9 89/1 89/14
factor [1] 84/12
facts [2] 40/12 40/20
faint [1] 45/14
fair [5] 10/10 10/25 11/3 11/9 13/8
fairly [1] 89/17
faith [1] 87/20
fall [4] 68/17 92/7 92/13 92/17
fallback [1] 43/5
fallen [1] 95/22
falling [2] 40/4 40/5
false [1] 93/19
far [3] 55/17 73/6 75/12
fascicle [3] 53/2 64/3 66/5
fascicles [2] 64/5 64/8
fascicular [1] 64/12
fat [7] 53/5 79/7 79/7 79/10 79/11 79/12 79/13
Fax [2] 2/9 2/21
feature [1] 91/21
Feb [1] 48/7
February [1] 48/6
February 1 [1] 48/6
federal [29] 4/8 4/12 4/13 4/22 5/11 6/7 6/21 6/21 11/4 20/8 21/2 21/15 22/3 22/15 22/20 24/8 25/6 29/4 29/10 33/11 34/13 34/25 35/11 35/16 36/9 36/19 36/22 37/5 59/24
FENSTER [33]
Fenster's [6] 19/25 26/2 92/9 92/23 94/3 96/3
few [2] 36/1 67/15
fiber [1] 43/18
field [3] 39/14 41/4 44/20
Fifteenth [1] 2/20
fifth [1] 65/13
figure [16] 33/2 47/21 57/10 57/17 57/19 57/20 58/2 58/5 58/10 58/13 58/25 59/12 64/6 64/11 78/8 80/1
figure 22 [1] 57/19
figured [1] 28/4
figures [4] 48/6 57/17 64/7 64/8
file [5] 7/3 24/23 38/19 62/17 87/4
filed [2] 20/19 79/23
Filler [35]

Filler's [14] 40/3 47/15 48/4 48/15 49/8 49/14 49/25 50/8 50/19 54/17 56/15 69/25 75/9 75/14
find [11] 11/4 19/24 36/4 37/8 56/3 56/13 60/23 60/24 65/15 97/3 97/11
finding [2] 29/15 35/8
fine [2] 4/5 37/14
first [41]
fit [1] 48/1
five [23] 21/8 25/2 48/6 48/14 48/18 48/19 77/10 77/16 78/8 80/1 80/2 80/16 88/16 88/23 89/2 89/3 89/6 90/14 90/21 91/16 92/7 92/16 95/11
Fl [1] 2/8
flagged [2] 86/25 87/9
flesh [1] 81/19
Flex [16] 4/14 4/18 6/8 7/10 7/11 22/4 22/23 23/2 25/6 29/13 29/16 32/14 32/21 32/22 33/21 33/22
Flip [1] 27/12
flows [2] 14/3 14/4
fluid [5] 31/4 85/4 85/5 85/7 85/15
focused [2] 72/16 74/6
follow [2] 7/9 78/15
following [2] 60/5 60/6
follows [1] 89/6
footnote [4] 43/23 45/10 46/8 93/9
for,' [1] 5/15
force [16] 12/6 29/7 29/11 36/20 36/21 36/24 37/2 37/6
foregoing [2] 98/8 98/10
form [2] 5/4 12/9
formal [1] 50/10
format [1] 5/7
formula [4] 52/2 52/3 52/4 60/23
forth [5] 7/10 13/7 44/4 65/13 70/10
found [17] 11/5 19/22 21/12 21/13 25/10 29/24 33/4 33/4 33/8 33/9 33/13 35/7 35/16 36/16 52/10 54/8 90/20
foundation [1] 33/5
four [30] 21/4 29/4 36/10 38/3 53/3 55/2 77/10 77/16 79/5 88/16 88/19 88/23 89/2 89/3 89/5 89/22 89/24 90/2 90/3 90/14 90/21 91/4 91/4 91/15 91/22 91/22 92/7 92/16 93/9 95/11
fourth [1] 65/13
frankly [5] 19/1 26/13 27/24 62/7 86/8
FREDRICK [1] 2/7
Fredricka [1] 3/11
free [1] 46/19
friend's [1] 30/24
fringe [2] 72/17 73/20
from,' [1] 50/24
front [2] 12/9 29/8
front-end [1] 12/9
frontally [1] 65/4
full [1] 63/23
fully [2] 17/24 18/1
function [72]
functions [2] 17/12 36/10
fung [1] 2/11
further [9] 5/11 5/15 13/9 17/14 31/19 32/5 97/12 97/24 98/1

# G

GACKLE [2] 1/23 98/14
games [1] 72/10
general [2] 21/20 21/21
generally [2] 15/9 88/10
generate [19] 9/18 10/23 11/21 13/5 13/18 16/7 22/2 23/2 23/6 24/20 24/21 26/22 28/10 29/12 30/14 30/20 31/11 33/19 34/10
generate this [1] 26/22
generated [4] 37/8 58/5 58/23 72/12
generates [1] 76/15

## G

generating [1] 34/2
generic [7] 24/4 24/9 33/11 35/6 36/16
 82/18 94/18
Geneva [1] 51/6
get [33]
gets [8] 26/17 46/1 48/17 48/19 49/19
 63/17 70/23 75/18
getting [1] 76/13
give [4] 14/7 19/4 24/24 26/17
given [4] 24/21 33/11 43/20 44/6
gives [3] 42/8 55/24 63/23
glance [1] 48/10
gloss [1] 28/13
go [34]
goes [9] 5/11 5/18 57/16 59/5 67/8 67/9
 72/6 84/8 90/7
going [6] 12/8 37/17 66/1 66/14 67/11
 78/20
gone [2] 35/21 94/5
good [7] 3/9 3/13 18/18 49/11 54/21 73/11
 87/19
got [12] 4/4 12/16 23/15 23/19 23/23 30/25
 43/9 49/16 57/21 69/17 75/2 76/3
gotcha [3] 86/10 87/1 93/19
governs [1] 64/17
gradients [4] 30/13 30/20 31/9 31/15
graft [1] 57/18
grant [1] 10/4
granted [1] 25/17
gray [4] 85/3 85/5 85/6 85/15
great [3] 20/21 36/5 66/23
greater [4] 72/11 72/20 91/7 91/12
green [3] 69/24 75/14 75/17
GREGG [2] 2/19 3/15
gregg.locascio [1] 2/22
gross [4] 52/24 53/1 72/5 72/7
growing [1] 68/3
guess [1] 42/9
guidance [3] 14/8 52/13 60/19

## H

H-a-j-n-a-l [1] 76/6
ha [1] 87/1
had [21] 9/3 20/19 23/17 34/12 38/16 39/8
 39/9 39/11 40/7 61/14 61/17 65/6 70/9
 75/11 77/23 78/10 78/12 78/23 84/4 87/4
 92/15
hadn't [1] 28/6
Hajnal [34]
hand [3] 8/18 9/9 14/23
handed [2] 23/16 37/16
handful [1] 47/13
happen [1] 20/1
happening [1] 74/6
happens [2] 27/2 72/4
happenstance [1] 66/1
hard [2] 18/13 57/20
has [40]
hasn't [1] 52/21
have [113]
haven't [4] 35/21 73/11 73/12 83/25
having [2] 76/14 79/13
he [51]
he's [4] 30/2 38/21 48/20 56/18
heading [1] 63/19
hear [3] 18/16 97/15 97/20
heard [1] 91/10
hearing [5] 32/9 61/14 62/17 76/22 76/24
heart [5] 22/11 35/3 35/4 35/14 78/23
held [3] 4/17 5/20 50/18
help [1] 30/24
helpful [1] 78/19
helps [1] 63/1

her [2] 30/25 31/2
herding [1] 61/8
here [43]
here's [5] 33/6 49/17
hereby [1] 98/8
Hey [1] 20/21
higher [1] 79/14
highlighted [4] 55/8 55/9 55/10 63/13
highlighter [1] 82/1
highlights [1] 55/9
him [2] 25/13 29/8
himself [4] 65/25 66/9 69/22 70/9
his [32] 4/15 6/7 39/5 40/8 40/22 40/24
 42/6 42/7 43/12 44/7 44/14 45/25 48/6
 48/25 50/3 50/4 50/15 55/25 65/24 66/1
 67/2 67/23 71/24 75/3 75/15 77/24 81/5
 81/8 81/11 81/13 92/22 96/5
history [3] 7/3 24/23 62/17
homogeneous [1] 46/19
homogenous [1] 46/16
honestly [1] 11/11
Honeywell [2] 28/12 51/6
Honor [129]
Honor's [9] 18/22 20/7 28/25 38/6 38/16
 39/21 76/1 83/7 93/22
HONORABLE [1] 1/5
hope [2] 16/20 88/7
hopefully [1] 28/25
host [2] 42/8 64/20
hours [1] 16/24
how [122]
how you'd [1] 86/19
how' [1] 50/25
however [5] 9/8 17/22 48/1 66/21 84/9
hypothetical [2] 20/9 46/15 46/19 74/25
 75/7

## I

I'll [6] 11/4 42/24 54/19 63/1 97/17 97/25
I'm [22] 6/20 6/23 10/5 10/5 11/8 11/19
 11/23 12/1 14/1 14/15 16/15 18/19 24/15
 24/17 24/18 37/17 49/2 61/25 74/17 89/17
 91/3 96/20
I've [8] 23/15 23/19 23/23 56/16 63/13 66/8
 75/2 76/4
i-n-g [3] 5/23 6/9 6/10
i.e [2] 19/22 95/13
IBM [1] 12/14
IBM-compatible [1] 12/14
idea [12] 16/24 17/2 17/3 24/11 42/24 47/7
 47/10 68/16 74/4 77/19 81/17 96/4
identical [1] 46/20
identification [3] 64/3 64/13 66/5
identified [8] 19/8 19/21 27/11 28/18 38/1
 61/15 63/4 92/15
identifies [1] 33/24
identify [12] 52/17 53/1 53/2 53/9 53/19
 54/2 55/17 55/19 59/14 63/21 72/5 72/8
identifying [2] 64/5 64/8
if you [1] 79/14
ignore [3] 20/1 50/19 78/15
ignores [2] 49/7 79/5
iii [4] 76/8 87/7 88/17 91/18
illustrate [1] 54/18
illustrated [3] 56/16 57/9 57/17
illustrates [1] 59/12
image [45]
imaged [4] 54/13 82/16 82/21 94/17
images [10] 45/12 54/14 57/2 57/12 57/21
 67/13 67/18 75/2 75/6 75/14
impacts [1] 45/8
implementation [1] 33/18
implies [1] 40/18
import [1] 15/7
important [6] 15/24 30/23 31/3 35/12

53/14 73/4
improper [6] 9/2 9/5 14/24 15/7 29/25
 79/18
improvement [2] 28/21 28/24
improves [1] 17/15
in [354]
INC [2] 1/12 3/6
include [2] 80/6 80/8
includes [1] 79/7
including [5] 5/17 57/18 80/12
inconsistent [7] 24/12 63/10 70/5 71/10
 71/20 77/9 81/6
inconsistently [1] 79/19
incorrect [2] 61/25 78/3
incredibly [1] 66/2
incumbent [1] 29/21
indeed [7] 20/16 32/16 34/8 40/3 41/11
 65/23 70/22
indefinite [7] 9/3 19/22 38/5 39/24 45/19
 70/25 83/10
indefiniteness [7] 28/14 38/10 51/7 59/24
 59/25 70/15 78/22
independent [7] 77/20 88/12 88/20 88/21
 88/24 89/13 89/16
Indiana [1] 36/7
indicates [1] 7/5
indicating [1] 84/10
indication [2] 5/15 24/24
industry [8] 39/18 40/10 40/13 40/14 40/24
 41/1 41/4 76/5
influence [1] 45/3
informal [2] 50/10 50/11
information [1] 8/11
informed [2] 77/25 81/7
infringe [14] 16/14 27/2 38/13 81/1 88/20
 89/13 89/13 89/14 89/15 89/16 89/21 89/22
 89/22 90/2
infringed [1] 17/23
infringement [9] 15/14 15/19 17/17 26/18
 38/8 38/15 48/18 48/20 89/21
infringes [1] 38/11
infringing [4] 15/18 16/5 51/8 51/8
inherent [4] 50/6 76/17 95/15 95/16
initially [1] 14/11
injured [1] 59/7
input [1] 12/10
inquiry [2] 7/7 38/5
inside [5] 64/10 79/22 80/2 80/9 80/12
insofar [1] 38/25
instance [4] 22/10 47/17 48/17 62/19
instances [1] 48/19
instead [1] 65/6
instruction [2] 39/22 41/22
insufficient [2] 33/13 34/5
intend [3] 5/16 7/6 21/18
intended [6] 6/18 7/1 7/4 87/19 96/24 97/4
intending [1] 6/17
intensities [2] 44/23 54/5
intensity [17] 45/16 46/2 46/6 46/9 46/17
 46/24 54/4 54/9 54/10 55/7 55/21 56/3 60/8
 60/12 60/14 63/14 63/16
intent [1] 7/3
interest [45]
interests [1] 42/19
interpret [4] 18/23 24/3 79/15 79/16
interpretation [4] 62/12 81/5 81/24 81/25
interpreting [1] 86/2
interval [3] 55/10 55/11 55/14
into [7] 15/8 36/25 37/7 81/18 81/18 82/11
 82/19
intro [1] 64/3
invalid [3] 90/21 90/22 91/22
invalidate [2] 16/17 60/1
invalidating [1] 16/24
invent [2] 96/6 96/13

**I**

invented [2] 96/4 96/18
invention [3] 30/23 59/10 96/9
inventor [2] 20/18 48/16
inventors [2] 20/18 21/18 28/4 39/10
invoke [4] 5/16 7/1 7/4 7/6
involve [1] 35/23
involved [2] 36/1 36/10
involves [2] 35/19 36/13
IPXL [1] 9/3
irrelevant [7] 9/23 13/23 45/4 49/24 72/21
 81/12 89/2
irrespective [1] 12/22
is [643]
isn't [8] 7/8 8/1 12/4 15/20 18/14 25/14
 49/11 75/7
issue [25] 14/10 20/4 20/16 21/4 26/1
 27/22 29/22 31/22 32/1 39/11 40/21 48/11
 64/1 67/18 68/12 70/16 75/20 77/25 81/3
 81/8 83/13 92/6 92/24 95/8 95/25
issued [1] 74/16
issues [6] 19/6 28/14 76/2 76/3 93/22
 97/19
it [402]
it's [116]
item [1] 3/4
its [10] 4/7 4/19 11/17 13/14 29/19 37/21
 47/3 52/10 62/16 83/4
itself [7] 11/13 38/13 42/7 70/18 70/22
 94/20 96/21

**J**

job [2] 17/8 18/22
joint [1] 93/9
JUDGE [10] 1/5 4/15 6/7 7/10 10/2 29/18
 29/24 32/14 32/22 33/4
judgment [15] 40/12 75/21 78/15 78/17
 78/18 78/21 79/2 83/3 83/9 83/11 83/13
 93/23 93/24 94/7 97/3
jump [1] 17/4
jumped [1] 17/5
jury [2] 14/8 14/19
just [76]

**K**

Kabat [2] 2/6 3/10
key [3] 21/17 34/13 84/13
killing [1] 92/2
kind [2] 21/20 86/3
Kirkland [2] 2/18 3/15
kirkland.com [2] 2/22 2/22
knew [2] 65/25 83/2
knife [1] 59/3
knob [1] 22/17
knock [1] 79/12
know [29] 6/11 15/23 21/7 25/23 30/16
 32/8 43/14 44/21 44/22 47/9 52/22 53/8
 53/11 53/13 55/2 61/16 67/6 72/7 72/17
 72/22 73/7 73/8 73/18 90/4 91/1 91/6 92/4
 96/15 97/25
knowledge [1] 40/8
known [1] 96/10
knows [1] 37/18
Krak [1] 45/2

**L**

lack [2] 41/12 79/12
laid [2] 38/17 92/25
language [46]
larger [5] 41/14 42/11 48/11 63/5 64/10
last [7] 22/4 23/19 65/15 68/11 70/11 75/20
 94/22
last-ditch [1] 65/15
lastly [1] 81/22

late [2] 62/6 69/25
later [4] 25/24 71/18 79/1 88/7
latitude [1] 63/23
law [21] 4/22 5/2 5/21 17/17 18/2 18/23
 20/8 21/2 21/3 21/8 21/14 35/16 36/5 45/18
 59/24 73/22 81/11 88/1 88/7 89/18
lead [7] 44/17 44/23 47/19 48/1 48/23 50/9
 70/21
leads [2] 43/25 45/21
leans [1] 18/21
learned [2] 87/3 87/6
least [4] 37/20 51/21 59/24 60/9
leave [1] 39/17
leaves [3] 42/3 42/15 42/22
left [14] 23/4 23/8 29/16 41/13 41/21 44/21
 47/15 58/11 58/15 58/25 59/10 67/3 75/17
 93/1
less [1] 18/21
let [15] 6/15 7/14 10/4 12/5 18/13 18/16
 19/3 20/24 27/3 29/2 29/3 36/6 57/11 75/23
 97/25
let's [29] 3/17 3/18 3/18 3/20 9/13 10/6
 11/24 14/2 16/11 21/15 22/3 25/11 25/16
 26/14 26/16 29/2 32/6 32/11 34/15 37/10
 37/14 54/23 58/3 58/20 59/20 62/7 72/3
 74/8 75/19
letting [1] 21/7
level [1] 55/11
lever [3] 29/11 36/24 37/6
life [1] 25/24
light [1] 75/15
lightly [1] 86/9
like [13] 20/4 29/12 29/13 33/20 35/9 35/15
 36/15 45/9 62/14 74/3 77/17 80/14 90/21
limit [2] 15/16 25/13
limitation [43]
limitations [10] 77/11 77/12 88/15 88/22
 89/2 90/2 90/14 92/16 93/1 94/1
limited [11] 9/1 12/3 15/4 31/8 78/10 80/4
 84/15 84/19 84/23 84/25 88/3
limits [2] 51/18 96/22
line [15] 19/10 48/25 49/1 52/11 53/4 57/15
 62/21 62/24 62/25 63/13 73/25 74/1 74/3
 74/4 75/7
line 26 [1] 53/4
lines [9] 41/13 43/17 45/14 53/3 53/6 54/1
 54/12 55/3 57/2
link [1] 12/4
Liquid [1] 81/9
listens [1] 92/4
lists [1] 5/18
lit [1] 67/9
literature [4] 41/4 43/8 44/25 50/20
litigation [1] 86/9
little [5] 6/15 20/17 57/20 59/5 59/7
LLP [2] 2/18 3/15
LOCASCIO [14] 2/19 3/15 25/24 29/4
 34/23 35/10 36/17 71/8 71/20 87/1 87/24
 88/10 91/3 91/10
LoCascio's [5] 30/7 37/3 71/4 89/23 91/2
logical [1] 88/18
long [4] 43/18 52/11 76/23 76/25
longer [25] 79/7 82/7 83/21 84/14 84/16
 84/21 84/22 85/9 85/10 85/16 85/18 85/18
 85/22 85/24 86/5 86/16 86/21 87/15 93/15
 94/25 95/17 96/17 96/23 97/2 97/9
look [31] 6/18 6/25 7/2 7/3 10/1 11/24
 17/11 20/14 21/3 21/15 21/23 24/2 28/15
 32/21 32/22 44/24 46/12 56/22 58/20 59/4
 63/25 66/19 74/3 75/14 81/5 81/22 82/20
 94/3 94/9 95/2 95/5
looked [6] 29/10 35/1 41/10 51/3 57/12
 76/19
looking [14] 7/16 9/5 19/5 33/7 45/20
 48/20 51/17 58/12 72/20 73/7 73/8 74/17

**79/21 83/17**
leaks [2] 27/14 51/24
looks [1] 1/16 1/24 2/8 3/1
lose [2] 34/17 34/18
lost [1] 32/3
lot [3] 41/10 55/15 67/19
lots [1] 31/6
love [1] 18/11
lower [4] 4/11 29/14 29/15 36/25
lung [3] 46/2 48/5 49/10

**M**

machine [7] 7/22 15/12 16/4 18/4 26/21
 26/23 76/13
made [6] 38/2 51/13 75/4 75/6 88/11 92/21
magic [1] 23/8
mail [3] 2/10 2/10 2/11
maintain [2] 88/2 88/4
majority [4] 4/14 29/16 73/5 73/16
make [11] 25/23 35/10 44/16 44/19 67/18
 68/21 79/17 81/25 82/12 90/13 94/2
makes [4] 21/14 38/9 45/23 96/6
making [3] 38/7 88/14 90/9
manner [1] 61/12
manual [1] 68/9
manually [9] 41/15 41/22 42/11 57/3 63/6
 69/23 71/12 71/16 71/17
many [5] 41/5 42/5 67/15 71/11 71/15
MARC [2] 2/6 3/9
MARIANA [1] 1/5
Markman [11] 23/23 25/10 28/2 37/21 38/1
 39/7 45/25 50/6 61/14 75/4 76/22
Masco [8] 4/22 22/5 22/16 29/5 29/9 29/10
 29/14 36/19
mat [2] 7/13 33/5
material [2] 40/15 40/16
materially [1] 30/24
materials [1] 67/1
mathematical [1] 44/16
mathematically [1] 45/7
mathematics [1] 70/22
matrix [1] 43/19
matter [19] 3/4 10/14 10/15 16/13 24/23
 25/5 27/15 28/14 47/11 68/15 79/9 85/3
 85/5 85/5 85/6 85/8 85/15 89/14 98/10
matters [1] 38/25
may [17] 3/22 17/14 23/11 25/8 32/12
 34/16 34/17 34/21 41/14 48/10 63/4 71/11
 71/12 71/14 71/15 74/11 88/22
McEldowney [2] 2/19 3/16
me [34]
mean [9] 11/1 15/13 15/15 15/18 31/23
 34/24 54/16 88/20 94/4
meaning [16] 4/24 11/16 13/12 13/14
 13/16 13/19 19/25 24/12 26/2 26/16 46/16
 48/18 48/19 82/16 84/4 95/3
meaningfully [2] 46/10 46/25
means [34]
means-plus-function [11] 5/4 5/6 5/7
 10/21 12/18 12/20 19/16 21/9 23/7 83/6
 83/10
meant [8] 76/20 77/24 77/25 79/3 81/24
 82/19 83/3 87/19
measure [4] 37/24 49/3 68/18 97/14
measured [2] 38/11 38/12
measurement [2] 38/9 46/18
measurements [1] 84/9
measures [2] 39/2 46/1
MEDICAL [6] 1/11 3/5 3/14 50/1 52/1 52/21
meet [13] 15/19 77/20 85/2 85/20 88/16
 88/19 88/22 88/23 89/1 89/23 89/24 90/7
 91/12
meets [6] 77/19 88/15 91/11 92/25 94/1
 97/11
mentioned [1] 86/22

**M**

Mercantile [1] 81/9
met [17] 8/20 17/13 72/15 73/18 78/7 78/8
 85/23 85/25 86/6 87/8 87/16 87/23 89/1
 89/5 89/6 89/6 97/8
method [42]
methods [9] 18/5 31/6 42/18 42/25 52/25
 63/12 68/18 70/21 70/21
mfenster [1] 2/10
microphone [1] 82/5
Microprocessor [1] 60/2
microscope [1] 74/3
mid [1] 55/11
middle [3] 59/4 59/7 64/9
might [5] 23/17 47/5 89/10 90/6 90/11
milliseconds [3] 84/11 84/12 91/8
minute [7] 3/19 12/1 14/2 16/11 25/16
 62/20 66/20
mistake [1] 90/9
mixed [1] 9/3
mole [1] 61/9
moment [2] 87/1 87/2
months [1] 66/3
more [14] 35/6 37/1 43/6 43/22 44/3 44/5
 49/10 63/3 67/19 73/2 73/8 77/8 79/13
 97/20
Moreover [2] 5/8 8/1
morning [5] 3/9 3/13 4/4 18/18 62/7
Moseley [4] 39/9 46/4 48/4 84/7
Moseley's [1] 83/23
most [1] 72/19
motion [14] 3/18 3/20 25/16 34/21 38/25
 40/12 62/18 65/8 78/21 79/23 80/19 88/1
 88/8 97/18
motions [2] 1/21 97/23
mountain [1] 74/3
move [2] 34/20 74/11
moving [2] 41/16 62/11
Mr [19] 20/10 20/25 30/7 34/23 35/9 36/17
 62/4 71/4 71/8 71/20 74/13 87/24 88/10
 89/11 91/2 91/3 91/10 91/18 94/20
Mr. [36]
Mr. Fenster [24] 9/14 16/19 20/3 23/21
 25/4 25/12 29/2 51/15 61/19 61/23 62/2
 62/14 63/6 63/15 64/6 64/15 68/17 69/18
 76/24 83/16 90/12 90/18 90/19 92/21
Mr. Fenster's [6] 19/25 26/2 92/9 92/23
 94/3 96/3
Mr. LoCascio [3] 25/24 29/4 87/1
Mr. LoCascio's [2] 37/3 89/23
Mr. Weiss [1] 62/1
MRI [9] 7/22 12/12 15/12 16/4 18/3 26/21
 26/23 63/21 76/12
MRP [1] 1/10
much [5] 18/21 72/11 72/13 72/20 73/8
multiple [1] 51/4
muscle [6] 52/8 52/9 83/22 84/6 84/10
 84/15
must [12] 17/4 30/3 38/13 68/17 77/20
 88/16 89/6 89/15 89/21 89/22 91/12 92/5
my [16] 3/15 11/15 12/6 17/8 17/23 18/22
 22/8 32/20 33/6 37/12 65/14 74/20 90/11
 90/20 92/6 95/6

**N**

naked [1] 72/13
namely [3] 64/19 76/14 81/11
narrow [1] 76/1
narrowing [4] 60/1 60/4 60/6 88/19
narrows [1] 91/4
near [1] 73/10
necessarily [3] 88/16 89/24 91/12
necessary [3] 14/6 32/9 88/6

need [15] 13/8 14/17 16/23 20/12 26/10
 33/24 44/18 45/18 56/9 59/13 63/9 74/21
 77/20 80/19 81/12
needs [4] 14/5 14/7 32/15 61/20
neither [2] 39/5 65/9
nerve [115]
nerve-to-muscle [1] 52/8
nerves [34]
net [1] 50/13
neural [34]
NEUROGRAFIX [40]
NeuroGrafix' [2] 20/12 21/10
NeuroGrafix's [11] 28/2 40/14 42/5 42/23
 44/2 50/5 61/18 63/7 69/10 81/15 94/21
neurogram [3] 30/25 58/22 59/10
neurography [5] 63/19 63/20 64/19 73/5
 73/14
never [19] 4/8 20/20 24/23 24/24 28/21
 34/18 35/23 39/3 40/8 61/10 61/20 62/4
 62/5 77/22 77/25 78/13 81/7 86/23 86/25
new [13] 18/3 18/4 38/21 77/18 78/1 78/1
 78/3 79/17 81/15 81/24 81/25 82/24 83/22
next [14] 5/5 5/12 5/22 26/14 31/19 47/13
 52/23 55/13 55/21 55/25 56/9 57/16 63/13
 85/21
nice [1] 59/6
nine [2] 19/10 40/7
no [72]
No. [2] 3/5 3/21
No. 3 [1] 3/21
No. CV [1] 3/5
noise [2] 46/17 46/19
noise-free [1] 46/19
non [31] 45/23 46/2 47/18 51/8 56/7 56/11
 56/12 56/12 56/17 56/18 56/21 56/22 56/24
 59/23 60/9 60/14 60/15 60/16 60/17 61/2
 63/8 67/15 68/15 68/19 68/25 69/2 69/6
 75/18 78/5 79/4 79/6
non-infringing [1] 51/8
non-nerve [2] 56/17 56/18
non-neural [28] 45/23 46/2 47/18 56/7
 56/11 56/12 56/12 56/21 56/22 56/24 59/23
 60/9 60/14 60/15 60/16 60/17 61/2 63/8
 67/15 68/15 68/19 68/25 69/2 69/6 75/18
 78/5 79/4 79/6
none [7] 17/3 19/24 26/20 47/6 62/17
 64/15 68/1
nonexpert [1] 38/18
noninfringement [3] 38/8 38/15 77/7
nor [7] 8/16 8/17 39/5 46/11 47/12 65/9
 91/22
normal [4] 13/25 14/6 14/6 59/6
North [1] 1/24
Northern [2] 36/7 78/14
not [237]
notch [1] 55/14
note [1] 63/24
notes [1] 22/8
nothing [8] 5/1 5/9 20/12 20/13 33/20
 35/21 68/7 97/24
notice [1] 86/23
notwithstanding [1] 29/25
novel [1] 28/24
novelty [14] 27/8 27/16 27/24 28/1 28/11
 28/13 28/20 30/6 30/10 30/17 30/18 31/11
 31/17 74/16
now [65]
nowhere [3] 20/4 28/7 93/18
numbers [3] 46/3 46/20 47/23
numerator [2] 53/19 56/3
nutshell [1] 18/25
NW [1] 2/20

**O**

O.I [4] 22/5 22/18 24/2 25/7

object [3] 6/3 6/6 30/7
objection [1] 12/2
objects [1] 6/5
obligations [2] 34/6 65/5
obtain [1] 28/20
obvious [3] 72/13 72/19 76/5
obviously [5] 25/20 32/9 77/19 78/21 88/2
OCTOBER [3] 1/19 3/1 98/12
of,' [1] 5/14
off [5] 5/13 19/3 19/8 20/25 67/11
offer [1] 11/21
Office [1] 80/18
Official [1] 98/14
Oh [4] 10/16 11/12 15/23 27/19
okay [24] 7/15 11/3 11/6 11/15 11/18 14/4
 15/1 16/22 17/1 17/7 18/8 22/4 25/24 26/15
 28/5 39/22 55/13 56/1 63/3 66/14 75/20
 75/23 91/7 91/10
on [175]
onboard [1] 25/25
once [1] 73/2
one [65]
only [30] 4/12 5/25 10/1 13/12 13/12 14/10
 26/3 28/6 32/1 32/20 34/3 40/17 48/2 50/1
 60/21 64/25 70/2 72/16 72/16 73/9 76/7
 77/7 77/17 79/24 80/8 81/5 83/12 94/2
 94/11 97/3
open [4] 15/25 38/1 42/4 47/25
open-ended [2] 15/25 47/25
opening [8] 28/2 40/22 55/25 86/23 87/9
 92/24 93/1 93/18
operate [3] 6/2 11/20 14/18
operating [3] 13/17 93/20 93/21
operation [1] 12/12
operative [1] 59/1
operator [1] 42/15
operators [1] 42/17
opining [1] 81/10
opinion [10] 4/14 4/15 4/16 4/19 6/8 29/16
 36/9 70/2 91/19 95/24
opinions [3] 81/8 81/12 81/13
opposed [3] 5/14 95/4 96/18
opposite [1] 69/14
opposition [11] 42/23 61/12 62/18 65/2
 65/8 66/20 69/10 77/22 79/25 87/3 87/13
options [1] 41/5
or [115]
order [16] 3/17 4/19 11/21 13/5 23/17
 30/13 30/20 30/21 31/10 38/16 52/10 65/5
 89/20 89/21 93/23 97/11
ordinary [10] 13/12 13/14 13/16 13/18
 19/25 24/12 26/2 31/20 32/6 52/16
original [13] 33/16 39/7 45/25 49/8 49/25
 51/2 57/21 58/4 58/9 58/12 58/21 58/22
 89/15
originally [4] 50/4 59/20 78/12 82/19
originated [1] 45/12
Osirix [1] 67/25
other [28] 18/16 18/22 22/4 27/4 28/12
 31/7 33/15 35/11 35/12 35/16 40/9 42/25
 43/23 56/13 56/20 58/14 60/16 64/7 67/16
 68/8 68/19 81/10 83/5 84/21 85/7 94/2 97/2
 97/22
others [4] 32/11 47/6 83/23 96/3
otherwise [1] 47/2
ought [2] 63/25 68/20
our [13] 14/17 43/23 45/9 61/25 80/3 86/24
 87/3 87/8 88/4 88/5 91/17 92/16 97/18
out [23] 5/17 10/6 12/6 12/7 12/23 20/9
 22/10 28/4 28/22 33/2 36/6 38/5 38/17 62/1
 63/15 64/18 67/19 69/23 79/13 87/1 87/12
 92/25 97/10
outcome [3] 20/13 45/4 45/5
outside [8] 31/4 40/5 47/22 78/11 79/19
 80/23 81/5 88/3

**O**

over [6] 23/9 26/13 28/25 41/16 52/7 53/13
62/5 94/6
overall [1] 67/3
overcome [2] 25/9 34/7
overwhelming [2] 73/5 73/16
own [16] 11/17 40/3 40/17 42/25 43/8
44/22 47/1 48/4 50/15 65/12 65/18 68/22
69/10 70/6 74/20 96/5
Oxidal [1] 45/7
Ozsunar [1] 41/6

**P**

p.m [1] 98/4
Pacemakers [10] 22/5 22/9 27/21 27/21
35/1 35/2 35/8 35/12 36/3 36/16
page [10] 24/3 28/3 44/7 49/2 63/18 66/6
85/4 93/1 93/8 93/17
paper [2] 74/1 74/1
paragraph [9] 4/24 5/16 5/17 7/2 7/6 20/1
21/14 57/16 59/1
parameter [2] 52/8 54/8 57/7
parameters [1] 55/1
pardon [7] 21/6 23/15 38/22 61/6 67/15
81/1 89/13
parse [1] 53/11
part [6] 6/20 39/21 56/16 78/21 78/22
89/25
particular [19] 9/2 15/5 15/5 15/16 28/11
41/19 42/24 43/18 43/19 44/20 47/16 69/13
76/16 77/16 78/6 84/24 84/24 88/13 91/21
particularly [1] 68/5
parties [14] 23/3 41/3 76/18 77/9 77/23
78/17 81/20 81/23 82/18 83/2 93/9 93/20
95/9 95/25
parties' [7] 29/17 29/20 30/1 93/6 93/25
94/4 94/10
partner [1] 3/16
passage [2] 22/19 64/16
passages [1] 92/24
passing [1] 22/18
patent [103]
patentee [4] 5/15 7/1 7/4 7/5
patents [2] 33/10 70/13
patient [1] 76/12
pattern [1] 53/3
penned [1] 4/15
people [5] 30/24 43/12 44/16 47/24 76/5
perceive [1] 16/16
perceived [1] 34/3
perceives [1] 31/19
percent [4] 45/17 45/21 45/22 46/4
perfect [1] 60/20
perfectly [2] 18/6 18/7
perform [9] 8/17 10/23 13/7 15/15 16/6
18/1 20/15 28/17 51/1
performed [3] 17/13 39/5 41/15
performing [2] 28/16 43/21
performs [2] 17/21 18/5
perhaps [1] 6/16
peripheral [7] 80/7 82/3 82/13 84/11 93/13
94/15 95/15
permission [1] 87/4
permit [1] 9/21
person [6] 6/18 13/3 40/4 48/16 52/16
52/18
personal [1] 12/14
perspective [2] 17/25 61/8
persuasive [1] 38/2
PFAELZER [1] 1/5
Pharmaceuticals [1] 51/6
phase [2] 14/11 38/22
Phone [2] 2/9 2/21
phrase [2] 5/14 77/1

pick [1] 72/3
piece [7] 22/12 22/25 23/21/14 73/25 74/1
80/14 81/19
pieces [3] 65/22 80/11 80/12
pixel [7] 41/14 42/10 46/16 63/5 63/14 68/9
71/11
pixels [4] 43/19 54/4 67/9 67/13
place [4] 41/23 43/3 43/18 46/21 49/21
53/13 78/24
placement [1] 45/8
places [1] 79/10
plain [3] 56/14 86/4 87/14
plaintiff [7] 1/9 2/4 15/2 38/10 38/23 39/11
63/20
plaintiff's [1] 28/2
plaintiffs [4] 3/12 74/25 87/18 88/3
plan [2] 38/17 38/18
played [1] 20/9
playing [1] 72/10
please [9] 3/7 4/20 5/12 21/5 52/15 61/5
74/9 82/5 83/16
plexus [1] 48/5
plural [1] 82/14
plurality [1] 35/3
plus [60]
point [57]
pointed [3] 46/13 52/4 63/15
pointing [2] 45/14 59/2
pointless [1] 27/4
points [11] 19/7 21/11 46/7 63/24 63/24
64/2 64/6 64/24 90/13 92/20 94/22
pop [1] 67/19
portion [5] 59/7 61/21 69/23 80/9 94/22
position [22] 7/25 9/19 13/6 14/11 14/17
16/8 18/7 21/10 49/25 50/6 50/18 61/11
61/23 63/7 65/6 79/8 88/4 88/5 90/11 94/23
95/23 97/18
positions [2] 78/17 94/8
posits [1] 53/15
possibilities [1] 42/4
possible [2] 92/14 95/7
possibly [1] 73/17
post [1] 57/3
post-processed [1] 57/3
potentially [1] 54/2
practical [1] 10/14
practice [2] 46/15 94/5
practicing [2] 38/24 73/24
preamble [5] 5/12 5/13
preceded [1] 64/7
precedents [1] 34/13
precise [1] 43/6
precisely [1] 11/8
predetermined [3] 30/12 30/19 31/13
predictable [1] 43/15
premise [2] 49/12 94/8
prepared [3] 11/19 11/21 19/7
prescient [1] 66/2
prescribe [1] 44/4
prescribed [1] 24/2
prescribing [1] 44/5
presence [1] 53/2
present [1] 11/18
presented [4] 11/10 11/13 11/13 11/14
PRESIDING [1] 1/6
presumed [2] 6/22 59/25
presumption [6] 6/23 24/22 25/8 25/21
32/23 34/7
presumptively [4] 5/7 23/4 23/7 24/15
previously [6] 23/25 30/21 76/10 84/4 84/5
95/1
prima [1] 34/11
primary [2] 41/4 29/4
principles [1] 68/16
prior [10] 28/25 31/14 31/16 39/7 45/25

80/13 81/18 83/22 88/20 97/7
probably [4] 75/24
problem [4] 20/14 33/6 70/1 73/5
procedural [1] 97/17
procedure [2] 24/2 94/5
proceed [2] 23/17 73/13
proceedings [3] 1/17 98/4 98/10
process [45]
processed [3] 37/4 57/3 57/13
processing [66]
processor [4] 10/16 10/19 33/13 33/14
produced [1] 62/4
program [1] 12/16
programmed [4] 8/4 8/15 8/23 9/20
programming [1] 12/24
prompted [1] 32/19
pronounced [1] 76/4
proper [5] 14/14 15/1 15/3 15/15 83/11
properly [1] 60/2
proposal [1] 32/3
propose [2] 60/4 60/6
proposed [7] 15/2 26/3 31/25 59/20 61/9
77/18 81/15
proposition [1] 46/24
prospect [1] 43/2
protect [1] 88/1
protection [1] 57/18
provide [1] 44/8
providing [3] 36/11 36/13 84/12
provision [2] 4/24 83/1
publications [1] 40/1
pull [1] 22/9
pulled [1] 87/1
pulling [1] 96/5
pulse [2] 76/11 76/12
purely [2] 46/15 65/10
purporting [1] 10/5
purpose [7] 25/15 44/6 44/11 44/15 44/19
50/13 78/15
pursue [1] 27/4
put [18] 15/17 23/16 23/21 24/1 24/7 24/13
29/8 46/13 47/14 62/2 62/4 63/1 65/2 65/13
66/10 86/23 94/4 94/21
puts [2] 62/14 64/15
putting [3] 28/5 67/17 70/3

**Q**

qualify [1] 39/4
quantitative [1] 45/3
quarreling [1] 6/24
query [1] 52/19
question [33]
questions [7] 19/3 30/4 37/22 38/6 51/25
52/15 61/3
quintessential [1] 70/1
quite [2] 32/25 58/13
quote [4] 24/3 28/3 46/23 69/11
quoted [1] 83/25

**R**

Rader [8] 4/15 6/7 7/10 10/2 29/24 32/14
32/22 33/4
Rader's [1] 29/18
radiologists [1] 38/24
raise [2] 32/13
raised [10] 13/13 14/9 14/10 37/21 51/25
52/21 78/13 87/8 87/24 93/19
raises [1] 27/10
raklaw.com [3] 2/10 2/10 2/11
ran [2] 48/5 49/16
random [1] 72/3
range [3] 45/17 45/21 46/3
ranges [1] 77/16
Raters [1] 43/20
ratio [10] 52/6 52/9 52/12 52/14 53/20

# R

ratio... [5] 33/21 54/7 57/7 60/24 77/17
re [1] 96/20
re-arguing [1] 96/20
read [6] 9/12 28/22 64/18 66/8 70/14 97/10
reader [2] 25/24 60/25
reading [4] 19/10 62/8 86/24 91/17
real [8] 10/5 53/7 72/11 72/18 72/23 72/25 73/21 74/7
real-world [1] 72/25
realize [1] 6/16
really [7] 16/21 18/12 53/14 65/21 78/23 79/22 88/11
reason [2] 18/9 79/23
reasonably [2] 72/24 73/23
reasoned [1] 37/1
rebuttal [1] 75/3
rebutted [1] 25/9
recall [2] 54/7 71/22
recited [7] 6/1 10/2 13/7 17/13 17/22 35/17 36/10
recognized [2] 20/14 40/22 83/20
recognizes [1] 25/21
reconsider [2] 4/7 25/17
reconsideration [5] 3/20 80/11 83/13 88/1 88/9
record [4] 3/8 46/12 88/1 98/9
records [1] 40/1
recycled [1] 78/9
red [1] 69/19
refer [2] 24/4 97/6
reference [14] 43/10 43/16 45/2 45/7 64/2 76/6 78/2 80/1 80/14 81/21 85/1 85/14 85/19 92/25
references [3] 12/5 43/9 79/10
referred [4] 77/4 86/10 93/5 93/16
referring [1] 87/21
refers [6] 24/10 85/17 94/11 94/12 94/14 95/6
regarding [1] 29/4
regardless [1] 28/24
region [39]
regions [17] 39/1 44/17 44/17 48/8 48/17 50/21 52/19 53/10 53/18 54/2 54/3 54/6 60/25 61/7 61/12 63/3 71/19
rejected [4] 36/18 36/22 80/5 80/24
relates [1] 76/24
relative [2] 51/19 56/10
relatively [1] 54/2
relaxation [17] 82/3 82/7 82/11 82/12 82/20 82/24 83/21 84/20 93/12 93/14 94/24 95/3 95/5 95/7 95/14 95/17 97/1
relevant [1] 85/13
rely [1] 65/10
remanded [1] 11/6
remember [1] 47/6
reminding [1] 27/7
render [2] 9/3 91/22
renders [2] 38/5 80/23
repeatable [2] 47/4 47/9
repeatedly [1] 47/3
repetition [10] 76/14 77/2 77/11 82/2 86/13 86/19 91/5 93/5 93/11 95/11
replaced [1] 94/13
reply [2] 21/11 28/2
report [18] 40/22 40/24 41/7 45/25 47/22 48/7 48/7 50/1 50/4 50/4 55/25 65/25 66/10 67/23 69/17 75/3 75/4 77/24
Reporter [2] 98/14
REPORTER'S [1] 1/17
reports [4] 38/19 51/2 64/22 67/2
representative [6] 9/17 16/7 28/5 54/3 73/14 73/19
require [2] 8/17 73/22

requirement [4] 15/19 51/18 51/25 86/16
requires [17] 19/22 15/22 18/2 30/12 33/21 50/7 51/20 70/17 73/23 77/8 78/4 81/20 84/22 85/21 86/6 87/14 95/20
requiring [1] 93/11
Research [1] 58/6
reserved [1] 83/8
resolve [2] 11/25 87/19
resort [1] 4/23
respect [20] 26/18 28/9 29/5 30/5 33/10 35/10 37/20 37/25 40/6 40/20 48/22 48/24 49/14 53/21 69/11 71/21 83/5 83/11 88/5 96/21
respectfully [1] 4/6
respond [6] 34/17 34/21 61/23 65/21 92/3 92/20
responding [1] 74/13
response [5] 40/14 46/7 47/3 49/24 76/16
rest [1] 67/10
result [9] 43/15 44/1 45/20 47/11 55/24 65/19 66/22 70/24 76/13
results [8] 39/23 40/3 44/18 46/6 50/9 50/23 56/8 66/20
retained [1] 39/3
retention [1] 39/5
retrieving [2] 36/11 36/14
revelation [2] 84/13 84/25
reverse [3] 35/8 57/22 58/14
reversed [4] 4/12 4/16 29/14 37/5
right [63]
rise [3] 92/7 92/13 92/17
road [1] 43/14
ROI [46]
ROIs [11] 44/23 45/8 45/16 46/11 47/17 47/19 47/22 47/22 49/16 50/9 65/23
Room [1] 1/24
round [3] 33/16 39/7 75/4
route [1] 20/3
RPR [1] 1/23
rule [1] 21/20
ruled [1] 88/2
rules [2] 21/21 78/14
ruling [1] 4/7
running [1] 78/4
runs [1] 48/8
Russ [2] 2/6 3/10

# S

S.O.I.TEC [1] 70/11
said [45]
same [31] 20/14 35/10 40/4 43/14 43/24 44/3 45/5 45/8 45/12 45/20 46/1 46/4 46/17 47/18 48/7 48/8 48/16 48/20 48/24 49/3 49/3 49/16 49/18 50/25 54/20 55/24 58/16 64/9 75/12 76/24 92/10
sample [2] 73/14 73/19
satisfied [1] 91/20
satisfy [5] 33/14 34/5 49/4 49/4 70/13
satisfying [2] 48/23 91/21
saw [2] 49/12 62/6
say [51]
saying [17] 10/6 12/1 14/2 18/14 24/20 82/19 87/7
says [73]
scale [1] 58/13
scan [4] 48/8 48/20 49/3 78/5
scheduling [1] 65/5
sciatic [9] 57/5 57/23 58/16 59/3 59/3 59/6 64/9 68/23 69/3
scope [4] 4/25 51/5 80/13 95/23
score [1] 29/7
screen [9] 23/15 23/20 23/23 62/3 63/1 64/15 66/19 75/1 84/18
Seal [16] 4/14 4/18 6/8 7/10 7/11 22/4 22/23 23/2 25/6 29/13 29/16 32/14 32/21

32/22 33/21 33/22
Seal-Flex [16] 4/14 4/18 6/8 7/10 7/11 22/4 22/23 23/2 25/6 29/13 29/16 32/14 32/21 32/22 33/21 33/22
SEAN [4] 2/19 3/16 23/10 27/12
sean.mceldowney [1] 2/22
second [14] 11/5 27/17 36/6 37/16 37/25 39/17 39/21 52/18 53/20 57/2 57/13 62/22 64/14 71/20
seconds [1] 91/12
section [12] 4/24 5/16 7/1 21/14 21/23 46/19 47/18 58/1 63/18 64/3 64/7 69/24
sections [2] 23/16 57/5
see [41]
seek [2] 87/25 88/8
seem [1] 48/10
seems [2] 21/10 51/24
seen [1] 4/2
segmentation [3] 54/23 55/1 67/24
select [17] 42/18 47/19 52/18 52/22 52/24 52/24 53/10 56/4 56/5 56/14 57/6 64/19 67/21 69/12 70/8 71/13 82/1
selected [12] 42/11 46/11 46/18 47/18 54/19 55/20 56/18 57/8 58/24 68/24 71/12 71/19
selecting [11] 38/3 40/13 42/4 42/18 57/3 57/13 71/9 86/18 91/5 91/11 95/10
selection [5] 41/15 47/7 49/5 50/15 75/15
selections [1] 38/7
selects [2] 54/22 72/6
semantic [1] 92/1
sense [4] 68/21 79/17 81/9 81/25
sensing [1] 5/19
separate [3] 31/10 32/8 97/15
sequence [7] 76/11 76/12 77/4 77/5 77/8 93/4 93/16
series [2] 57/3 57/13
set [27] 5/17 7/10 8/11 9/8 9/18 10/23 11/21 13/6 13/7 13/18 16/8 23/2 23/6 28/11 29/12 30/14 30/21 31/11 34/2 37/4 37/7 44/4 46/5 55/7 55/9 57/21 70/10
sets [4] 5/13 28/5 48/8 56/7
setting [1] 91/16
settings [6] 41/25 48/23 64/15 66/18 68/4 68/9
seven [13] 7/11 7/12 23/10 23/14 23/19 23/24 24/3 37/18 43/24 48/6 54/1 56/20 76/22
several [1] 23/16
sewed [1] 59/8
shape [6] 7/24 9/18 13/6 16/8 41/23 69/13
shapes [2] 46/10 46/25
sheer [1] 66/1
shifting [1] 78/17
shod [1] 50/16
shortcut [1] 6/15
shorter [3] 79/4 81/16 96/18
shot [1] 66/19
should [11] 4/16 6/10 24/24 48/13 60/7 68/14 78/1 81/12 83/3 87/11 95/12
shouldn't [2] 22/21 60/1
show [17] 30/15 30/21 30/25 31/10 31/12 43/8 45/15 47/8 47/12 50/5 57/16 65/18 67/16 73/15 73/17 74/12 89/3
showed [5] 52/20 62/4 67/1 67/12 69/18 71/20
showing [7] 4/25 5/8 38/2 40/3 64/7 64/9 85/13
shown [13] 12/10 48/22 49/15 55/8 58/2 58/10 58/15 58/15 58/25 59/11 77/1 84/17 88/25
shows [19] 15/14 30/14 31/14 44/23 54/25 57/17 59/17 57/22 58/11 58/22 61/22 64/6 67/14 74/1 80/1 80/14 80/21 80/21 81/16
side [15] 18/16 18/19 19/1 23/24 39/8

**S**
Slide... [10] 42/21 45/14 47/21 55/3 58/10
58/10 62/10 67/12 75/1 94/7
sides [2] 38/19 78/24
Siemans [1] 3/14
SIEMENS [14] 1/11 3/5 3/14 31/13 32/2
37/21 38/2 38/20 50/1 52/1 52/21 53/15
86/8 93/8
Siemens' [6] 14/11 42/3 86/23 92/7 93/1
97/18
signal [8] 45/16 46/1 46/2 46/9 46/17 46/24
60/12 60/14
significant [2] 95/24 95/25
significantly [1] 49/9
Silicon [1] 70/11
similar [3] 23/5 43/24 48/12
simply [5] 42/3 67/24 85/25 94/6 96/2
since [1] 62/8
single [8] 39/6 41/14 42/10 63/5 71/11 76/7
81/19 95/21
situation [8] 4/12 23/1 26/4 38/13 44/15
84/19 84/24 96/17
situations [1] 84/15
six [24] 4/24 5/16 7/2 7/4 7/6 12/10 20/1
20/7 21/14 22/15 22/21 23/3 29/22 32/23
34/6 34/11 47/5 47/21 48/6 66/3 79/5 79/5
79/14 79/17
size [4] 41/23 43/19 49/21 69/13
sizes [2] 46/10 46/25
skill [11] 37/23 47/20 50/17 52/16 52/18
52/22 53/8 56/2 72/24 73/24 75/13
skilled [4] 9/21 13/3 13/3 47/24
slide [68]
slider [2] 55/16 72/4
slides [5] 3/23 23/11 37/17 47/13 54/20
slip [1] 50/16
slow [1] 21/5
slug [1] 22/18
SM [2] 52/7 54/9
small [2] 45/15 71/14
SN [2] 52/6 54/8
so [110]
software [16] 7/17 8/23 12/22 13/19 20/20
33/7 33/10 33/17 35/13 35/14 35/18 35/19
35/23 36/1 54/23 67/25
solution [1] 90/25
SOLUTIONS [6] 1/11 3/5 3/14 50/2 52/1
52/21
some [22] 10/8 12/23 19/6 19/6 21/21
23/11 23/21 24/5 26/21 27/1 27/1 31/1 31/1
33/10 34/4 51/25 59/5 61/7 69/23 75/7
93/19 97/14
somebody [1] 10/8
Somebody's [1] 12/16
somehow [8] 65/23 71/9 79/22 80/4 86/24
86/24 87/17 87/24
someone [3] 17/21 43/14 44/19
something [22] 14/19 22/6 22/20 22/25
24/7 27/22 27/23 29/7 31/25 35/25 50/13
52/17 71/2 73/20 77/8 77/14 81/10 82/19
90/8 92/15 95/12 96/8
somewhere [1] 67/9
sorry [2] 49/2 82/6
sort [8] 20/17 20/24 27/1 27/1 41/25 44/9
59/6 69/22
sought [2] 80/11 93/23
space [10] 78/12 79/23 80/2 80/9 80/12
80/23 81/3 81/6 88/4 96/20
speak [1] 29/2
spec [4] 12/3 12/5 25/13 25/14
specific [12] 15/21 30/9 30/11 31/8 31/8
44/3 44/5 51/25 64/5 67/24 69/8 89/2
specifically [11] 35/22 38/21 40/6 43/3
43/22 48/12 52/25 69/9 74/19 75/24 77/11

specification [20] 18/1 18/1 19/24 24/23
26/11 33/25 41/9 41/18 42/1 56/23 56/22
60/7 61/21 61/22 62/16 63/11 63/17 68/12
69/2 70/7
specificity [1] 73/22
specifics [2] 3/24 44/8
specified [2] 60/25 61/11
specifies [1] 17/18
specify [3] 8/16 56/21 60/10
spelled [1] 87/12
spend [1] 77/20
spent [2] 16/23 17/3
spin [40]
spin-spin [20] 82/2 82/6 82/11 82/12 84/20
85/16 85/17 86/5 86/14 87/15 93/12 93/14
94/24 95/3 95/5 95/6 95/14 95/16 96/22
97/1
spinal [5] 31/4 85/4 85/5 85/7 85/15
spreading [7] 7/12 22/23 22/24 22/25
29/13 33/1 33/3
Spring [1] 1/24
square [1] 75/15
stacked [1] 84/24
stand [3] 16/3 94/25 97/18
stand-alone [1] 94/25
standard [14] 8/1 39/14 39/15 39/18 40/6
40/10 40/13 40/17 40/21 40/23 40/25 41/2
41/4 44/20
standing [1] 23/4
standpoint [1] 20/11
start [5] 3/18 3/20 19/3 20/25 81/2
started [1] 90/12
state [3] 3/7 21/2 90/11
statement [3] 88/12 88/18 93/10
STATES [2] 1/1 1/23
stenographic [1] 98/9
step [72]
step-plus-function [49]
steps [24] 5/13 5/14 5/14 5/17 5/18 8/17
13/7 15/8 17/12 17/22 18/2 18/5 24/1 24/3
24/3 24/6 24/8 24/8 24/13 24/20 34/9 34/10
35/9 70/9
still [5] 18/4 27/4 43/2 46/22 81/21
stipulate [1] 93/10
stipulated [2] 78/16 93/7
stipulating [1] 93/4
stipulation [3] 86/11 86/22 87/11
stop [2] 16/21 75/19
story [1] 66/1
Street [1] 1/24 2/20
strike [1] 65/8
strikes [1] 18/23
structure [6] 7/25 19/21 19/23 33/8 46/16
46/16
structures [1] 30/15
struggled [1] 60/22
studies [3] 73/5 73/14 73/19
stuff [3] 55/15 55/18 57/23
sub [2] 52/9 52/9
subarachnoid [1] 81/6
subject [1] 80/13
subjective [6] 38/4 45/8 51/9 52/13 52/19
70/7
submission [5] 61/13 62/6 65/20 69/10
69/25
submissions [1] 39/8
submit [5] 13/11 35/5 73/1 73/14 74/5
submits [1] 67/23
submitted [10] 38/19 50/4 50/4 50/12
66/19 67/2 70/20 75/10 77/24 97/25
substantially [14] 45/19 82/7 83/21 84/14
84/21 84/22 85/9 85/10 85/22 86/5 93/15
94/25 95/17 97/2
such [3] 17/18 21/10 81/16
sufficient [2] 35/7 53/1

suggest [10] 16/1 31/21 32/4 35/16 35/21
36/2 50/8 50/16 64/16 79/15
suggested [1] 91/8
suggesting [1] 68/17
suggestion [3] 37/12 92/21 93/18
suggests [4] 36/3 45/4 46/9 94/6
Suite [1] 2/20
summary [15] 40/12 75/21 78/15 78/17
78/18 78/21 79/2 83/3 83/9 83/11 83/12
93/23 93/24 94/6 97/3
Supp [1] 36/12
support [6] 35/15 47/7 47/10 50/5 70/2
70/3
supported [1] 17/25
supports [2] 46/23 62/17
suppression [2] 53/5 79/11
sure [9] 18/17 21/6 27/18 47/20 62/1 62/23
64/12 68/6 74/22
surgery [3] 31/1 31/2 59/2
surgical [1] 59/1
surgically [1] 31/1
surprise [2] 22/22 68/1
surprising [1] 22/14
Surprisingly [2] 84/8 84/9
surreply [1] 87/5
surround [2] 59/18 71/17
surrounded [1] 85/3
surrounding [26] 30/15 51/21 57/9 59/17
60/18 77/3 82/8 84/21 84/23 85/6 85/7
85/11 85/19 85/23 85/24 86/6 86/17 86/21
87/16 93/15 95/18 95/21 96/18 96/23 97/2
97/9
surrounds [1] 84/16
sutures [2] 59/5 59/8
sweeping [1] 46/24
synchronize [1] 12/12
synonymized [1] 24/6
synonymous [1] 24/20
system [5] 12/9 12/12 54/12 63/20 64/19

**T**
T2 [55]
tab [3] 23/18 23/19 37/16
tack [4] 7/12 22/24 25/15 33/3
take [14] 25/15 40/21 55/21 56/5 57/11
59/14 61/11 67/13 77/2 79/9 79/16 82/18
84/24 88/6
taken [1] 59/1
takes [2] 55/13 56/18
taking [4] 34/9 34/10 46/20 59/12
talk [7] 20/6 21/3 21/3 22/4 74/13 76/13
82/23
talked [5] 27/23 33/16 44/6 65/20 69/7
talking [8] 17/6 21/24 28/12 34/19 64/4
68/22 73/20 91/16
talks [5] 23/20 27/20 43/11 68/16 77/13
taught [1] 40/19
TE [7] 77/12 84/3 84/6 84/6 91/16 93/5
94/19
teach [2] 42/1 88/22
teaches [12] 43/1 47/12 50/25 52/6 52/23
52/25 53/4 53/10 56/1 56/2 76/6 88/21
teaching [1] 47/8
teachings [1] 47/25
technique [3] 79/12 96/10 97/7
technique to [1] 79/12
techniques [1] 70/12
technology [2] 17/14 17/20
teeth [1] 79/1
telephone [1] 38/16
television [1] 71/24
tell [31] 9/12 9/12 9/13 10/7 14/8 18/13
20/5 26/12 28/8 33/22 36/17 36/21 36/23
39/18 41/18 41/24 44/19 50/21 51/5 52/3
53/16 56/23 60/25 62/8 64/14 65/17 66/18

# T

fair... [4] 66/22 68/4 70/17 95/11
telling [3] 43/17 44/16 54/9
tells [9] 12/14 24/11 33/20 41/11 43/3 53/22 54/15 57/6 59/11
template [1] 43/20
ten [1] 46/9
term [15] 28/10 31/20 31/21 32/6 33/12 41/12 63/20 77/18 77/24 78/1 78/11 79/12 79/19 80/4 94/9
terms [4] 17/25 31/18 32/7 60/4
test [1] 49/7
tested [1] 70/4
testified [1] 20/19
testify [1] 26/17
testimony [8] 28/6 39/25 46/13 53/14 65/2 65/9 65/12 70/1
text [1] 43/17
textbook [1] 38/10
than [48]
thank [12] 3/25 4/1 21/6 23/13 27/6 37/11 51/14 55/5 96/12 98/1 98/2 98/3
that [636]
that's [59]
their [45]
them [12] 4/3 14/8 15/10 18/23 19/5 23/16 38/19 38/25 64/10 65/3 70/19 88/24
themselves [3] 50/24 75/1 80/20
then [42]
theory [1] 16/2
there [72]
there's [23] 16/3 18/9 20/3 20/15 21/10 22/19 39/22 40/21 40/22 41/1 41/3 41/5 41/22 42/21 45/16 55/1 65/21 67/20 69/8 72/15 73/16 80/15 83/6
therefore [3] 34/24 89/1 89/6
therein [1] 52/12
these [36]
they [106]
they'd [1] 20/20
they're [8] 5/6 44/21 58/14 59/2 64/4 73/24 82/17 83/7
they've [3] 20/22 24/21 83/8
thing [15] 21/10 34/3 43/24 44/3 45/8 46/4 49/18 50/25 56/14 70/2 74/12 76/7 76/24 95/1 95/21
things [12] 21/22 35/5 49/19 49/20 61/19 67/16 70/6 70/14 72/6 76/1 90/2 94/15
think [43]
thinking [3] 9/6 12/6 19/5
thinks [2] 32/5 87/17
Third [1] 39/21
Thirty [1] 21/8
Thirty-five [1] 21/8
thorough [1] 78/20
those [36]
though [3] 23/3 58/13 66/3
thought [5] 80/19 84/5 87/10 87/20 90/25
thoughtful [1] 29/18
three [56]
three-dimensional [1] 28/4
threshold [8] 55/2 55/8 61/1 66/23 67/12 67/18 68/4 72/3
thresholding [36]
through [38]
throughout [1] 69/9
time [36]
timely [1] 67/2
times [11] 49/10 59/24 60/10 78/5 79/4 81/19 85/4 85/13 85/13 91/17 95/12
tissue [59]
tissues [1] 81/16
today [4] 3/10 3/23 20/16 36/2
together [4] 59/9 92/7 92/13 92/17
told [2] 76/4 77/25
too [2] 7/14 55/17
took [2] 57/25 76/18
top [8] 46/8 54/25 56/5 58/7 59/2 69/7 83/19 84/8
totally [1] 16/18
TR [4] 77/12 91/16 93/5 94/19
track [1] 43/19
traditional [1] 22/12
transcript [2] 1/17 98/9
transitive [2] 6/2 6/3
transmit [1] 36/21
transmitted [1] 37/2
transmitting [7] 22/16 29/6 29/11 36/20 36/24 37/1 37/6
tries [1] 42/23
trigeminal [3] 80/1 80/16 80/17
troubled [1] 16/15
true [4] 6/4 15/20 49/5 98/8
try [4] 24/22 65/11
trying [2] 10/5 82/17
Tsuruda [1] 20/18
tune [2] 83/4 94/7
turn [3] 67/7 67/8 82/19
turned [1] 62/5
TV [2] 67/7 67/8
Twenty [1] 64/9
two [52]
two-centimeter [5] 58/2 58/24 61/21 68/12 71/16
type [3] 23/10 27/12 94/19
types [2] 84/13 95/7

# U

U-n-g [1] 3/11
U.S [1] 1/5
U.S.C [2] 21/8 21/14
ultimate [1] 20/13
ultimately [2] 32/22 83/7
unclear [1] 14/7
uncontroverted [2] 40/12 40/20
undefined [1] 27/1
under [14] 9/3 10/17 16/2 20/7 34/6 39/4 49/17 50/15 70/11 78/14 81/9 81/15 93/21 93/25
underlying [2] 38/2 88/23
undermines [1] 50/17
underneath [1] 47/23
understand [9] 6/23 12/2 14/20 14/21 17/6 17/17 18/24 90/8 90/9
understanding [2] 17/24 88/11
understands [1] 88/7
understood [1] 90/15
undisputably [1] 7/5
undisputed [6] 51/20 52/23 75/2 85/1 85/10 85/17
undisputedly [1] 86/7
unfeasible [2] 84/4 84/5
unfortunate [1] 81/8
UNG [2] 2/7 3/11
unique [1] 92/15
uniqueness [1] 33/17
UNITED [2] 1/1 1/23
University [2] 31/5 58/6
unknown [2] 30/22 31/3
unless [6] 5/8 60/1 61/3 68/8 89/3 96/24
until [6] 31/3 61/12 69/9 72/4 73/18 86/25
unwilling [1] 4/23
up [31] 4/10 12/5 15/3 16/12 18/3 20/24 22/9 23/21 25/2 31/3 31/14 37/16 40/4 45/5 46/5 55/9 55/14 55/14 58/1 63/1 65/6 67/8 67/9 67/16 70/9 80/19 88/6 90/12 94/21 96/4 96/5
upon [7] 6/5 29/21 39/13 76/25 91/17 93/21 94/9
urge [2] 32/2 37/8
urges [1] 34/23
US [12] 10/3 32/14 36/2 56/23 57/6 73/13 95/11
USA [2] 1/11 3/6
use [41]
used [21] 8/17 13/19 13/20 15/14 24/19 30/24 34/11 38/11 38/12 41/19 41/20 41/20 46/11 46/25 50/24 54/1 61/1 61/1 63/20 65/23 70/13
useless [1] 66/18
user [7] 37/23 39/17 41/13 42/22 43/7 43/17 78/4
users [1] 44/21
uses [3] 13/4 54/22 77/5
using [27] 3/23 16/5 19/18 24/5 26/21 26/23 30/19 36/11 36/14 42/4 47/17 54/14 55/20 55/23 56/25 57/7 58/23 59/10 60/13 60/23 67/25 72/12 75/4 75/5 77/14 84/6 93/16
usually [1] 96/19
utilizing [1] 7/22

# V

vague [1] 66/17
valid [2] 36/4 59/25
valuable [1] 78/25
values [1] 77/3
variety [1] 41/21
various [2] 16/12 76/5
vector [5] 5/19 30/13 30/20 31/9 31/16
venture [1] 16/25
verb [10] 5/24 6/3 6/4 6/9 22/6 22/19 22/24 27/22 27/23 35/17
verbs [3] 6/2 6/5 33/1
version [1] 78/9
versus [5] 3/5 48/5 68/19 68/19 88/12
very [12] 15/17 15/21 16/1 20/14 28/18 28/18 30/9 30/24 51/25 64/18 67/15 72/16
vessels [2] 68/25 68/25
via [3] 61/13 63/9 70/23
view [7] 18/22 20/12 65/14 90/20 92/6 92/7 92/9
view and [1] 92/6
violating [1] 65/4
virtually [1] 24/20
vis [2] 67/10 67/10
vis-a-vis [1] 67/10
voxel [5] 41/14 42/10 63/5 68/9 71/14

# W

wait [6] 8/10 8/14 11/24 12/5 62/20 62/22
waiting [2] 76/23 76/25
waive [2] 86/15 96/25
waived [3] 86/25 87/10 87/17
waiving [1] 88/8
wake [1] 66/12
walk [8] 19/6 30/11 37/17 39/16 39/20 39/25 61/22 75/23
walked [1] 61/19
want [33]
wanted [1] 25/23
wants [3] 32/4 47/9 50/24
warranted [2] 31/21 32/6
was [112]
Washington [2] 2/20 31/5 58/6
wasn't [5] 20/23 23/4 33/6 70/4 88/3
way [50]
ways [11] 16/12 24/5 41/11 41/21 42/8 44/3 50/22 51/4 61/7 64/20 65/19
we [164]
we'd [3] 38/18 38/18 38/19
we'll [12] 3/23 15/3 31/12 31/13 31/22 31/24 39/16 39/20 40/16 45/23 64/13 88/6
we're [25] 3/11 7/16 11/25 12/8 13/25

## W

we're... [20]  2/7 2/23 28/12 34/19 34/20 45/20
51/17 58/12 61/25 62/17 66/6 67/11 73/20
74/6 78/20 79/21 86/2 86/2 86/3 88/7 88/7
we've [10]  24/6 33/16 43/9 46/12 65/20
76/3 83/13 88/25 94/5 97/14
WEDNESDAY [2]  1/19 3/1
weight [1]  36/5
weighted [8]  30/13 30/19 31/9 31/15 77/4
77/8 93/3 93/16
weighting [21]  53/5 76/14 76/21 77/12
77/14 82/18 86/14 86/20 87/22 93/6 94/18
95/1 95/14 96/2 96/4 96/6 96/7 96/8 96/14
97/6 97/7
WEISS [3]  2/7 3/10 62/1
well [42]
went [2]  35/11 91/25
were [19]  5/20 12/19 16/25 23/22 25/25
36/10 37/21 38/6 39/8 43/20 57/3 57/13
66/13 69/4 73/25 75/4 86/23 86/24 96/7
whack [1]  61/8
what [188]
what's [6]  9/6 15/11 21/2 27/3 44/4 68/3
whatever [8]  8/18 9/9 12/3 13/4 17/22
26/16 41/12 61/9
when [35]
where [53]
whereas [3]  6/13 24/10 51/4
whereby [1]  34/4
wherein [7]  82/6 84/20 85/20 87/23 93/14
94/24 97/1
whether [31]  7/1 7/2 7/3 10/2 11/12 12/22
13/23 14/7 16/13 17/11 24/21 31/13 32/1
32/17 35/17 35/24 35/25 38/8 50/13 52/17
61/8 72/22 72/23 73/19 73/20 73/24 86/20
87/23 95/22 97/8 97/8
which [63]
while [4]  25/8 29/16 52/10 84/11
white [7]  57/23 58/15 64/10 64/10 67/9
85/5 85/8
who [9]  6/18 8/4 38/8 38/20 40/23 62/8
70/19 76/5 88/10
whoever [1]  6/16
whole [8]  38/17 56/5 56/14 61/14 64/18
78/19 79/11 95/1
why [10]  4/16 15/6 18/9 30/3 47/9 49/11
79/25 80/18 87/4 92/25
will [18]  11/18 14/19 16/3 16/14 17/23
34/18 45/5 46/10 46/24 47/8 53/9 62/1
67/13 67/25 72/19 73/15 90/12 97/25
Wilshire [1]  2/8
wish [1]  60/20
wishes [1]  97/15
within [8]  32/9 40/4 46/18 54/22 63/4
63/14 63/19 95/22
without [7]  4/25 13/21 19/21 33/15 36/9
37/1 44/20
withstanding [1]  29/20
witnesses [2]  43/10 47/1
word [7]  6/10 14/6 14/7 34/12 37/1 50/10
82/11
words [7]  23/8 56/13 82/23 92/1 92/2
92/22 94/24
work [3]  45/11 76/5 83/23
working [1]  45/12
world [4]  72/11 72/18 72/25 74/7
would [67]
wouldn't [6]  10/12 12/23 20/21 20/24
73/17 92/15
write [2]  21/21 21/22
writing [1]  32/18
written [8]  5/3 5/6 24/25 24/25 62/15 62/15
76/17 91/16
wrong [6]  12/6 16/18 16/19 81/13 91/3
94/9
wrongly [1]  23/17

## Y

yeah [1]  46/19
year [1]  94/6
years [1]  16/11
yellow [1]  45/14
yes [27]  4/3 6/11 6/25 8/13 9/16 11/12
15/13 16/8 17/14 17/21 18/15 30/16 34/22
42/20 49/6 51/23 55/4 55/12 58/8 58/19
69/21 71/7 71/23 73/3 75/22 89/9 91/9
yesterday [1]  30/25
yet [3]  31/16 49/23 84/1
you [315]
you that [1]  73/1
you'd [11]  12/3 12/4 15/18 19/23 26/1 26/3
42/17 44/3 46/19 74/3 86/19
you'll [4]  30/10 43/16 45/6 45/14
you're [9]  6/17 7/11 10/6 14/15 15/25 16/5
17/6 18/14 44/15
you've [2]  18/22 51/13
your [157]

## Z

Zawadzki [18]  38/23 38/24 39/2 40/7 40/23
41/9 42/6 43/11 47/1 48/3 48/21 50/23
61/18 66/16 66/22 69/11 70/6 87/2
Zawadzki's [1]  80/25
zoom [1]  22/10
zoomed [2]  64/10 74/2